IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JAMES WEBSTER,

                              Plaintiff,

                                             Civ. Action No.
          vs.                                9:08-CV-0071 (LEK/DEP)

BRIAN FISCHER, Commissioner
NYS-DOCS, *et al.,*

                    Defendants.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

JAMES WEBSTER, *Pro Se*
Mohawk Correctional Facility
P.O. Box 8451
Rome, New York 13440

FOR DEFENDANTS:

HON. ANDREW M. CUOMO         CHRISTINA ROBERTS-RYBA, ESQ.
Attorney General of the State   ASST. ATTORNEY GENERAL
of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

          Plaintiff James Webster, a prison inmate who is proceeding *pro se*

and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1993, *inter alia*, complaining of civil rights violations allegedly occurring while he was confined at the Cayuga Correctional Facility ("Cayuga"), a prison operated by the New York State Department of Correctional Services ("DOCS"). The plaintiff's complaint centers upon a series of events which he attributes to retaliatory motives on the part of prison officials at Cayuga allegedly resulting from his involvement in the facility's Inmate Liaison Committee ("ILC"). The plaintiff asserts that he suffered discrimination, retaliation, and harassment because of complaints he made regarding prison conditions while on the ILC and alleges violations of various constitutional rights, federal statutes, state law, and DOCS regulations. To redress the alleged violations, the plaintiff seeks a declaratory judgment and injunctive relief, as well as money damages in the amount of $500,000.

Presently before the court is defendants' motion for summary judgment seeking dismissal of the plaintiff's claims. In their motion, defendants argue that plaintiff's claims should be dismissed for failure to state and support viable causes of action and, as to several of the named defendants, due to lack of their personal involvement in the alleged

constitutional violations.

Having carefully considered the record now before the court I recommend that defendants' motion, in response to which plaintiff has offered only modest opposition, be granted and his complaint be dismissed in its entirety.

I.      BACKGROUND[1]

At all times relevant to the complaint, the plaintiff was a prison inmate entrusted to the custody of the DOCS and confined at Cayuga. Complaint (Dkt. No. 1) ¶¶ 1, 11.  The actions giving rise to plaintiffs' claims began at or around the time of his transfer into an Alcohol and Substance Abuse Treatment ("ASAT") dormitory at the facility, known as the F-2 unit, in December of 2005.[2]  Id. ¶¶ 11-12.

Among the corrections officers assigned to work in the F-2 unit at the relevant times was defendant Robert Clink.  Clink Decl. (Dkt. No. 44-13) ¶ 3.  According to defendant Clink, who was on vacation at the time

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

[2]      The F-2 unit is comprised of "cubes" in which approximately sixty inmates are housed.  See Transcript of Plaintiff's Deposition ("Webster Tr.") (Dkt. No. 44-2) p. 53; see also Clink Decl. (Dkt. No. 44-13) ¶ 3.

that plaintiff entered the unit, his philosophy is that applicable prison rules should be strictly enforced, particularly given that the unit houses inmates with histories of substance or alcohol abuse.  *Id.*

When inspecting the unit upon his return from vacation, defendant Clink observed that Webster's living area did not comply with ASAT cube standards; as a result of his finding, Corrections Officer Clink left a written warning for Webster.  *See* Clink Decl. (Dkt. No. 44-13) Exh. A (Memorandum dated January 1, 2006).  Later that day, plaintiff approached Clink to discuss the written warning.  Even though plaintiff had received and signed for an ASAT program manual when entering the unit (which included within it the governing standards for maintaining a cube), Clink took the time to explain the ASAT standards to him.  *Id.* at ¶ 10 and Exh. A.  Webster had apparently also received prior written warnings of cube standards violations on December 13 and 27, 2005, before Clink returned from vacation, and he subsequently received two more, on January 12 and 30, 2006, the latter two of which resulted in the issuance of misbehavior reports to plaintiff.  *Id.*

According to plaintiff, his difficulties with Corrections Officer Clink began when Clink learned that Webster was running for the position of

dormitory representative to the ILC.  Webster Tr. (Dkt. No. 44-2) pp. 55-56.  Plaintiff overheard a conversation in which one of the inmates in the unit informed Corrections Officer Clink of this fact, to which Clink replied that "ILC guys don't last long over here." *Id.* at p. 56.  Thereafter, every time Clink issued Webster a misbehavior report he would make a negative comment about the fact that he was on the ILC. *Id.* at pp. 62-64.

Plaintiff began lodging complaints against Corrections Officer Clink on January 30, 2006.  *See* Roberts-Ryba Aff. (Dkt. No. 44-4) Exh. A pp. 30-36 (unnumbered).  On that date, as well as again on February 10 and February 16, 2006, plaintiff wrote letters to the superintendent of the facility, with copies to the DOCS Inspector General, alleging that Corrections Officer Clink was harassing him as a result of Webster's position with the ILC and also claiming that the cube violations charged and subsequent misbehavior reports issued by defendant Clink were retaliatory.  *See id.*  Corrections Officer Clink responded in writing to each denying any harassment, or that his actions were in any way motivated by Webster's position on the ILC.  *See* Clink Decl. (Dkt. No. 44-13) Exh. A. In his written response, Corrections Officer Clink offered his view that plaintiff's problems stemmed from his inability to deal with the strict

enforcement of the rules in the ASAT unit.  *See id.*

Plaintiff's complaints regarding Corrections Officer Clink's alleged harassment and retaliation were investigated by Corrections Captain R. Chapin, another named defendant in the action, who interviewed plaintiff on more than one occasion; the findings resulting from defendant Chapin's investigation are memorialized in a memorandum prepared by him on March 2, 2006.  Roberts-Ryba Aff. (Dkt. 44-4) Exh. A p. 42 (unnumbered).  In it Captain Chapin reported that during a meeting on March 1, 2006 Webster advised that his relationship with Corrections Officer Clink was good and that there were no further problems.[3]  *See id.* Chapin also noted that plaintiff declined to identify witnesses to the alleged harassment and that he requested Webster to forward any future security concerns to him.  *See id.*  In his report defendant Chapin concluded that there was no evidence of harassment and that it was his "strong opinion that Webster is having difficultly with the ASAT program." *Id.*

---

[3]     Defendant Chapin's memorandum of March 2, 2006, as well as the declaration of Michael P. Corcoran, *see* Corcoran Decl. (Dkt. No. 44-9) ¶ 20, also reference a letter of complaint dated February 22, 2006 from plaintiff to former DOCS Commissioner Goord. That letter, however, is not included in the record, and although the Corcoran declaration refers to several exhibits, none were attached to the copy of his declaration filed with the court.

On February 10, 2006, after reporting to Corrections Officer Clink that he was going to Jumah services, by his own later admission plaintiff instead went to an ILC meeting at the commissary.  *Id.*  When Corrections Officer Clink called to confirm that plaintiff was present at the Jumah services, he learned that Webster was not.  *Id.*  Clink subsequently questioned Webster who lied and said that he had been called out of Jumah services for an ILC meeting when he had not attended religious services at all.  *Id.*  As a result, Corrections Officer Clink issued Webster another misbehavior report on February 10, 2006, charging plaintiff with making false statements, being out of place in the facility, and failing to follow facility regulations, all in violation of prison rules.  Clink Decl. (Dkt. No. 44-13) Exh. B.

Plaintiff was afforded a Tier II disciplinary hearing, held on February 17, 2006, with respect to these charges.[4]  Clink Decl. (Dkt. No. 44-13) Exh. C.  Although the charge of making false statements was dismissed,

---

[4]      The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU").  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

at the close of the hearing, in light of his admission that he had signed up for Jumah services but had instead gone to the commissary for an ILC meeting Webster was found guilty of being out of place and of a movement violation; as a result, he was sentenced to a loss of recreation, microwave, and telephone privileges for a period of fifteen days.  *Id.* at pp. 4-5, 15.  Plaintiff did not appeal this disciplinary determination.

The February 17, 2006 disciplinary proceeding was followed by another occurring approximately two months later due to plaintiff's repeated failure to comply with a written medical restriction.  On April 12, 2006, a member of the health services staff at Cayuga issued a medical restriction excusing Webster from all programs, including his position as a school porter, ASAT, and recreation, expressly stating that "inmate must remain in housing unit - may watch TV" until April 26, 2006.  *See* Roberts-Ryba Aff. (Dkt. No. 44-4) Exh. A at p. 45 (unnumbered).  Copies of the medical excuse, which was signed by the plaintiff and a registered nurse at the facility, were provided to prison officials stationed at the F-2 unit, the program committee, the work area, and plaintiff.  *See id.*

Despite this limitation on plaintiff's activities, Webster apparently continued to attended programs and activities.  As a result, on April 14,

8

2006 plaintiff was issued three separate misbehavior reports from three different corrections officers, all relating to violation of the medical restriction.  The first of those disciplinary charges occurred at 8:20 a.m. on that day when Webster approached Corrections Officer Clink's desk and stated that he was going to the facility gym to conduct ILC business.  Clink Decl. (Dkt. No. 44-13) ¶¶ 15-17 and Exh. F.   Clink informed Webster that he could not do so because of his medical restriction, and Webster became loud and argumentative, stating to Clink, "I'm going to write you up."  *Id.*  As a result of the incident, Corrections Officer Clink issued plaintiff a misbehavior report  for conduct disturbing order at the facility and harassing a corrections employee.  *Id.*  Later that same day, at approximately 6:35 p.m., plaintiff received a second misbehavior report from Corrections Officer Smith, accusing him of disobeying a direct order and being out of place, again due to the fact that he left his dorm notwithstanding his medical restriction.  Hoadley Decl. (Dkt. No. 44-11) ¶ 15.

Shortly thereafter Sergeant Hoadley, who is the ILC staff advisor, attended an ILC meeting being held in the facility library and found plaintiff also in attendance, despite the medical restriction and the misbehavior

reports issued to him earlier that day.  *Id.* at ¶¶ 11-12.  Based upon that unauthorized attendance at the ILC meeting, defendant Hoadley issued plaintiff his third misbehavior report of the day, and his second for being out of place in violation of prison rule 109.10.  *Id.*

A Tier II disciplinary hearing was conducted on April 18 and 19, 2006 in connection with all three misbehavior reports.  *See* Hoadley Decl. (Dkt. No. 44-11) Exh. C.  At the hearing the charges were read to plaintiff, and, after his understanding of them was confirmed, plaintiff denied all of the charges lodged against him.  Clink Decl. (Dkt. No. 44-13) ¶ 19 and Exh. G.  The evidentiary portion of the hearing proceeded, and Webster was permitted to call witnesses on his own behalf.  *Id.*  At the close of the proceedings the hearing officer dismissed the charges contained in the misbehavior report issued by Corrections Officer Smith as redundant to that issued by defendant Hoadley, but found plaintiff guilty of all other charges and sentenced him to thirty days of keeplock confinement with a concomitant loss of recreation, microwave, telephone, package, and commissary privileges.[5]  *Id.,* Exh. G at p. 28 and Exh. H.  Plaintiff

---

[5]       Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others and depriving him or her of participation in normal prison activities.  *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp.2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n.2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. &

appealed the hearing officer's decision to defendant Michael Corcoran, the Superintendent at Cayuga, who affirmed that determination.  Hoadley Decl. (Dkt. No. 44-11) Exh. D.

Plaintiff claims that he discussed his complaints regarding Corrections Officer Clink's harassment with defendant Hoadley and that in response Hoadley informed plaintiff that Clink did not like ILC members in his dorm.  Webster Tr. (Dkt. No. 44-2) p. 109.  According to plaintiff, he responded by telling defendant Hoadley that he did not want any trouble and asked Hoadley to speak with Clink on his behalf.  *Id.*  Plaintiff also claims that he complained to Hoadley that after certain changes to ASAT rules were made by the administration, Corrections Officer Clink nonetheless refused to acknowledge the changes.[6]  *Id.* at p. 111.

Plaintiff complains that defendant Hoadley, like Clink, harassed and

---

Homer, M.J.) (citing, *inter alia, Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998).  While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day with one hour for exercise.  *Id.*  Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals.  *Id.*  The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs and are usually allowed less time out of their cells on the weekends.  *Id.*

[6]     It is not clear from the record before the court when plaintiff is alleged to have made these complaints to Hoadley.

threatened him.  Plaintiff alleges that on September 24, 2006, as he was exiting the law library, Hoadley confiscated a legal folder from him. Webster Tr. (Dkt. No. 44-2) pp. 120-21, 128-30.  When Hoadley took the folder, Webster's legal papers fell on the floor, and some went into a vent and were lost.  *Id.* at p. 132.  Plaintiff alleges that he filed a grievance regarding the incident and because of this was later threatened by Hoadley to "watch his back."[7]  *Id.* at p. 135.

Hoadley denies harassing or retaliating against plaintiff and maintains that he was unaware of any complaints by the plaintiff regarding Corrections Officer Clink, that he was not Clink's supervisor, and that he did not even work the same shift as Clink.  Hoadley Decl. (Dkt. No. 44-11) ¶ 7.  While Hoadley acknowledges having taken plaintiff's folder, he asserts that the folder in Webster's possession was for ILC members only and that in September of 2006 plaintiff was no longer a member of the ILC.[8]  *Id.* at ¶ 20.

---

[7]     There is no written grievance dated September 24, 2006 contained in the record.

[8]     The statement that plaintiff was no longer a member of the ILC in September of 2006 appears to be inconsistent with other evidence in the record suggesting that plaintiff remained on the ILC, and served as its chair, until May 2, 2007.  *See*, *e.g.* Hoadley Decl. (Dkt. No. 44-11) Exh. F and Corcoran Decl. (Dkt. No. 44-9) ¶ 29.  This fact issue is not outcome determinative, however, and thus does not stand as an impediment to the granting of defendants' summary judgment motion.

On February 7, 2007, plaintiff filed a written grievance claiming that Sergeant Hoadley was harassing him in retaliation for his activities on the ILC and that Hoadley had instructed him that all ILC correspondence must be reviewed and approved by Hoadley in advance; plaintiff's grievance requested that Hoadley be removed from the ILC advisor position due to a conflict of interest.[9]  Roberts-Ryba Aff. (Dkt. No. 44-4) Exh. A p. 14 (unnumbered); Hoadley Decl. (Dkt. No. 44-11) ¶ 22.  At the direction of the Superintendent Corcoran, an investigation of plaintiff's grievance was conducted.[10]  *See* Hoadley Decl. (Dkt. No. 44-11) Exh. E.

Sergeant Hoadley responded in writing to Webster's grievance complaint to the Commissioner.  Hoadley Decl. (Dkt. No. 44-11) ¶ 24 and Exh. F.  In his memorandum Hoadley confirmed that he had met with Webster on the evening of February 7, 2007 and explained that during that encounter he asked Webster why, without Sergeant Hoadley's prior

---

[9]   It appears that this letter was received by the deputy superintendent on February 12, 2007, and it is referred to in the grievance case history by that date.  *See* Roberts-Ryba Aff. (Dkt. No. 44-4) Exh. A p. 21 (unnumbered).

[10]   Apparently Webster also sent a written complaint, dated February 13, 2007, to the DOCS Commissioner reiterating his allegation of harassment by Hoadley.  Corcoran Decl. (Dkt. No. 44-9) ¶ 12.  A copy of that complaint is not included in the record.  It is unclear whether a separate investigation was conducted with respect to that complaint, or whether the complaint was addressed in the context of the investigation of the February 7, 2007 complaint.  The record seems to suggest, however, that separate investigations resulted from the two complaints.

approval as staff advisor to the ILC, plaintiff had sent two letters, dated

January 29, 2007 and February 2, 2007, to the superintendent and others

complaining of certain prison conditions.  *Id.*  Regarding the need for prior

approval of these letters, during the conversation Hoadley pointed out that

DOCS Directive No. 4760, Section II, Subsection D, requires that inmate

organizations be under the direct supervision of a staff advisor.  *Id.*  In

response to Hoadley's comments Webster disputed that the ILC was

required to obtain prior approval before sending letters to the

administration and challenged Sergeant Hoadley to prove him wrong.  *Id.*

In his memorandum, defendant Hoadley recounted that Webster became

argumentative during the conversation and that he warned Webster that

he was close to issuing a misbehavior report.

Sergeant Hoadley also denied plaintiff's allegations of retaliation and

a purported conflict of interest in serving as both staff advisor to the ILC

and a member of the Inmate Grievance Review Committee ("IGRC"),

adding that "Webster appears to [be] 'covering his back' and affording

himself an alibi in attempt to perhaps become more and more antagonistic

while serving as Chairman of the ILC."  Hoadley Decl. (Dkt. No. 44-11)

Exh. F p. 3.  In a later written addendum to the memorandum, Hoadley

acknowledged that he subsequently learned from the superintendent and deputy superintendent that the ILC is not considered an inmate organization for the purposes of Directive No. 4760; Hoadley nonetheless continued to deny any harassment of Webster.  *Id.*

Plaintiff's grievance against defendant Hoadley was referred by the IGRC to the facility superintendent, who denied the grievance, advising that Directive No. 4760 relieves the ILC from the constraints imposed on other inmate organizations, but stating that "given the recent misleading and inaccurate correspondence authored on behalf of the ILC by the grievant, he would be well served to have his correspondence reviewed by a knowledgeable party."  Hoadley Decl. (Dkt. No. 44-11) Exh. E p. 7. Plaintiff appealed that unfavorable determination to the DOCS Central Office Review Committee ("CORC"), which upheld the superintendent's determination, clarifying that plaintiff's assertion that Hoadley's position as ILC advisor was in conflict with his position on the IRGC was without merit and advising that the grievance program is not intended to support an adversary process.  *Id.* at p. 1.

Defendant Thomas Napoli, a DOCS employee who at the relevant times served as the inmate grievance supervisor at Cayuga, was

responsible for taking all inmate complaints, researching them, and

attempting to obtain informal resolution; if unsuccessful, it was his duty to

provide involved DOCS employees with the information necessary to

initiate an appropriate investigation.  Napoli Decl. (Dkt. No. 44-8) ¶¶ 3-4.

In or about March of 2007, Napoli attended an ILC meeting during which

he heard the vice chairperson of the ILC make derogatory remarks

regarding the superintendent.  *Id.* at ¶¶ 9-10.  On the following day Napoli

interviewed some inmates, including an inmate named Shuts who was

scheduled to be released from prison.  *Id.* at ¶ 11.  Shuts reported to

Napoli that plaintiff and the vice chairperson of the ILC were attempting to

intimidate other ILC members and pursue their own agendas.  *Id.*

Conduct of that nature is contrary to the role of the ILC, whose purpose is

to provide effective communications between inmates and the prison

administration for accurate dissemination and exchange of information.

*Id.* at ¶ 8; *see also* DOCS Directive No. 4002.  On March 1, 2007 Napoli

issued plaintiff a misbehavior report directly as a result of the information

received from inmates as well as his observations while in attendance at

the ILC meeting.  *Id.* at ¶ 8 and Exh. A.  Napoli cited plaintiff for violation

of prison rules as a result of his intimidation and harassment of other

inmates involved on the ILC.

Defendant David Halcott, who at the relevant times was a corrections lieutenant at Cayuga and served as the watch commander for all shifts, as well as a hearing officer, received information corroborating what Napoli had reported regarding plaintiff's actions on the ILC.  Halcott Decl. (Dkt. No. 44-10) ¶¶ 4-5, 12.  Halcott interviewed three inmates; like Shuts, all three reported that plaintiff had a negative attitude toward the administration and that plaintiff and the vice chairperson of the ILC recommended that nobody speak directly to the administration and instead circumvent their authority. *Id*. at ¶ 12.  As a result of this information, Halcott co-signed the March 1, 2007 misbehavior report, which charged the plaintiff with organizing to the detriment of the order of the facility, providing false statements, and harassment in violation of prison rules.  Halcott Decl. (Dkt No. 44-10) ¶ 8 and Exh. A.

A Tier III disciplinary hearing was conducted by defendant Robert Chapin over a two-day period, concluding on March 5, 2007, to address the charges lodged in the March 1, 2007 misbehavior report.  Halcott Decl. (Dkt. No. 44-10) ¶ 11 and Exh. B.  At the close of the hearing plaintiff was found guilty of all three charges and sentenced to three months in

disciplinary SHU confinement, with a corresponding  loss of package, commissary, and telephone privileges.[11]  *Id.*; *see also* Chapin Decl. (Dkt. No. 44-6) ¶¶ 4, 11 and Exhs. A and B.  An appeal of that determination to the DOCS central office resulted in modification of the hearing officer's finding, ordering dismissal of the charge of organizing a demonstration, but with no resulting change in the penalty imposed.  Chapin Decl. (Dkt. No. 44-6) ¶ 13 and Exh. C.

On or about May 14, 2006, after serving an SHU disciplinary sentence, plaintiff was assigned to a two-person cell occupied by another inmate despite having a medical exemption from double-bunking. Complaint (Dkt. No. 1) ¶¶ 49-50.  The record is equivocal as to what followed and the chronology of the relevant events.  In his complaint, plaintiff alleges that on the following day he brought his medical exemption to the attention of defendant Michael Maher, the deputy superintendent of security at the facility, but Maher failed to take any action.  *Id.* at ¶¶ 50-56.

---

[11]     SHU is a more restrictive form of disciplinary confinement than keeplock, although inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one of hour of outdoor exercise per day.  *Id.*  They are entitled to unlimited legal visits and one non-legal visit per week.  *Id.*  SHU inmates have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

According to defendant Maher, he was not aware that plaintiff had such an exemption until receiving a letter dated August 14, 2006 from the plaintiff requesting reassignment to a single cube with a window based upon his medical permit.  Maher Decl. (Dkt. No. 44-12) ¶ 6 and Exh. A. Upon receipt of this letter, Deputy Superintendent Maher assigned a member of his staff to look into the matter.  On August 18, 2006 Maher received a memorandum advising that plaintiff did in fact possess a medical permit for a single cube, but nothing in the medical permit required that he also be located near a window.  *Id.* at ¶ 7 and Exh. B. Accordingly, plaintiff was moved to a single cube on that same date.  *Id.*

The last of plaintiff's claims surrounds his contention that certain of his mail was withheld by defendant A. Costello, the mail room supervisor at Cayuga.  *See* Complaint (Dkt. No. 1) ¶ 84.  Plaintiff attributes the alleged withholding of his mail to a mail watch implemented by prison officials at Cayuga.  *Id.* ¶ 83.  The record, however, fails to support plaintiff's surmise in this regard.  After being placed on notice of the allegation defendant Costello reviewed all mail watch requests submitted by the superintendent, the only person at the facility authorized to implement a mail watch, between November of 2006 through the end of

2009; that review failed to substantiate plaintiff's claim that he was ever put on mail watch during that time period.[12]   Costello Decl. (Dkt. No. 44-5) ¶¶ 5-7.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on January 18, 2008.  Dkt. No. 1. Named as defendants in plaintiff's complaint, all in both their individual and official capacities, are Brian Fischer, Commissioner of the DOCS; Michael Corcoran, the superintendent at Cayuga; Michael Maher, the deputy superintendent of the facility; Corrections Sergeant Vincent Hoadley; Thomas Napoli, the inmate grievance supervisor at Cayuga; Corrections Officer R. Clink; Anne Costello, a mail room supervisor at Cayuga; Corrections Captain Robert Chapin; and Corrections Lieutenant David Halcott.   *Id*.  Plaintiff alleges that his civil rights complaint is filed pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and additionally requests that the court exercise supplemental jurisdiction over his state law tort claims.[13]  *Id.*  The essence of plaintiff's complaint is that he

---

[12]    Although defendants' motion includes an affidavit from Superintendent Corcoran addressing other matters, the affidavit does not address plaintiff's mail watch claim.  *See* Corcoran Decl. (Dkt. No. 44-9).

[13]    Plaintiff's complaint does not separately state and identify his purported state law claims.

suffered discrimination, harassment, and adverse actions taken by prison officials as a result of his position with and activities while on the ILC.  *See generally id.*  Webster claims violations of the First, Eighth and Fourteenth Amendments to the United States Constitution as well as state laws and regulations.  Liberally construed, also included within plaintiff's complaint are what appear to be claims of illegal search and seizure, deliberate indifference to his medical needs, conspiracy, and damages for loss of personal property.

On June 1, 2009, following the completion of pretrial discovery, defendants filed a motion for summary judgment seeking dismissal plaintiff's entire complaint.  Dkt. No. 28.  In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) plaintiff has failed to establish personal involvement on the part of defendants Fischer, Costello, and Corcoran; 2) he has failed to state viable retaliation, due process, and medical indifference claims, or claims under sections 1981, 1985 and 1986; and, 3) plaintiff has failed to adequately allege state law tort claims.  Plaintiff has since filed an opposition to the defendants' motion, consisting of a two-page written, unsworn statement.[14]  Dkt. No.

---

[14]     With their motion, defendants properly filed with the court a statement of materials facts alleged not to be in dispute, as required under Northern District of New

55.   Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

---

York Local Rule 7.1(a)(3).  Under that rule, in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it, in matching numbered paragraphs.  N.D.N.Y.L.R. 7.1(a)(3).  In light of plaintiff's failure to provide such a statement, the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement are now deemed to have been admitted by him.  *Id.; see, e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).  As will be seen, however, my recommendation in this matter does not hinge upon those deemed admissions.

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).  When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

   B.   <u>Personal Involvement</u>

   In their motion, defendants first seek dismissal of plaintiff's claims against defendants Fischer, Costello, and Corcoran, on the basis that he has failed to show their personal involvement in the alleged constitutional violations.  Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The three defendants on whose behalf this argument is made appear to have been named by Webster as defendants by virtue of their supervisory positions within the DOCS.  It should be noted, however that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability.  *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the extent that [a] complaint attempts to

assert a failure-to-supervise claim . . .  [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").  Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds*, *sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 2931(2009); *see also, Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

### 1.   Commissioner Fischer

Plaintiff's complaint names Commissioner Fischer in a single cause of action alleging that he was responsible for supervision of inmates and correctional employees and that he was notified in letters sent throughout

the period between January and March 2006 of Corrections Officer Clink's retaliatory conduct.  Complaint (Dkt. No. 1) ¶¶ 22, 26.  During his deposition, plaintiff clarified that he seeks to hold defendant Fischer liable because "he's the Commissioner of Correctional Services [,and]  he was made aware of the situation . . . through letters."  Webster Tr. (Dkt. No.44-2) pp. 26-27, 47.

In a declaration in support of defendants' motion, Fischer states that as commissioner and chief executive officer of the DOCS, he is responsible for the overall management of the agency and that the day-to-day management of the prison facilities within the system is within the responsibility of the superintendent of each facility.  Fischer Decl.  (Dkt. No. 44-7) ¶¶ 5-6.  As Commissioner of the DOCS, Fischer  receives thousands of letters each year from inmates and other individuals on behalf of inmates.  *Id.*  When an inmate letter arrives, typically a clerical staff member within his office will review it and determine the particular division or bureau to which the letter should be forwarded along with an instruction to prepare a response or to take whatever action the official deems appropriate, including in some cases making no response.  *Id.* at ¶ 6.  Commissioner Fischer further states that although a review of the

records of the Commissioner's office shows that plaintiff sent three letters addressed to him, dated January 29, 2007, March 1, 2007, and April 17, 2007, he does not recall these letters, and he did not personally respond to them; instead, they were handled by members of his staff.  *Id.* at ¶¶ 8-9.

The January 29, 2007 and April 17, 2007 letters do not relate to any of the constitutional violations alleged in plaintiff's complaint; rather, in those letters plaintiff complains about the alleged improper use of ILC funds and requests an accounting.  *Id.* at Exh A.  It is true that plaintiff did allege in the March 1, 2007 letter that he was being retaliated against for having sent the prior letters regarding the use of ILC funds.  *See id.* However, plaintiff has produced nothing but this single letter in an attempt to sustain liability against Fischer.  There is no evidence that Fischer had knowledge of and failed to remedy any unconstitutional conduct, that he created or allowed to continue a policy or custom under which retaliation was permitted to occur, or that he knew of and failed to act on information indicating that plaintiff's rights were being violated.  "[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."  *Greenwaldt v. Coughlin*,

No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) (citing, *inter alia, Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).  Accordingly, I recommend that plaintiff's claims against Fischer be dismissed.

2.   <u>Superintendent Corcoran</u>

Turning next to plaintiff's claims against Superintendent Corcoran, his complaint alleges two causes of action against Corcoran, the first asserting supervisory liability for Corrections Officer Clink's retaliatory conduct, and the other claiming damages for loss of his personal property at the time of his transfer to another DOCS facility.  For the most part, Webster's claims against defendant Corcoran are premised upon letters written to him by the plaintiff as well as a few conversations with the plaintiff during which Webster "explained to him the treatment [he] was getting."  Webster Tr. (Dkt. No. 44-2) pp. 37-38.  Plaintiff alleges that Superintendent Corcoran is responsible as a supervisor for both incidents and that he was notified of defendant Clink's harassment by written complaints sent by the plaintiff in January through March, 2006 timeframe. Complaint (Dkt. No. 1) ¶¶ 20, 25, 77.

Corcoran, who is the superintendent of Cayuga, states that he has
no recollection of plaintiff.  Corcoran Decl. (Dkt. No. 44-9) ¶ 5.  Corcoran
acknowledges that facility records reveal plaintiff filed a grievance claiming
harassment on February 12, 2007, complained of retaliation in a letter
dated March 6, 2007 to Superintendent Corcoran, and wrote letters to the
Commissioner dated February 22, 2006 and February 13, 2007
complaining of matters which defendant Corcoran was requested to
investigate.  *Id*. at ¶¶ 7, 13, 20, 24.  Superintendent Corcoran delegated
the responsibility to conduct investigations with regard to all of those
matters.  *Id.* at ¶¶ 9, 16, 23, 26.  Plaintiff's grievance of February 12, 2007
was denied, and on appeal the denial was affirmed by the CORC.
Corcoran Decl. at ¶ 11; *see also* Hoadley Decl. (Dkt. No. 44-11) Exh. E.
The investigations of plaintiff's letters all concluded that no DOCS
employee had engaged in improper conduct.  *Id.* at ¶¶ 22, 25.  As with
Commissioner Fischer, plaintiff has failed to produce evidence
establishing Corcoran's personal involvement with respect to the majority
of the claims alleged in the complaint.

To the extent that plaintiff's retaliation claim encompasses his
removal from the ILC, however, the record shows sufficient personal

involvement on behalf of Corcoran.  Corcoran admits that he exercised his

discretion in removing plaintiff from the ILC after receiving the Napoli and

Halcott misbehavior report of March 2, 2007.  Corcoran Decl.  (Dkt. No.

44-9) ¶¶ 27-28.  For purposes of that claim, defendants' motion to dismiss

plaintiff's complaint as against Superintendent Corcoran based upon lack

of personal involvement should be denied.[15]

### 3.    Senior Mail and Supply Clerk Costello

With regard to defendant Anne Costello, plaintiff's complaint alleges

that she initiated and/or participated in an illegal watch of plaintiff's mail.[16]

Complaint (Dkt. No. 1) ¶¶ 83-88.  Costello is a senior mail and supply

clerk at Cayuga responsible for supervising mail room staff during her

shift.  Costello Decl. (Dkt. No. 44-5) ¶¶ 2-3.  Costello affirms that she

never met Webster, and that only the superintendent of the facility has

authority to institute a mail watch.  *Id.* at ¶ 5.  Costello advises that upon

receipt of plaintiff's complaint in this action Costello conducted search of

facility records for the period of November 2006 through 2009 which

---

[15]    As will be seen, plaintiff's retaliation claim against defendant Corcoran is nonetheless destined to fail on the merits.  *See* pp. 45 - 47, *post.*

[16]    While plaintiff refers to defendant Costello in the masculine, from the record before the court it appears clear that she is a woman.  *See* Costello Decl. (Dkt. No. 44-5).

revealed that the superintendent did not institute a watch of plaintiff's mail ordered during that period of time.  *Id*. at ¶ 7.  Plaintiff admits that he never met Costello and that he has sued her simply because she was the supervisor of the mail room at the relevant times.  *Id.* at p. 43.

"[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."  *Richardson*, 347 F.3d at 435 (citations omitted).  For this reason, plaintiff's allegations against Costello are patently insufficient to establish the requisite personal involvement in the constitutional violations alleged.  *See*, *e.g.*, *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (same).  I therefore recommend that plaintiff's claims against defendant Costello be dismissed.

In sum, for the foregoing reasons I recommend that all claims against Costello and Fischer, and all those against Corcoran with the exception of plaintiff's retaliation cause of action insofar as plaintiff alleges that his removal from the ILC was an adverse action taken as a result of constitutionally protected conduct, be dismissed for lack of personal

involvement.

    C.    <u>Retaliation</u>

To support his claim of retaliation Webster alleges that his First Amendment rights were violated because he was involved in the ILC and voiced complaints regarding the facility administration and institutional policies.   Plaintiff contends that as a result of this constitutionally protected activity he was subjected to harassment and threats, disciplinary charges were lodged against him, and ultimately he was removed from the ILC.  Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of these claims as legally insufficient.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach

such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *sub. nom Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Davis* v. Goord, 320 F.3d 346, 352 (2d Cir. 2003).

In order to establish a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must prove that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492.  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.  If taken for both proper and improper reasons, state action may be upheld if the action would have

been taken based on the proper reasons alone.  *Graham v. Henderson*,

89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires thoughtful consideration

of the protected activity in which the inmate plaintiff has engaged, the

adverse action taken against him or her, and the evidence tending to link

the two.  When such claims, which are exceedingly case specific, are

alleged in only a conclusory fashion and are not supported by evidence

establishing the requisite nexus between any protected activity and the

adverse action complained of, a defendant is entitled to summary

judgment dismissing a plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at

13.

### 1.    Defendants Clink and Hoadley

In essence, plaintiff alleges that he was harassed by Corrections

Officer Clink commencing when he entered the ASAT unit because Clink

did not like the presence of ILC representatives in his dorm.  Plaintiff

maintains that he filed a complaint against defendant Clink for

discriminating against and harassing him, and that thereafter defendants

Clink and Hoadley retaliated against him by, among other things, issuing

the April 14, 2006 misbehavior reports and subjecting him to disciplinary

action.

It is well recognized that the filing of a grievance is protected conduct and can thus satisfy the first prong of a retaliation claim. *Graham*, 89 F.3d at 80.  The right of an ILC member to voice criticisms regarding prison conditions is also a clearly established constitutional right.  *Shaheen v. Filion*, No. 9:04-CV-625, 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006 (Scullin, S.J. & Homer, M.J.) (citing *Simmat v. Manson*, 535 F. Supp. 1115, 1117-18 (D. Conn. 1982)).  Plaintiff has therefore sufficiently alleged that his engagement in constitutionally protected conduct.  Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action by way of a prison disciplinary proceeding and sanctions; he has, therefore, also established the adverse action element of his retaliation claim.  *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004).

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York*, 477 F. Supp.2d 546, 558 (N.D.N.Y. 2007).  Mere conclusory allegations of such retaliatory motivation will not suffice to withstand a summary judgment motion; to

establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is normally lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F. Supp.2d 327, 339 (S.D.N.Y. 2000).

On January 30, 2006, plaintiff filed a grievance alleging harassment by defendant Clink.  Roberts-Ryba Aff. (Dkt. No. 44-4) Exh. A pp. 30-36 (unnumbered).  Plaintiff later sent two letters, dated February 10 and 16, 2006, to Superintendent Corcoran voicing the same complaints.  *See id.* Plaintiff also claims that he complained about Clink directly to Hoadley. Webster Tr. (Dkt. No. 44-2) p. 111.  Several weeks later, on April14, 2006, Clink and Hoadley authored separate misbehavior reports accusing plaintiff of failing to comply with his medical restriction.[17]

It is true that a closeness in time between protected activity and the issuance of a misbehavior report can sometimes give rise to an inference that the two are connected and suffice to defeat a summary judgment

---

[17]     Those misbehavior reports accused plaintiff of attending an ILC meeting without authorization, and thus being out of place, after being told that he was under medical restriction from participation in program and recreation due to chronic back injuries and was therefore not allowed to leave his dorm.  Complaint (Dkt. No. 1) ¶¶ 33, 40.

motion seeking dismissal of a retaliation claim.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty,* 713 F.2d at 14).  In many circumstances, however, this alone is insufficient to avoid summary judgment.  *Williams v. Goord,* 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (citing *Ayers v. Stewart*, 1996 WL 346049, at *1 (2d Cir. 1999)); *see also Ethier v. City of Cohoes*, No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006) (McAvoy, S. J.).  Notably, in this case, at least two months passed between plaintiff's complaints and the April 14, 2006 misbehavior reports and the resulting determination that plaintiff was guilty of the charges, which was issued at the conclusion of disciplinary hearing on April 19, 2009.  Accordingly, at the outset it is questionable whether the disciplinary action followed plaintiff's complaints close enough in time to raise an inference of retaliation.

Even assuming the requisite proximity in time exists to support an inference that the protected activity and adverse action are linked, the overwhelming evidence in the record proves that this alone is insufficient to establish a retaliatory motive in this case.  Considering first plaintiff's disciplinary history, in certain circumstances prior good behavior may supply evidence of such motive.  *Barclay*, 477 F. Supp.2d at 558.   In this

case, however, the plaintiff is unable to rely on a favorable disciplinary

record to prove his claim.  To the contrary, the record reveals that plaintiff

began receiving cube violations and misbehavior reports soon after he

entered the more restrictive F-2 unit, even before Corrections Officer

Clink, who was responsible for supervising the ASAT program, returned

from his vacation.  Plaintiff soon responded by making accusations

against Clink, and later against Hoadley.  Each of plaintiff's accusations

was investigated and found to be without merit, and it was suggested that

plaintiff was having difficulty abiding by the strictly enforced rules in the

ASAT program.  The evidence suggests that plaintiff was issued at least

three misbehavior reports before April of 2006, *see* Clink Decl. (Dkt. No.

44-13) Exh. A, one of which is included in the record before the court.[18]

Corrections Officer Clink issued Webster a misbehavior report on

February 10, 2006 for lying about his whereabouts, a violation of which

plaintiff was found guilty after a disciplinary hearing, and for which he

received disciplinary sanctions, but did not appeal.  *See* Clink Decl. (Dkt.

---

[18]     As was previously noted, plaintiff was issued a misbehavior report on
February 10, 2006 based upon his admission that despite signing up for Jumah
services when he left his cube area, he instead went to the commissary.  Clink Decl.
(Dkt. No. 44-13) Exhs. B and C. I do not construe plaintiff's complaint as alleging that
this misbehavior report was issued in retaliation for his having engaged in protected
activity.

No. 44-13) Exh. B.

On April 14, 2006, plaintiff was issued not one but three separate misbehavior reports by three different corrections officers, one of whom is not named as a defendant in this lawsuit.  On that date, plaintiff admittedly was under medical restriction providing that he be excused from all activities and programs and confined to his housing unit.  Notwithstanding this restriction, on three different occasions that day plaintiff attempted to attend activities outside of his F-2 dorm unit.  In the face of his first misbehavior report at 8:20 a.m. that morning and a warning from defendant Clink that he was restricted and could not attend any outside program, plaintiff apparently continued to do so.  Here, plaintiff's prior poor disciplinary record undermines his contention that the April 14, 2006 misbehavior reports were solely retaliatory.

If plaintiff were able to point to a finding of not guilty on the charges in these misbehavior reports, then there might be some question as to retaliatory motive.  *See Rivera*, 119 F. Supp.2d at 339.  Here again, however, the record belies plaintiff's bald claim of retaliation.  At the Tier II hearing conducted with respect to all three April 16, 2006 misbehavior reports, plaintiff acknowledged not only his written medical restriction, but

that he had left his housing unit for other activities, arguing that the

restriction did not really mean that he was completely prohibited from

leaving the F-2 unit and that another unnamed officer had permitted him

to go to the commissary despite his medical restriction.  In light of these

admissions, at the close of the hearing plaintiff was found guilty of all

charges contained in both the Clink and Hoadley misbehavior reports.

Based upon the record as a whole, I conclude that no reasonable

factfinder could find that the misbehavior reports issued on April 14, 2006

were in retaliation for plaintiff's protected activity.  For this reason, I

recommend dismissal of plaintiff's retaliation claims against defendants

Clink and Hoadley.

### 2.    Defendants Napoli, Halcott, and Chapin

Plaintiff also alleges retaliation with respect to defendants Napoli,

Halcott, and Chapin, asserting that the March 1, 2007 misbehavior report

written by defendant Napoli and co-signed by defendant Halcott was

issued only because Webster made written and oral statements,

demands, and requests involving changes in institutional conditions,

policies, rules, regulations, and laws affecting the institution.  According to

plaintiff, Hearing Officer Chapin's finding of guilt on all charges contained

in that misbehavior report was likewise retaliatory.  As with his claims of

retaliation against Clink and Hoadley, the record lacks any evidence to

support plaintiff's conclusory allegations of retaliatory motives.

During his deposition testimony, plaintiff attempted to link the

misbehavior report to his work on the ILC, stating that "[t]hey were pissed

off about the soap balls."  Webster Tr. (Dkt. No. 44-2) p. 216.  Plaintiff

conceded, however, that he had no evidence to support his contention but

only his belief that Napoli wrote the misbehavior report for retaliatory

reasons.  *Id.* at p. 217.  When asked if he believed that Halcott retaliated

against him for the same reason, plaintiff stated, "I would imagine so."

Webster went on to explain that he "really [does not] know exactly

motivation, but this is the only thing I can think.  I can't say for sure this

would be his motivation, but I can't think what else it would be."  *Id*. at p.

218.

The only evidence in the record that might suggest the March 2,

2007 misbehavior report was issued in retaliation for complaints to the

administration is the temporal proximity between plaintiff's letter of

February 2, 2007 to Superintendent Corcoran raising a safety concern

regarding the blue soap balls used by inmates and the disciplinary charge

issued a month later.  There is no evidence, however, that defendants

Napoli, Halcott , or Chapin were even aware of this letter to the

superintendent or any other complaints that plaintiff made regarding the

institution and/or the administration.  Plaintiff's soap ball complaint as well

as his concerns regarding the use of ILC funds were investigated by

Sergeant Hoadley, and there is no evidence suggesting that Napoli,

Halcott, or Chapin were involved.  Additionally, plaintiff does not allege

that he filed any grievances or complaints against Napoli, Halcott, or

Chapin which might have served as motivation to retaliate.

Nor has plaintiff adduced any evidence of statements made by these

defendants revealing retaliatory motives.  To the contrary, all three

expressly deny any such improper motive.  *See* Napoli Decl. (Dkt. No. 44-

8) ¶¶ 6, 11; Halcott Decl. (Dkt. No. 44-10) ¶¶ 7, 10; and, Chapin Decl.

(Dkt. No. 44-6) ¶¶ 6, 14.  Additionally, Napoli explains that he filed the

misbehavior report based upon information he received in a interview with

an inmate who was being released; that inmate told Napoli that Webster

and the vice chairperson of the ILC were intimidating ILC members in

order to further their own agenda.  Napoli Decl. (Dkt. No. 44-8) ¶¶ 6, 11.

Halcott similarly confirms that he co-signed the misbehavior report

because he received the same information from three different inmates who were on the ILC.  Halcott Decl. (Dkt. No. 44-10) ¶¶ 7, 10.

Again, plaintiff is unable to rely on a good disciplinary history as circumstantial evidence of retaliatory motive.  In the year preceding the March 1, 2007 misbehavior report, plaintiff was issued several misbehavior reports, found guilty on a number of charges, and suffered disciplinary sanctions on at least two prior occasions.  Nor can plaintiff show that he was absolved of the charges, which might also provide some support for his retaliation claims.  Instead, after conducting a Tier III disciplinary proceeding, Hearing Officer Chapin determined that Webster was guilty on all three charges.  *See id.* at Exh. B.  The hearing officer's findings of guilt on two of the three charges (harassment and making false statements) as well as the penalty imposed were upheld on appeal.  *Id*. at Exh. C.

Standing alone, the mere temporal closeness of plaintiff's letters of complaint to the superintendent and the March 2007 disciplinary proceedings is insufficient to establish retaliation.  I am thus constrained to conclude that when considered in the context of the entire record, no reasonable juror could find that the March 1, 2007 misbehavior report was

issued in retaliation for plaintiff's constitutionally protected conduct.

> ### 3.   <u>Defendant Corcoran</u>

Approximately two months after plaintiff was issued disciplinary sanctions as a result of the March 1, 2007 misbehavior report, Superintendent Corcoran removed plaintiff from his position as chairman of the ILC, based upon his disciplinary record.  Corcoran Decl. (Dkt. No. 44-9) ¶ 29.  To the extent that plaintiff relies upon this action to support a claim of retaliation against defendant Corcoran, his claim must fail.  While at least one court in this district has recognized a constitutional right of an inmate to serve as a grievance representative, *Gill v. Riddick*, No. 9:03-CV-1456,  2005 WL 755745, at *10 (N.D.N.Y. Mar. 31, 2005) (Treece, M.J.), that is not to say that there is a constitutional right to remain on the ILC once appointed.  *Compare Salahuddin v. Coughlin*, 591 F.Supp. 353, 361 (S.D.N.Y. 1984) ("an inmate has no protectable right to remain on the ILC. . . .").  To the contrary, "[p]ursuant to DOCS Directive 4002, the Superintendent has discretion to exclude membership on the ILC to those inmates who have recent or chronic disciplinary problems."  *Gonzalez v. Narcato*, 363 F.Supp.2d 486, 496 (E.D.N.Y. Mar. 24, 2005) (citing DOCS

Directive No. 4002).[19]

In his notification to Webster Superintendent Corcoran advised plaintiff that he was being removed from the ILC due to his disciplinary history.  The record supports this contention, revealing that over a one-year period, during which he was assigned to the ASAT unit, plaintiff amassed a disciplinary history that included several misbehavior reports. Significantly, the March 1, 2007 misbehavior report related directly related to his attempts to intimidate and control the ILC to the detriment of the prison administration.

The Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.'"  *Hynes v. Squillace*, 143 F.3d at 657 (quoting *Rivera v. Senkowski*, 62 F.3d 80,86 (2d Cir. 1995)).  In addition, it is well established that "prison officials are entitled in the name of discipline, order and security to forbid collective organizational activity among inmates."  *Salahuddin*, 591 F. Supp. at 361 (citing *Jones v North Carolina Prisoners' Labor Union*, 433 U.S. 119, 128-

---

[19]   "In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights."  *Shaheen v. Filion*, No. 9:04-CV-625, 2006 WL 2792739, at * 3 (N.D.N.Y. Sept. 17, 2006) (Scullin, S. J.) (citing *Dawes*, 239 F.3d at 492)).  It is questionable whether a fairminded jury would find plaintiff's removal from the ILC be sufficiently adverse to deter an inmate in his circumstances from exercising his constitutional rights.

29, 97 S.Ct. 2532, 2539 (1977)).  Defendants have established a proper basis for plaintiff's removal from the ILC, and Superintendent Corcoran acted well within his discretion when ordering that measure.  *Gonzalez*, 363 F. Supp.2d at 496.  Accordingly, insofar as plaintiff makes a claim of retaliation based upon his removal from the ILC, that claim must be dismissed.

     D.    <u>Harassment</u>

     Though not specifically addressed by defendants in their motion, during his deposition plaintiff asserted that the retaliation he suffered included harassment and threats by defendants Clink and Hoadley. Webster Tr. (Dkt. No. 44-2) pp. 60-61, 98-100, 104,135, 146.  According to plaintiff, Corrections Officer Clink harassed Webster by going through his cube every day, telling the plaintiff that he did not like him participating in the ILC, and making derogatory remarks.  *Id.* at pp. 60-61.  Plaintiff asserts that defendant Hoadley harassed plaintiff by threatening him to "watch his back" and calling him a liar.  *Id.* at pp. 98-100, 104,135, 146. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff has failed, however, to allege any

conduct that would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse.  *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261 F. Supp.2d 113, 129 (N.D.N.Y. 2003); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998); *Alnutt v. Cleary*, 913 F.Supp. 160, 165-66 (W.D.N.Y. 1996) (citations omitted).  Accordingly, the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under 42 U.S.C. § 1983.  *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J. ) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff specifically testified at his deposition that Hoadley did not use any

physical force against him.  Webster Tr. (Dkt. No. 44-2) p. 146.  Plaintiff

has therefore failed to meet the threshold requirement for an Eighth

Amendment violation of showing the "unnecessary and wanton infliction of

pain" by prison officials.  *Whitley v. Albers*, 475 U.S. 312, 319, 196 S.Ct.

1078, 1084 (1986).  Consequently, I find plaintiff has failed to establish

any facts that would support an Eighth Amendment violation.

     E.    <u>Due Process</u>

A portion of plaintiff's complaint centers upon his contention that his

right to procedural due process was abridged in connection with his March

4-5, 2007 disciplinary hearing.  In their motion, defendants assert that

plaintiff's due process claim lacks merit.

To successfully state a claim under 42 U.S.C. § 1983 for the denial

of procedural due process arising out of a disciplinary hearing, a plaintiff

must show that he or she 1) possessed an actual liberty interest, and 2)

was deprived of that interest without being afforded sufficient procedural

safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000)

(citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d

349, 351-52 (2d Cir. 1996).

     1.    <u>Liberty Interest</u>

At the outset, plaintiff has failed to demonstrate that he has suffered deprivation of a constitutionally protected liberty interest.  The Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sealey*, 197 F.3d at 583 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293).  Atypicality in a *Sandin* inquiry is normally a question of law.[20]  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.   When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997); *see also Williams v. Goord*, 111 F.Supp.2d 280, 289 (S.D.N.Y. 2000) (citations omitted) (SHU confinement in New

---

[20]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution*.  Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585.

York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*.[21]  *Colon*, 215 F.3d at 231.  Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n.5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.  *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).[22]

In his complaint, plaintiff alleges that he was confined to SHU for ninety days, but does not allege that the resulting conditions imposed an atypical and substantial hardship nor does he allege any facts that might

---

[21]     Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate.  515 U.S. at 485-86, 115 S. Ct. at 2301.  In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence.  *Id.*

[22]     In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

suggest that this was the case.  In his deposition, Webster testified only that in SHU he was deprived of "freedom, talking to my family on the phone, everything that wasn't SHU[, and] I had a lot of problems breathing at night because they wouldn't let me have my breathing machine, my sleep [apnea] machine."  Webster Tr. (Dkt. No. 44-2) pp. 230-231. Plaintiff's confinement to SHU for a period of ninety days, without more, is insufficient to raise a constitutionally protected liberty interest.  *Mortimer Excell v. Fischer*, No. 08-CV-945, 2009 WL 3111711, at *9 (N.D.N.Y. Sept. 24, 2009) (Hurd, J.) ("[C]ourts have roundly rejected the notion that . . . a short period of confinement, without additional hardships, creates a liberty interest even when confinement is completely segregated, such as when an inmate is sent to . . .[SHU].") (citing *Sealey*, 197 F.3d at 589-90); *see also Borcsok v. Early*, No. 9:03-CV-395, 2007 WL 2454196, at *9 (N.D.N.Y. 2007) (Sharpe, J.) (finding that 90-day confinement in SHU alone with 90-day loss of packages, commissary and telephone privileges insufficient to raise a liberty interest without showing there as an atypical and significant hardship).  Accordingly, I find that dismissal of plaintiff's due process cause of action on this basis alone would  be appropriate.

> 2.    Procedural Protections

Even assuming that plaintiff were able to prove that he suffered a deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process.  The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-70, 94 S.Ct. at 2978-83.  In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence".[23]  *Superintendent v. Hill*,

---

[23]     The "some evidence" standard under *Hill* has been described as considerably tolerant.  *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000).

472 U.S. 445, 105 S.Ct. 2768 (1985).

The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Chapin Decl. (Dkt. No. 44-6) Exh. A at p. 2. A disciplinary hearing was conducted and was recorded. *See generally id*. At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. *Id.* at pp. 2-5. Plaintiff received assistance in preparing for the hearing and was permitted to give an oral statement as well as to offer testimony from his own witnesses. *See generally id.* After announcing his disposition the hearing officer advised plaintiff of his right of appeal. Chapin. Decl. A (Dkt. No. 44-6) Exh. A p. 73. Plaintiff later sought review by the superintendent, and the hearing officer's determination as to two of the three charges and the sentence were upheld on appeal. Chapin Decl. (Dkt. No. 44-6) Exh. C.

The hearing officer's determination of guilt hinged upon his finding that defendants Napoli and Halcott were credible witnesses. Chapin Decl. (Dkt. No. 44-6) ¶ 12. Both of those defendants testified that they had

---

To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (*quoting*, *inter alia*, *Luna v. Pico*, 356 F.3d 356, 488 (2d Cir. 2004)).

been informed by other inmates that plaintiff was trying organize the ILC by intimidation and that the plaintiff had advised other inmates to bypass facility administration.  *Id.*  Chapin also relied on credible evidence from an inmate that was being released who reported that plaintiff was spreading disparaging information about the prison administration regarding alleged missing ILC funds and poor administration.  *Id.*  The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment.

The only procedural defect alleged by the plaintiff to have occurred during the hearing is that the hearing officer called defendant Halcott to testify after he had already closed the proceedings.  It is true that the hearing officer had announced that the evidence was closed before accepting Lieutenant Halcott's testimony.  He then realized, however, that defendant Halcott, who had co-signed the misbehavior report, had not yet testified.  *Id.* at ¶ 8.  Defendant Chapin immediately went back on the record, with the plaintiff present, and was able to reach Halcott to testify by telephone.  *Id.*  Halcott testified before Chapin made any determination as to plaintiff's guilt or innocence.  After the hearing officer questioned

Halcott, Webster was given the opportunity to ask him questions.  *Id.*  The court finds that the timing of Lieutenant Halcott's testimony did not result in any prejudice to plaintiff, and plaintiff has identified none.  To the contrary, the evidence in the record clearly establishes that the procedures that were provided to plaintiff were more than adequate to afford plaintiff the minimal process to which he was entitled*.*

In light of the lack of evidence in the record demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of his due process claims.[24]

F.    Medical Indifference

In their motion, defendants also assert that plaintiff's fourth cause of action, alleging that defendant Deputy Superintendent Maher was deliberately indifferent to his medical needs, is insufficient because

---

[24]    Plaintiff's complaint also alleges that he was deprived of his personal property when it was lost upon his transfer from Cayuga to another facility.  Any procedural due process claim premised upon the claimed loss of his personal property during the transfer is also subject to dismissal.  The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available."  *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194 (1984).  The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property.  *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983).  In any event, acknowledging that he did in fact make a claim and received compensation for his lost property, at his deposition plaintiff stated his intent to not pursue this portion of his due process claim.  Webster Tr. (Dkt. 44-2) p. 229.

plaintiff has failed to establish the requisite objective and subjective elements of deliberate indifference.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* ; *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement –

the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

### 1.   Serious Medical Need

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need that is, in objective terms, "'sufficiently serious'".  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S.

1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*, 143 F.3d at 702).  Relevant factors informing this determination include whether the plaintiff suffers from a condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'"  *Chance*, 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

The plaintiff in this case suffers from sleep apnea and has a medical permit restricting his housing location to a single bunk cell so that he can

utilize a machine that assists him in breathing at night.  Apparently, upon

his release from SHU confinement on May 14, 2006 plaintiff was housed

in a double bunk cube.  Plaintiff alleges that he informed the housing

officer of his medical restriction and that, even after defendant Maher

learned of plaintiff's condition, he refused to move Webster to a single

bunk cube.

The record before the court fails to establish that plaintiff's sleep

apnea was sufficiently serious to warrant Eighth Amendment protection.

Plaintiff admits that he did not use the breathing machine for the ninety-

day period that he was confined to SHU, yet there is no evidence, or even

an allegation, that plaintiff experienced any physical deterioration or other

consequences as a result of that lapse in treatment.  Moreover, plaintiff

admits that he used the breathing machine even though he was in a

double bunk cube and that it was more of a safety concern for his cube

mate than it was a medical concern for him.  Webster Tr. (Dkt. No. 44-2)

p. 209.  In light of these facts, no reasonable juror could find that plaintiff's

medical condition was sufficiently serious to warrant Eighth Amendment

protection.[25]

---

[25]     Plaintiff also claims that his condition requires that he be housed near a
window, but upon questioning was unable to identify any medical reason for this

2.    <u>Deliberate Indifference</u>

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291.  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979); *Waldo*, 1998 WL 713809, at *2 (same).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference.  Plaintiff admittedly did not directly notify Maher of his medical restriction until August 14, 2006, and was moved within days thereafter.  Webster Tr. (Dkt. No. 44-2) p. 207.  Defendant Maher denies that he disregarded plaintiff's medical needs and states that upon receipt of plaintiff's letter he promptly directed his staff to look into

---

alleged restriction.  See Webster Tr. (Dkt. No. 44-2) p. 210.

the matter.  Maher Decl. (Dkt. No. 44-12) ¶¶ 5-7.  Maher also denies ever directing any of his staff to ignore the plaintiff's permit for a single cube or deliberately placing him at the bottom of a list for a single cube unit, and plaintiff has offered no evidence to counter that denial.  *Id.* at ¶ 9.  As a result, plaintiff has also failed to demonstrate that Deputy Superintendent Maher was deliberately indifferent to his serious medical needs.  I therefore recommend that plaintiff's medical indifference claim be dismissed.[26]

### G.   Mail Watch

To the extent that plaintiff's complaint, when broadly construed, sets forth a claim for violation of his First Amendment rights as a result of an illegal mail watch, that claim is also subject to dismissal.

To be sure, it is well recognized that among the protections enjoyed by prison inmates, though not unfettered, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek*, No. 05-CV-172, 2007  3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).

---

[26]    Based upon a careful review of plaintiff's complaint, it appears that his medical indifference claim is limited to defendant Maher and is based exclusively upon the alleged failure to honor his single cube medical permit.  The record contains no evidence of any conduct that could be construed as deliberate indifference to plaintiff's medical needs on the part of any of the other defendants in the case.

That right, however, yields to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred.  *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S. 938, 117 S. Ct. 319 (1996).

In this case, plaintiff's mail watch claim is premised upon the delay in delivery of a single piece of mail – a Valentine's Day card from his girlfriend – that was allegedly stamped "missent to Malaysia" when it finally arrived.  Plaintiff has offered no evidence to show that he was placed on mail watch or that any of his mail was illegally opened or intentionally misdirected.  In fact, defendant Costello confirms that there is no record that plaintiff was the subject of a mail watch while housed at Cayuga.  Once again, plaintiff has provided nothing but sheer surmise to show otherwise.  As a result, plaintiff has failed to state a viable cause of action for violation of his First Amendment rights due to an illegal mail watch.

H.    Seizure of Legal Folder

Though not separately addressed by defendants in their motion, to the extent plaintiff's complaint alleges that he was searched and his legal

folder was confiscated and his papers lost, it could be interpreted as an attempt to allege that defendants conducted an unlawful search and seizure, in violation of the Fourth Amendment, and/or interference by the defendants with his access to the courts. *See* Complaint (Dkt. No. 1) ¶ 44-47.

In *Hudson v. Palmer*, the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." 468 U.S. 517, 526, 104 S. Ct. 3194, 3200 (1984). In concurring with the majority opinion authored by Chief Justice Burger in *Hudson*, Justice O'Connor succinctly pronounced that [t]he fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects . . .." *Id*. at 538, 104 S. Ct. at 3206. Plaintiff has therefore failed to state a cognizable claim under the Fourth Amendment.

Any claim for interference with his access to the courts similarly must fail. Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. *Bounds v. Smith*, 430 U.S. 817, 823, 97 S. Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). To establish a violation of the right of access to

the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury – that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct.  *Lewis v. Casey,* 518 U.S. 343, 353, 116 S. Ct. 2174, 2181 (1996).

In this instance plaintiff admits that the alleged loss of legal papers did not interfere with his access to court.  *See* Webster Tr. (Dkt. No. 44-2) pp. 131-132.  He has, therefore, failed to state and support a cognizable claim for denial of access to courts.

I.      Violation of State Law

In addition to setting forth constitutional claims, throughout his complaint plaintiff generally makes reference to and alleges violations of state law and regulations.  To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."

*Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)).  "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."  *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)."  *Cabassa v. Gummerson*, 01-CV-1039, 2008  4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.) (internal quotation marks and citation omitted).  This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives.  *Id.*

Plaintiff's claims relating to state laws and regulations should therefore be dismissed.[27]

    J.    Conspiracy

---

[27]      While plaintiff initially alleges in his complaint that the court has supplemental jurisdiction over state law tort claims, no such claims are set forth in the body of the complaint.  In any event, even if I were to conclude that plaintiff had sufficiently alleged state law tort claims, I would recommend that the court not exercise pendent jurisdiction over such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed."  *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009  2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

Another claim that could be gleaned from plaintiff's complaint, when liberally construed, though again not addressed by defendants is one for conspiracy.  To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted).  Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).

Plaintiff's complaint contains only a single allegation regarding a conspiracy, alleging that defendant Maher "conspired with other defendant's and have shown himself to discriminatorily dereliction in his responsibilities and obligation to the care and custody of plaintiff's medical condition."  Complaint (Dkt. No. 1) ¶ 54.  Neither plaintiff's complaint nor the record before the court provides the identity of the parties to the alleged conspiracy, a showing of agreement or a "meeting of the minds", or any details as to the time and place of conspiracy or its objective.  Such

deficiencies are fatal to plaintiff's conspiracy claim.  *Warren v. Fischl,* 33 F. Supp.2d 171, 177 (E.D.N.Y. 1999).

Because plaintiff has asserted claims of conspiracy in only vague and conclusory terms and, in the face of defendants' summary judgment motion, has failed to come forward with evidence to support his conspiracy claim, I recommend its dismissal as a matter of law.[28]  *See Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990), *cert. denied*, 499 U.S. 937, 111 S. Ct. 1399 (1991); *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).

### K.    Claims Under Sections 1981, 1985 and 1986

Plaintiff's complaint, which is in other respects quite detailed, makes only passing reference to alleged violations of 42 U.S.C. §§ 1981, 1985 and 1986.  Defendants assert that all of those claims are fatally deficient.

#### 1.    Section 1981

Plaintiff's complaint purports to assert a claim under 42 U.S.C. § 1981, which provides that

---

[28]    Even if plaintiff's conspiracy claim was adequately pleaded and supported in the record, in all likelihood it would be precluded based upon the intra-agency conspiracy doctrine, since it appears to be asserted against the various employees of the DOCS, each acting within the scope of his or her employment.  *Little v. City of New York*, 487 F. Supp.2d 426, 441-42 (S.D.N.Y. 2007) (citations omitted); *see also Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

> [a]ll persons within the jurisdiction of the United States shall
> have the same right in every State and Territory to make and
> enforce contracts, to sue, be parties, give evidence, and to the
> full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white
> citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to
> no other.

42 U.S.C. § 1981(a).  As defendants correctly note, on its face that

section prohibits discrimination in the making and enforcement of

contracts.  *See Mahmud v. Kaufmann*, 496 F. Supp.2d 266, 274 (S.D.N.Y.

2007).  Plaintiff's complaint clearly does not implicate a contract, and he

has, therefore, failed to state a claim under section 1981.  Additionally, in

*Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702

(1989), the Supreme Court held that the exclusive remedy for vindicating

rights guaranteed under section 1981 when the claim is against a state

actor is through section 1983.  *Whaley v. City Univ. of New York*, 555 F.

Supp.2d 381, 401 (S.D.N.Y. 2008).  While the Second Circuit has yet to

rule on the continued vitality of *Jett* following the amendments of section

1981 included within the Civil Rights Act of 1991, without clear guidance

from that court, other district courts have declined to deviate from *Jett*.  *Id.*

at 401 (citing cases).  Consistent with the decisions of these courts, I too

opt not to deviate from the Supreme Court's analysis of section 1981 in

*Jett*.  For these reasons, any claim alleged under section 1981 should be dismissed.

      2.   <u>Section 1985</u>

To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws or equal privileges and immunities secured by law.  *United Brotherhood of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834-39, 103 S. Ct. 3352, 3359-61 (1983); *Gagliardi v. Village of Paing,* 18 F.3d 188, 194 (2d Cir. 1994); *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir. 1989); *Patterson v. County of Oneida*, No. 00-CV-1940, 2002  31677033, at *4 (N.D.N.Y. 2002) (Hurd, J.), *aff'd in relevant part*, 375 F.3d 206 (2d Cir. 2004); *Benson v. United States*, 969 F. Supp. 1129, 1135-36 (N.D. Ill. 1997) (citing, *inter alia*, *United Brotherhood*, 463 U.S. at 434-37); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995).  A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially by a showing that the parties had a "'tacit

understanding to carry out the prohibited conduct.'" *LeBlanc-Sternberry*,

67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d

Cir.1988)).  This notwithstanding, in order to properly plead such a claim,

a plaintiff must make more than "conclusory, vague, or general allegations

of conspiracy." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.1983) (per

curiam); *Williams v. Reilly*, 743 F. Supp. 168, 173 (S.D.N.Y. 1990)

("[u]nsubstantiated, conclusory, vague or general allegations of a

conspiracy to deprive constitutional rights are not enough to survive [even]

a motion to dismiss").  "[D]iffuse and expansive allegations are insufficient,

unless amplified by specific instances of misconduct." *Ciambriello v.*

*County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v.*

*City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

Moreover, it is well settled that a plaintiff attempting to establish a

claim under 42 U.S.C. § 1985(3) must demonstrate that the defendant

under consideration acted with class-based invidiously discriminatory

animus.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 266-68,

113 S.Ct. 753, 758-59 (1993).  "When a plaintiff fails to establish

membership in a protected group, a civil rights conspiracy complaint under

42 U.S.C. § 1985 may be dismissed." *Estes-El v. Town of Indian Lake*,

954 F.Supp. 527, 532 (N.D.N.Y. 1997)(citation and internal quotations omitted).

Plaintiff's complaint alleges discrimination based upon his participation on the ILC.  There are no allegations that he was discriminated against on the basis of race or some other cognizable suspect class.  Similarly, as noted above, there are no allegations of an explicit agreement to deprive plaintiff of his constitutionally protected right, nor are there any allegations of fact that might provide circumstantial evidence of a tacit understanding to effect prohibited conduct.  For these reasons, I find plaintiff's allegations insufficient to state a claim under section 1985(3) and as a result recommend that these claims also be dismissed.

### 3.   Section 1986

Section 1986 provides, in relevant part that

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed shall be liable to the party injured. . . .

42 U.S.C. § 1986.  As can be seen, a claim under section 1986 is

dependent up the existence of a claim under section 1985.  Accordingly,

since there is no claim stated under section 1985, plaintiff has likewise

failed to state a claim under section 1986.  *Dacey v. Dorsey*, 568 F.2d

275, 277 (2d Cir. 1978).

     L.    <u>Eleventh Amendment</u>

     Although not raised by defendants, there is a separate and

independent basis for dismissal of plaintiff's claims against them to the

extent they are sued in their official capacities.  The Eleventh Amendment

protects a state against suits brought in federal court by citizens of that

state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438

U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978).  This absolute immunity

which states enjoy under the Eleventh Amendment extends both to state

agencies, and in favor of state officials sued for damages in their official

capacities when the essence of the claim involved seeks recovery from

the state as the real party in interest.[29]  *Richards v. State of New York*

*Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984),

---

     [29]     In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.   In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  547 U.S. 189,193, 126 S.Ct. 1689, 1693 (2006).

*aff'd* 767 F.2d 998 (2d Cir. 1985) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[30]  *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 26, 112 S.Ct. 358, 361 (1991) .

Plaintiff's complaint states that it is brought against defendants in their individual and official capacities.  Plaintiff's claims against defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects.  As a result, they are subject to dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend that plaintiff's damages claim against the defendants in their capacities as state officials be dismissed.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The centerpiece of plaintiff's complaint is his claim that he was harassed and retaliated against for participating in the ILC at Cayuga and

---

[30]     By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S.Ct. at 364-65.

voicing complaints regarding the operation of the facility and the prison administration.  Although plaintiff alleges that the retaliation began with Corrections Officer Clink upon his transfer into the ASAT unit at Cayuga, the record shows that after entering that dorm plaintiff consistently failed to follow prison rules and was issued several misbehavior reports and received disciplinary sanctions solely as a result of his misconduct, not in retaliation for any complaints he may have made.  Plaintiff has failed to show that any misbehavior report lodged against him was spawned by his filing of a grievance or other protected conduct.  Indeed, it appears that plaintiff's grievances against individual officers were made only after he was cited for rules violations.

Addressing plaintiff's other claims, the record demonstrates that plaintiff received more than the constitutionally mandated minimal due process before being subjected to SHU confinement based upon the charges contained in the March 1, 2007 misbehavior report relating to his efforts to control and intimidate the ILC, and that his removal from that committee was not only well within the discretion of Superintendent Corcoran but was justified by plaintiff's actions.

Plaintiff has produced no evidence establishing personal

involvement on the part of Fischer, Costello, or Corcoran in any constitutional violation alleged, and his damages claims against defendants in their official capacities are precluded by the Eleventh Amendment.  Likewise, plaintiff has adduced no evidence to support his claims of an unconstitutional search and seizure of his legal folder, an illegal mail watch, unlawful medical indifference, conspiracy, or violation of 42 U.S.C. §§ 1985 and 1986, and has failed to even sufficiently allege a claim under section 1981 or for a common law tort.

For all of the foregoing reasons, I conclude that plaintiff's complaint should be dismissed as a matter of law.  Accordingly, it is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 44) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 22, 2010
              Syracuse, New York



Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow Correctional
Facility; Gary Yule, Corrections Officer, Great Meadow
Correctional Facility; and David Roberts, Senior
Counselor, Great Meadow Correctional Facility,
Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of counsel,
for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a
report-recommendation and order by Magistrate Judge
David R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his
confinement. Report-recommendation, Dkt. No. 24, at

9-10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty of
possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence
were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor,* 515 U.S. 472,
----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995).
Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin.* I have reviewed the entire
file in this matter, including plaintiff's many submissions,
and I find that he failed to raised any issue of fact to
support an alleged deprivation of his due process liberty
interests. Magistrate Judge Homer's thorough
report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September
13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

ORDERED that defendants' motion for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.
HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

*2 Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by Corrections Officer Rando and defendant Yule and was

supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

> FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

> FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance was found in Tinsley's cell. Testimony during hearing by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> [FN4]. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and significant hardship on the inmate in relation to the*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle,* 65 F.3d 29, 31-32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the complaint complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

**\*4** Several judges in this district have adopted this position. *See Polanco v. Allan,* No. 93-CV-1498, 1996 WL 377074, at \*2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119 (N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of

M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95-CV-1620, 1996 WL 227859, at \*2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth,* 88 F.3d 431, 433-34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37-38 (2d Cir.1996); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin,* No. 95-CV-1526, 1996 WL 227857, at \*1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's interpretation of *Sandin* mandated further fact-finding as

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock, including plaintiff, are the same regardless of the reason

for placement there. *Id.* at pts. 302-05.[FN5]

> **FN5.** Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meacham v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

**\*6** 515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from other inmates or guards such that keeplock confinement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow his from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

*7 Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

> FN6. A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

Fourth, plaintiff claims that defendant Roberts failed to

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [FN7]

> **FN7.** Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

### 3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [FN8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [FN9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

> **FN8.** In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the marijuana five hours after the search was

conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

> **FN9.** Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

### 4. *Qualified Immunity*

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

**\*8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

### III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

FN10. Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

### IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

*9 Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F.Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D.N.Y.1998); *Costello v. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization

of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also,

for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

### DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

inferences and resolve all ambiguities in favor of the nonmoving party. See *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. See *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements

to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). Accord *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

> FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. See, e.g., *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. See *id.*

*6 In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." _Richardson v. New York State Dep't of Corr. Servs ., 180 F.3d 426, 436_ (alteration in original) (quoting _Harris, 510 U.S. at 21-22)._ From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. _See id._ Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." _Davis, 119 S.Ct. at 1675._

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. _Harris, 510 U.S. at 21._ Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. _Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)._ Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. _See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 77 (1998)._ Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." _Id._ at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. _See Harris, 510 U.S. at 23._ These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct.

_See id.; Richardson, 180 F.3d at 437._

Although conduct can meet this standard by being either "frequent" or "severe," _Osier, 47 F.Supp.2d at 323,_ "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' _Quinn, 159 F.3d at 767_ (quoting _Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)_). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." _Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir.1992)_ ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. _See, e.g., Gutierrez v. Henoch, 998 F.Supp. 329, 335 (S.D.N.Y.1998)_ (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); _Christoforou v. Ryder Truck Rental, Inc., 668 F.Supp. 294, 303 (S.D.N.Y.1987)_ ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. _See, e.g.,_ Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, _Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999),_ this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. _See Osier, 47 F.Supp.2d at 324._

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipsis in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to

which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile work environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.*, 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.*, 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.*, 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese*, 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis*, the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

> **FN6.** Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, she can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

> **FN7.** As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third

exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray*, 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray*, 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd*, 194 F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> [FN9.] Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Com pl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal of the disciplinary hearing judgment. (Am. Compl. ¶¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63).

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

### DISCUSSION

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21;*Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 691 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including:

(1) direct participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

**\*5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims where defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

**\*6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, *Correction Law § 851et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

*Correction Law § 855(9).* Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to

engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995

Greenwaldt v. Coughlin

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Marvin Smith SHAHEEN, Plaintiff,
v.
Gary FILION, Superintendent; Joan Smith, Deputy
Superintendent; Lt. Perez; J. Funk; Jochomas,
Correctional Officer; and John Doe, Defendants.
**No. 9:04-CV-625 (FJS/DRH).**

Sept. 5, 2006.
Sept. 17, 2006.

Marvin Smith Shaheen, Portchester, NY, Plaintiff, Pro se.

Hon. Eliot Spitzer, Attorney General for the State of New
York, Stephen M. Kerwin, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

FREDERICK J. SCULLIN, JR., S.J.

**\*1** The above-captioned matter having been presented to
me by the Report-Recommendation of Magistrate Judge
David R. Homer filed September 5, 2006, and the Court
having reviewed the Report-Recommendation and the
entire file in this matter, and no objections to said
Report-Recommendation having been filed, it is hereby

**ORDERED,** that the Report-Recommendation of
Magistrate Judge David R. Homer filed September 5,
2006 is **ACCEPTED** in its entirety, for the reasons stated
therein; and it is further

**ORDERED,** that Defendants' motion for summary

judgment is **GRANTED,** as to defendants Filion, Smith,
Horton, Perez and Funk and as to both of Shaheen's causes
of action, and it is further

**ORDERED,** that the complaint is **DISMISSED** without
prejudice as to defendants John Doe and Jochomas, and it
is further

**ORDERED,** that this action is **TERMINATED** in its
entirety as to all defendants and all claims.

**IT IS SO ORDERED.**
DAVID R. HOMER, Magistrate Judge.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Marvin Smith Shaheen ("Shaheen"),
formerly an inmate in the custody of the New York State
Department of Correctional Services (DOCS), brings this
action pursuant to 42 U.S.C. § 1983 alleging that
defendants, seven DOCS employees, violated his
constitutional rights under the First, Fifth, and Fourteenth
Amendments. Compl. (Docket No. 1). Presently pending
are the motions of five defendants [FN2] for summary
judgment pursuant to Fed.R.Civ.P. 56 or to dismiss for
failure to prosecute pursuant to Fed.R.Civ.P. 41(b).
Docket No. 34. Shaheen opposes both motions. Docket
No. 40. For the reasons which follow, it is recommended
that defendants' motion be granted. It is also recommended
that the complaint be dismissed without prejudice as to the
two unserved defendants.

> FN2. Filion, Smith, Horton, Perez, and Funk.

**I. Background**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

The facts are presented in the light most favorable to Shaheen as the non-moving party. *See* Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Shaheen was incarcerated at Coxsackie Correctional Facility ("Coxsackie"). In November 2003, Shaheen was elected Chairman of the Inmate Liaison Committee ("ILC"). Filion Decl. (Docket No. 34) at ¶ 5. On November 25, 2003, Shaheen was punched in the face by another inmate in the ILC office. Funk Decl. (Docket No. 34) at Ex. A. Corrections officers responded and Shaheen was issued an inmate misbehavior report for fighting and violent conduct. *Id.* On December 1, 2003, a hearing on the charges was held. Smith Decl. (Docket No. 34) at Ex. A. During the hearing, Shaheen did not request any witnesses or documents and was the only witness to testify. *Id.* at ¶ 5, Ex. A; Pl. Reply Statement of Material Facts (Docket No. 40) at ¶¶ 8-10. Defendant Smith, the hearing officer found Shaheen guilty and sentenced him to sixty days of keeplock,[FN3] sixty days loss of recreation, and thirty days loss of telephone, commissary, and packages. Smith Decl. at ¶ 5. Shaheen was also removed from his position as ILC chairman. Filion Decl. at ¶ 12. On administrative appeal, the determination was overturned but only after Shaheen had completed service of the punishment. Pl. Reply Statement of Material Facts at ¶ 14. This action followed.

> FN3. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

## II. Discussion

**\*2** Shaheen asserts two causes of action against all defendants. The first alleges that defendants retaliated against him after he wrote newspaper articles criticizing prison officials. The second alleges that defendants violated his due process rights in the disciplinary proceedings. Defendants seek judgment and dismissal for both claims.

### A. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.*[FN4] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

> FN4. Notwithstanding his pro se status, Shaheen has significant experience in litigation having filed at least twenty-one other federal actions in the last eighteen years. *See U.S. Party/Case Index* ( v i s i t e d  A u g .  3 0 ,  2 0 0 6 ) <http://pacer.uspci.uscourts.gov/cgibin/dquery. pl>.

### B. Retaliation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

Shaheen contends that defendants placed him in keeplock and removed him from his position as chairman of the ILC in retaliation for writing newspaper articles and filing complaints criticizing prison officials. Defendants contend that this claim is without merit.

In order to prevail on a retaliation claim, a plaintiff must first assert the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Id.; see also Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because the conduct may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

**\*3** Here, Shaheen's writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the ILC were clearly assertions of his constitutional rights protected by the First Amendment. *See Simmat v. Manson,* 535 F.Supp. 1115, 1117-18 (D.Conn.1982) ( "[prisoner's] first amendment right to freedom of expression encompasses the right to express himself without punitive retaliation."). Shaheen claims that the adverse action which resulted from this conduct was defendants' filing of a false misbehavior report that resulted in Shaheen spending sixty days in keeplock. In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights. *Dawes,* 239 F.3d at 491. It is reasonably possible that other inmates would fail to exercise their constitutional right to criticize prison officials for fear that they would be subjected to false misbehavior reports and sentenced to keeplock. Thus, the disciplinary action and Shaheen's placement in keeplock at least present questions of fact whether they constitute adverse actions.

However, Shaheen fails to show a causal connection

between his criticism of prison officials and the alleged filing of a false misbehavior report because he only offers conclusory evidence to support his claim that defendants were aware of his criticism of the prison. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see also Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Shaheen provides no evidence to demonstrate that any defendant had any knowledge of his complaints against prison officials prior to the filing of the misbehavior report. In response to Shaheen's allegations, each moving defendant had provided a declaration stating that he or she was unaware of any of Shaheen's writings that criticized prison officials and conditions. *See* Filion Decl. at ¶ 9; Funk Decl. at ¶ 5; Horton Decl. (Docket No. 34) at ¶ 7; Perez Decl. (Docket No. 34) at 4; Smith Decl. at ¶ 3. Thus, because Shaheen offers only conclusory evidence to support his claim, he has failed to demonstrate a causal connection between the constitutionally protected conduct and the alleged adverse action.

Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To determine whether an inmate possessed a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Here, Shaheen concedes that his time in keeplock was not atypical, stating "plaintiff has never presented or suggested that his confinement was atypical and significant hardship." Pl. Reply Mem. of Law (Docket No. 40) at 21. Thus, by his own admission, Shaheen has failed to establish the existence of a protected liberty interest.[FN5]

FN5. Shaheen also concedes that his position as Chairman of the ILC does not constitute a

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

protected liberty interest. Pl. Reply Mem. of Law at 20 ("Next addressing the defendants claim that plaintiff had no liberty interest in my position as ILC chairman which they are totally correct ...").

**\*4** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Shaheen's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, defendants' motion for summary judgment on this alternative ground should be granted.

### III. Failure to Prosecute

Defendants contend in the alternative that Shaheen's failure to inform the court of his new address after his release from Coxsackie requires dismissal of his claim for failure to prosecute.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may dismiss an action based upon the failure of a plaintiff to prosecute an action, comply with an order of the court, or notify the court of a change of address. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 629 (1962); *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998); *see also* N.D.N.Y.L.R. 41.2(b). Local Rule 10.1(b)(2) provides that all pro se litigants must notify the Court of any change of address. *See Moshier v. Trabout,* No. 96-CV-1666, 1998 WL 167298, at *1 (N.D.N.Y. Apr. 2, 1998). Here, subsequent to defendants' motion for summary judgment, Shaheen filed a response in opposition to defendants' motion and a notice of a change of address. *See* Docket Nos. 40, 41. Thus, Shaheen clearly has not abandoned his claim and dismissal would be an unduly harsh remedy. *See LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir.2001) (Rule 41(b) dismissal is a harsh remedy to be used only in extreme circumstances).

Therefore, defendants' motion on this ground should be denied.

### IV. Failure to Serve Defendants Doe and Jochomas

Shaheen's complaint asserts claims against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Shaheen or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

**\*5** As to defendant Jochomas, a summons for service of process upon Jochomas was issued on June 3, 2004. Docket Entry dated 6/3/04. The summons was returned unexecuted as to Jochomas on July 7, 2004. Docket No. 7. More than 120 days have passed since the summons for Jochomas was issued. Accordingly, it is also recommended that the complaint be dismissed as to Jochomas without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

### V. Conclusion

For the reasons stated above, it is hereby

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 34) be **GRANTED** as to defendants Filion, Smith, Horton, Perez, and Funk and as to both of Shaheen's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendants John Doe and Jochomas; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2006.
Shaheen v. Filion
Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.)))

**C** NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Second Circuit.
Howard AYERS, Plaintiff-Appellant,
v.
Sergeant Paul STEWART and Captain David Stark,
Defendants-Appellees.
**No. 96-2013.**

June 25, 1996.

Appeal from the United States District Court for the Western District of New York.
Howard Ayers, pro se, Attica, NY, for appellant.

Troy Oechsner, Assistant Attorney General, of counsel, of the State of New York, for appellees.

W.D.N.Y.

AFFIRMED.

Before OAKES, ALTIMARI, and WALKER, Jr., Circuit Judges.

**\*1** This cause came on to be heard on the transcript of record from the United States District Court for the Western District of New York (Telesca, *Judge* ), and was submitted.

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court be and it hereby is AFFIRMED.

Plaintiff-appellant Howard Ayers, who is proceeding *pro se* and *in forma pauperis,* appeals from a November 29, 1995 judgment of the district court granting summary judgment to the defendants pursuant to Fed.R.Civ.P. 56(c).

On November 22, 1993, Ayers filed a *pro se* complaint, pursuant to 42 U.S.C. § 1983, against Sergeant Paul Stewart and Captain David Stark of Elmira Correctional Facility, alleging that (1) Stewart filed a false administrative segregation recommendation against Ayers in retaliation for Ayers having filed a prison grievance against Stewart; (2) Stark violated Ayers's procedural due process rights while acting as a hearing officer for the administrative hearing, which resulted in Ayers being placed in administrative confinement; and (3) Stewart violated Ayers's due process rights by confiscating papers from Ayers's cell.

We review the district court's grant of summary judgment de novo to determine whether a genuine issue of material fact exists. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991). We draw all inferences in the light most favorable to the nonmoving party. *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). Reviewing a claim of retaliation by an inmate, however, mandates skepticism and particular care, because of the ease with which such a claim can be fabricated. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Ayers' allegation that a meeting had transpired among the defendants, during which they allegedly agreed to confine Ayers, is conclusory and is totally unsupported by the record. As such, it cannot defeat summary judgment. *See Finnegan v. Board of Educ.,* 30 F.3d 273, 274 (2d Cir.1994) (conclusory allegations insufficient to survive summary judgment motion on retaliation claim). Given the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.)))

weakness of his retaliation claim, Ayers' reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment. *See Colon, 58 F.3d at 873* ("If ... circumstantial evidence represented the sum total of [plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case."); *see also Flaherty v. Coughlin, 713 F.2d 10, 13-14 (2d Cir.1983).*

Although we have been reluctant to affirm summary judgment in cases where the party opposing the motion was not allowed to conduct discovery, *see, e.g., Flaherty, 713 F.2d at 13,* Ayers was given ample opportunity. Ayers conducted discovery and received five separate answers to interrogatories from Stewart. Despite his use of discovery mechanisms, Ayers is unable to ascertain information that would substantiate his claims. Although Ayers has attached two new affidavits to his brief on appeal to substantiate his claim that Stewart tried to coerce inmates to testify against him in the administrative segregation hearing, this evidence was not before the district court and we therefore do not consider it. Consequently, the district court properly granted the defendants' motion for summary judgment.

**\*2** Finally, the district court properly concluded that Ayers failed to establish the necessity of further discovery pursuant to Fed.R.Civ.P. 56(f). In order to oppose a motion on the basis of Rule 56(b), the plaintiff must file an affidavit detailing: (1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were unsuccessful. Ayers's general assertion that he needed more discovery does not meet these requirements, for Ayers fails to state what additional information he needs or how it will create a genuine issue of material fact.

We have considered the plaintiff's remaining contentions and affirm substantially for the reasons stated by the district court. For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.

C.A.2 (N.Y.),1996.
Ayers v. Stewart
101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward, Patrick
Abrams, and Jeffrey Guzy, Defendants.
**No. 1:02-CV-1584.**

April 18, 2006.

David Brickman, Office of David Brickman, Albany, NY,
for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo
Law Firm, Albany, NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action
against Defendants claiming violations of his civil rights
in connection with his employment as a police officer for
the City of Cohoes, New York. Presently before the Court
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its
entirety.

### I. FACTS

Plaintiff was a police officer with the City of Cohoes, New
York. During his first few years with the Cohoes Police
Department ("CPD") (1991-1993), Plaintiff was trained
and/or supervised by Defendants James Ward ("Ward")

and Patrick Abrams ("Abrams"). On August 21, 1995,
Plaintiff drove his police vehicle onto a curb and sidewalk,
nearly striking a pedestrian with the vehicle. As a result of
this incident, Plaintiff was the subject of an internal
investigation by the CPD. Plaintiff ultimately pleaded
guilty to violating Cohoes Police Department General
Order 0012-95 entitled "Rules of Conduct" and agreed to
undergo a psychological evaluation, undertake remedial
instruction on the operation of a police vehicle, and take
any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick
O'Donnell. After the arrest, but before Plaintiff transported
O'Donnell to the police station, O'Donnell suffered
injuries to his head and face. There also was damage to the
rear window of a police vehicle. As a result of this
incident, Plaintiff was the subject of an internal
investigation.

On January 8, 1998, while Plaintiff was in pursuit of
Richard Maynard, Mr. Maynard's body struck the ground
and/or a retaining wall on multiple occasions before
Plaintiff placed Maynard under arrest, causing Maynard to
suffer injury to his face. As a result of this incident,
Plaintiff was the subject of an internal investigation. This
investigation resulted in Plaintiff's pleading guilty in April
1998 to violating Cohoes Police Department General
Order 92-5 ("Off Duty Arrests"). As a result of this guilty
plea, Plaintiff agreed that he would receive a letter of
reprimand and thirty day suspension without pay, which
suspension was to be held in abeyance for one year unless
Plaintiff was found guilty of violating Cohoes Police
Department General Order 92-5 or 0019-48 ("Physical
Force") as a result of the January 8, 1998 incident
involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston
upon or against a police vehicle while attempting to arrest
him. During the course of the arrest, Gaston suffered
injury to his face and body and there was damage to the
police vehicle, including a dented fender and cracked
windshield. This incident resulted in an internal
investigation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

In 1998, there were discussions in the CPD regarding Plaintiff's participation in the D.A.R.E. program with the Cohoes City School District. School District officials advised Defendants that if Plaintiff was permitted to participate in the D.A.R.E. program, the school would drop the program.[FN1]

> [FN1.] Although Plaintiff denies this allegation, he fails to point to any record evidence tending to suggest that it is not true. Accordingly, this fact is deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

*2 On February 3, 1999, Plaintiff effected a traffic stop of Eric Sawyer. Plaintiff kicked and struck Sawyer before restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD.[FN2]

> [FN2.] Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra.*

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances filed on his and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock),[FN3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two months suspension without pay. There was no appeal of the arbitrator's decision.

> **FN3.** Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings

and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir.1999),* and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).* A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).*

If the movant is able to establish a basis for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

## III. DISCUSSION

### a. *Due Process*

Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmnt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir,* 1998

WL 709822, at *2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir.2004).

**\*5** To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such tangible interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

### b. First Amendment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. *See Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D.N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a police department might rise to the level of protected public speech. *See Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

**\*6** The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests. Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams's order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. *See Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed with the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[FN4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. *See Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[FN5]

> FN4. The Court declines to scour the record in an attempt to find triable issues of fact. *See Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir.2002)*("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted)

> FN5. Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue.

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

**\*7** Even assuming, *arguendo*, that Plaintiff did engage in protected speech, there is insufficient evidence of a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services, 2006 WL 93011 (2d Cir. Jan. 9, 2006)* ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir.1998)* for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); Colon v. Coughlin, 58 F.3d at 872-873; *Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049, at \*1 (2d Cir.1996)* (unreported decision); *Richter v. Monroe County Dept. of Social Serv., No. 01 Civ. 6409, 2005 WL 351052, at \*14 (W.D.N.Y. Feb. 11, 2005)* ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her termination."); *Ziemba v. Thomas, 390 F.Supp.2d 136, 157 (D.Conn.2005).*

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

**\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident

caused the March 26, 1999 change in duties is time-barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident.[FN6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

> [FN6.] Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion.

**IV. CONCLUSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Ethier v. City of Cohoes
Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony G. GILL, Plaintiff
v.
William RIDDICK, Senior Counselor, Mohawk Corr. Fac.;
T. Brown, Sergeant, Mohawk Corr. Fac.; J. Rosado, Deputy
Supt. of Health Care, Mohawk Corr. Fac.; K. Adamik,
Lieutenant, Mohawk Corr. Fac.; Kenneth Perlman, Supt.,
Mohawk Corr. Fac.; D. Malloni, C.O., Mohawk Corr. Fac.;
C.O. Cacocutti,[FN1] C.O., Mohawk Corr. Fac.; G. Watson,
C.O., Mohawk Corr. Fac.; K. Saxena, M.D., Mohawk Corr.
Fac., Defendants.

FN1. Defendants in form this Court that this Defendant's name is misspelled on the Amended Complaint and that the correct spelling is "Cacciotti." Dkt. No. 20 (Defs.' Mem. of Law at p. 1). The Court will refer to this Defendant by the correct spelling and will direct the Clerk of the Court to correct the docket report.

No. Civ. 9:03-CV-1456.

March 31, 2005.

Anthony G. Gill, Livingston Correctional Facility, Sonyea, New York, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, The Capitol, Litigation Bureau, Albany, New York, for Defendants, of counsel.

Lisa Ullman, Assistant Attorney General, of counsel.

REPORT-RECOMMENDATION and ORDER

TREECE, Magistrate J.

**\*1** Plaintiff Anthony Gill brings this *pro se* action, pursuant to 42 U.S.C. § 1983, alleging the Defendants violated his civil rights. Dkt. No. 5, Am. Compl. In his Amended Complaint, Gill alleges eight causes of action: (1) Defendant Riddick, Senior Correction Counselor at Mohawk Correctional Facility (Mohawk), filed a false misbehavior report against Plaintiff in retaliation for Gill exercising a First Amendment right; (2) Defendant T. Brown, Sergeant (Sgt.) at Mohawk, filed a false misbehavior report against Plaintiff in retaliation for Gill exercising a First Amendment right; (3) Defendant K. Adamik, Lieutenant (Lt.) at Mohawk, denied Gill his due process rights at a Tier II Disciplinary Hearing; (4) Defendant J. Rosado, Deputy Superintendent of Health at Mohawk, acted in concert with Defendants Riddick, Brown, and Adamik; (5) Defendant D. Malloni, Correction Officer (C.O.) at Mohawk, intentionally destroyed and/or tampered with Plaintiff's legal mail; (6) Defendant Kenneth Perlman, Supervising Superintendent of Mohawk, failed to render a decision on Gill's appeal of his Tier II Hearing disposition; (7) Defendants Cacciotti and G. Watson, C.O.s at Mohawk, subjected Gill to cruel and unusual punishment when, while en route to another facility, they denied Gill the opportunity to use the bathroom causing Plaintiff to urinate on himself, which was responded to with further taunting and humiliation; and (8) Defendant Kailash Saxena, Clinical Physician II, M.D., at Walsh Regional Medical Unit (Walsh or RMU), acted in concert with Defendants Adamik and Riddick and transferred Gill to another facility in retaliation for his exercise of a First Amendment right and to cover up the constitutional violations of the other Defendants.

Defendants filed a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6), on the ground that Plaintiff's Amended Complaint fails to state a cause of action. Dkt. Nos. 20 (Motion) & 28 (Reply). Plaintiff opposes the Motion. Dkt. No. 23.[FN2] For the reasons explained below, it is recommended that Defendants' Motion be granted in part and denied in part.

FN2. This matter was referred to the undersigned for a report-recommendation pursuant 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

## I. MOTION TO DISMISS STANDARD

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

**\*2** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint). In construing the complaint favorably to the pleader, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *see also Scheuer v. Rhodes,* 416 U.S. at 236; *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). In spite of the deference the court is bound to give to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

The Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520-21) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing Second Circuit opinion in *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun. 11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan. 10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district). As the Second Circuit has noted, Anthony Gill, the Plaintiff herein is no stranger to the courts. *See Gill v. Pidlypchak* 389 F.3d 379, 384 (2d Cir.2004) (noting that the plaintiff therein, Anthony G. Gill, "is no stranger either to the grievance system or to the federal courts"). In light of Gill's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein. [FN3]

> FN3. Gill has filed twenty (20) lawsuits in this district alone:
>
> (1) *Gill v. LeFevre,* 85-cv-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute);
>
> (2) *Gill v. Padilla,* 88-cv-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute);
>
> (3) *Gill v. Burch,* 94-cv-369 (FJS/DNH) (closed on Apr. 1, 1999-Defts.' Mot. for Summ. J. granted);
>
> (4) *Gill v. Kramer,* 98-cv-45 (FJS/GJD) (closed on Sept. 27, 1999-Stip. of Discont.);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

(5) *Gill v. Anderson,* 98-cv-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defts.' Mot. for Summ. J. granted);

(6) *Gill v. Gummerson,* 99-cv-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defts.);

(7) *Gill v. Dann,* 00-cv-566 (NAM/RFT) (closed on Nov. 20, 2001-failure to prosecute);

(8) *Gill v. Tuttle,* 00-cv-585 (DNH/DRH) (currently stayed);

(9) *Gill v. Doe,* 00-cv-983 (GLS/DEP) (closed on June 8, 2004-Defts.' Mot. for Summ. J. granted);

(10) *Gill v. Calescibetta,* 00-cv-1553 (LEK/DEP) (closed on Aug. 5, 2004-frivolous action);

(11) *Gill v. McGinnis,* 00-cv-1787 (LEK/RWS) (*habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000);

(12) *Gill v. Smith,* 00-cv-1905 (FJS/GJD) (currently pending, trial date to be set);

(13) *Gill v. Butero,* 01-cv-82 (LEK/DRH) (closed on Apr. 30, 2003-Defts.' Mot. to Dismiss granted at trial);

(14) *Gill v. Hoadley,* 01-cv-323 (FJS/DEP) (currently pending);

(15) *Gill v. Steinberg,* 02-cv-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.);

(16) *Gill v. Pflueger,* 02-cv-130 (DNH/GJD)

(closed on Jan. 30, 2003-Defts.' Mot. to Dismiss granted);

(17) *Gill v. Coyne,* 02-cv-1380 (TJM/GHL) (currently pending);

(18) *Gill v. Pidlypchak,* 02-cv-1460 (JMH/RFT) (currently pending);

(19) *Gill v. Erickson,* 02-cv-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003);

(20) *Gill v. Riddick,* 03-cv-1456 (NAM/RFT) (currently pending).

In light of Gill's litigious track record, as stated above, and the Second Circuit's explicit recognition that Gill has stepped into that rare status for inmate litigants as being deemed not entitled to "special solicitude," we place both parties on notice that FED. R. CIV. P. 11 sanctions may be applicable, when warranted, for any future litigation pursued by Gill. However, Rule 11 sanctions will not be considered for this case.

## II. BACKGROUND

**\*3** The following facts are derived from the Amended Complaint, which on a motion to dismiss this Court must construe as an accurate depiction of what took place. Due to the complexity of the facts involved and the numerous Defendants and claims asserted, the Court shall recite the relevant factual averments, set forth in the Amended Complaint, as it pertains to Gill's separate claims. As a general statement relevant to all claims, the Court notes that on or about June 10, 2002, Gill was transferred from Elmira Correctional Facility to the Walsh Regional Medical Unit (Walsh or RMU).[FN4] Dkt. No. 5, Am. Compl. at ¶ 1. Gill believed that this transfer was due to his chronic asthmatic medical condition. *Id.* Upon admission to Walsh, Gill was housed in the general population medical unit, C-wing, room C2B3-03, and was informed by Defendant Saxena that he was indeed transferred to Walsh due to his asthma condition and

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

would remain there until his scheduled parole board appearance in July 2003. *Id.* at ¶ 2.

FN4. Walsh Medical Center is a regional medical unit located on the grounds of Mohawk Correctional Facility. N.Y. COMP.CODES R. & REGS. tit. 7, § 100.100.

Retaliation Claims Against Defendants Riddick, Brown, and Rosado-First, Second, and Fourth Causes of Action

Walsh RMU has a "Problem Solving Committee" chaired by prison officials and inmate representatives from each living unit. Am. Compl. at ¶ 3, Ex. A, Vander Bosch Aff.FN5 at ¶ 3. The inmate representatives are selected by patient/residents of the respective living units, *i.e.,* A-wing, C-wing. *Id.* The C-wing at Walsh is divided into two separate living units, C-1 and C-2. Vander Bosch Aff. at ¶ 4. In the past, C-wing was permitted two inmate/patient representatives, one from the C-1 and one from C-2 living areas, to represent the C-wing before the Problem Solving Committee. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 5. At the time Gill was transferred to Walsh RMU, the C-wing only had one representative, inmate Samuel Kelly, who resided in the C-1 section. Am. Compl. at ¶ 3; Vander Bosch Aff at ¶ 6. Having no general or formal election procedures, the residents of the C-2 area approached Gill and collectively asked that he act as the C-2 Problem Solving Committee representative and work in conjunction with the C-1 representative. Am. Compl. at ¶ 3; Vander Bosh Aff. at ¶ 8. After a majority of the patient/residents in the C-2 living area of the C-wing selected Gill as the C-2 representative, Gill accepted such position. Am. Compl. at 3; Vander Bosh Aff. at ¶¶ 9-11.

FN5. Exhibit A, attached to Plaintiff's Amended Complaint, consists of affidavits of eight inmates all housed at Walsh, in the C-wing, during the relevant time. The Court has reviewed the contents of each affidavit and finds that they generally contain the same information same names, living assignment, and time spent at Walsh. In light of the fact that the affidavits generally contain the same material information, the Court will, in the interest of expedience, make reference to the first Affidavit submitted by Joseph Vander Bosch. It should be noted that in citing to Mr. Vander Bosch's Affidavit,

this Court makes no credibility nor reliability assessments with regard to this Affidavit as being more credible than the other seven Affidavits.

On or about September 1, 2002, Gill discussed his selection as the C-2 representative with Defendant Rosado. Am. Compl. at ¶ 8. On or about September 4, 2002, per the direction of Defendant Rosado, Gill submitted an agenda for the upcoming September 2002 Problem Solving Committee meeting. Am. Compl. at ¶ 4; Ex. B (typed agenda). The agenda, which contained multiple issues that were reviewed and approved by the residents of C-wing, was forwarded to Defendants Rosado and Riddick.FN6 Am. Compl. at ¶ 4. Plaintiff also attached to the agenda a memorandum he wrote to Defendant Riddick, dated August 29, 2002, notifying the recipients that he had been selected as the C-2 representative and would work in conjunction with the C-1 representative, Mr. Kelly. *Id.,* Ex. B. On or about September 5, 2002, Defendant Riddick provided Plaintiff with a copy of the August 21, 2002 Problem Solving Committee meeting minutes. FN7 Am. Compl. at ¶ 5, Ex. C (Memorandum of Minutes of Aug. 21, 2002 Meeting addressed to "All Concerned" from Defendant Riddick).

FN6. Gill also asserts he hand delivered the agenda to Mr. Pryor who is not a Defendant in this action. Am. Compl. at ¶ 4, n. 1.

FN7. It is unclear, and no inference can be drawn one way or another, whether the minutes were provided to Gill in his capacity as representative or as a general circulation given to all resident inmates.

**\*4** On or about the morning of September 7, 2002, Gill asked Defendant Brown about a recent memorandum posted by prison officials concerning the Walsh yard staying open until 11:00 p.m., as well as other issues concerning C-wing. Am. Compl. at ¶ 6. In response, Defendant Brown stated that Gill should mind his business and not be concerned about inmate activities. *Id.* at ¶ 7. Gill then informed Defendant Brown that he had been selected as the C-2 representative to the Problem Solving Committee and C-wing patients had asked him to inquire about their privileges since the posted memorandum was not being honored. *Id.* When Defendant Brown inquired how Plaintiff obtained such representational status, Gill disclosed his previous September 1st conversation with Defendant Rosado who accepted Plaintiff's appointment. *Id.* at

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

¶ 8. After Gill provided Brown with a copy of his August 29th Memorandum, Brown informed Gill that he would check into the yard matter. *Id.*

On or about September 10, 2002, Gill and inmate Kelly, C-1 representative, met with Defendant Riddick in the C-wing yard to discuss issues presented in the September 2002 proposed agenda. *Id.* at ¶ 9. During this meeting, Gill asked Defendant Riddick if the agenda he submitted had been circulated and also inquired as to the date of the upcoming meeting. *Id.* Defendant Riddick responded that there wasn't going to be a meeting until prison officials saw fit and that at no time in the past did the living units have two inmate representatives as one was sufficient. *Id.* at ¶ 10. Riddick also declared that the agenda was too demanding and that Plaintiff would be subjected to disciplinary action for filing the agenda on the basis that he was submitting legal work on behalf of the inmates in C-wing. *Id.* The following day, Gill wrote Defendant Rosado about the encounter with Defendant Riddick and requested Defendant Rosado to confirm, based on their previous September 1st conversation, whether she now disapproved of Plaintiff's selection as the C-2 representative. *Id.* at ¶ 11, Ex. D (typed letter). Defendant Rosado did not respond to Gill's inquiries.[FN8] *Id.*

> FN8. Gill states that upon information and belief, inmate Kelly also wrote a letter to Defendant Rosado regarding Defendant Riddick's disapproval of Gill's selection. Am. Compl. at ¶ 11, n. 3. Plaintiff did not submit Kelly's letter but did attach a memorandum from Defendant Rosado to Kelly in response to Kelly's correspondence dated September 6, 2002. *Id.,* Ex. E. In this correspondence, Rosado states, "[t]he correct procedure for an inmate to represent his unit on the problem solving committee is to be elected by his peers [and][t]his procedure is overseen by the Guidance Counselor." *Id.* Gill asserts that Rosado's response to Kelly established for the first time a new policy on how an inmate can become an inmate representative to the Problem Solving Committee. *Id.*

On or about September 12, 2002, Gill was issued two separate disciplinary reports authored by Defendants Brown and Riddick. *Id.* at ¶ 12, Ex. G (misbehavior reports). In his report, dated September 11, 2002, Defendant Brown relayed the substance of his September 7th encounter with Plaintiff, which was in accord with Plaintiff's account, as described above. *Id.*

Defendant Brown further stated that, after his encounter with Gill, he wrote to Defendant Riddick to confirm Gill's representations to which Riddick responded in a written statement that Gill was not the Problem Solving Committee representative.[FN9] *Id.* Brown accused Plaintiff of violating prison rule 107.20 (lying) and 110.10 (impersonation). Defendant Riddick's report, dated September 10 or 11, 2002,[FN10] recounts the encounter between himself and Gill on September 10th in the C-wing outside recreation area, however, such report is not in accord with Plaintiff's version. According to Riddick's report, while Riddick was sitting talking with other inmates in the yard, Gill approached him in an aggressive manner, stood over him, and demanded certain information about the Walsh Problem Solving Committee. Riddick replied that, as he told him throughout the week, Gill is not an inmate representative. *Id.* Riddick claimed that Gill then became loud, stating "you're a racist. You know I file lawsuits and that's why you oppose me as a representative. I am a rep until Administration says otherwise." *Id.* In his report, Riddick asserted that Gill's loud aggressive speech attracted the attention of the other inmates in the yard. *Id.* Defendant Riddick accused Plaintiff of violating rules 107.11 (harassment) and 104.13 (disturbance). *Id.*

> FN9. Brown asserts in his report that he attached to the report a copy of Riddick's written statement, however, such statement was not included as an exhibit to Plaintiff's Amended Complaint. Plaintiff asserts that at his disciplinary hearing he requested Riddick's written statement, which was not produced. Am. Compl. at ¶¶ 14 & 17.

> FN10. It is unclear whether the report is dated September 10[th] or 11[th].

**\*5** Plaintiff believed that these reports were false and were filed as retaliation for Plaintiff exercising his right to make oral requests and for filing his grievance agenda for the Problem Solving Committee to address at an upcoming meeting. *Id.* at ¶ 13. Plaintiff filed institutional grievances against Defendants Brown and Riddick for the filing of false disciplinary reports in retaliation for Plaintiff exercising his right to redress grievances to the Problem Solving Committee. *Id.* at ¶ 13, n. 4, Ex. F (grievance).

Due Process/Retaliation Claims Against Defendants Adamik

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

and Rosado-Third and Fourth Causes of Action

The disciplinary reports authored by Defendants Riddick and Brown were consolidated and a Tier II Hearing on both reports commenced on September 16, 2002, with Defendant Adamik presiding as hearing officer. Am. Compl. at ¶ 14. Gill pleaded not guilty to all charges. *Id.* Plaintiff requested witness testimony from Defendants Brown, Riddick, and Rosado, C.O. Swanson, and inmates Kelly and Cruz. *Id.* Plaintiff also requested document production, specifically, the letter sent by Defendant Brown to Defendant Riddick, as referenced in Brown's misbehavior report, as well as any Walsh RMU written policies disclosing the procedures for inmate elections as Problem Solving Committee representative. *Id.* After Gill testified on his own behalf, [FN11] the hearing was adjourned "for witnesses and document production." *Id.* at ¶ 15. On or about September 18, 2002, testimony was procured from inmates Kelly and Cruz, C.O. Swanson, and Defendant Brown. Inmates Kelly and Cruz testified that they were present in the C-wing yard on September 10, 2002, and witnessed the encounter between Defendant Riddick and Gill. *Id.* at ¶ 16. Both inmates asserted that Gill did not at any time harass or create a disturbance. *Id.* Inmate Kelly further testified that throughout the duration of his confinement at Walsh, each housing unit had two inmate representatives and that there hadn't been any "elections" for approximately five years. *Id.* C.O. Swanson testified on Gill's behalf and stated that, on September 10, 2002, he was employed as the "A-man" on C-wing and at no time was he informed by Defendant Riddick, or anyone else, that Plaintiff harassed Riddick or created a disturbance in the yard. Defendant Brown testified about the letter he wrote to Defendant Riddick but could not produce a copy of such letter.

FN11. In his Amended Complaint, Gill asserts the sum and substance of his testimony was as follows:

[P]er [plaintiff's] September 1, 2002, conversation with defendant Rosado about plaintiff being selected as the C-2 inmate Problem Solving Committee representative by his peers, that there was no disapproval of this selection and that defendant Riddick had in fact provided plaintiff with the August 2002 Problem Solving Committee minutes ... and that on information and belief, there hasn't been an election held within the past five years to elect representatives. Further, that plaintiff never violated the alleged prison rules violation

authored by the named defendants.

Am. Compl. at ¶ 15.

On the same date, that is September 18th, Gill submitted a formal complaint to Defendant Perlman to have Defendant Adamik removed from his role as hearing officer due to his prejudice and failure to conduct a fair and unbiased hearing. *Id.* at ¶ 19, Ex. H (typed complaint). In sum Gill complained that during the hearing when he and Adamik disagreed on an issue, Gill stated he would appeal that issue to which Adamik responded "you can appeal this issue, but you're going to los[e]." *Id.* Gill asked Defendant Perlman to assign a different officer to conduct the hearing. *Id.* Defendant Perlman did not respond to Gill's September 18th complaint. *Id.* On September 27, 2002, Defendant Brown approached Gill at his living quarters and stated, "next week you'll be locked up, just because you requested for Dep. Rosado as a witness, you think she'll testify for you. You're guilty, accept it, you're in a no win situation. You keep filing fucking grievances around here you'll be locked up until July, smart ass jailhouse lawyer." *Id.* at ¶ 20. Later that day, Gill filed a grievance against Defendants Brown and Adamik for collusion regarding Gill's disciplinary hearing and asked that Adamik be removed as hearing officer. *Id.* at ¶ 21, Ex. I (typed grievance).

**\*6** On or about October 1, 2002, Plaintiff's hearing was set to continue but was briefly adjourned so Gill could retrieve his documents. *Id.* at ¶ 22. Upon his return to the hearing with his documents in hand, Gill witnessed Defendants Adamik, Rosado, and Riddick exiting a room adjacent to the hearing office. *Id.* at ¶ 23. It appeared to Gill as though the three had been in a conference behind closed doors prior to the re-commencement of his hearing. *Id.* When the hearing re-convened, Gill attempted to place on the record what he had witnessed with respect to these Defendants conversing in a separate room, however, Defendant Adamik prevented Plaintiff from placing such information on the record and arbitrarily dismissed Defendant Rosado as Plaintiff's witness and proceeded instead with the testimony of Defendant Riddick.[FN12]*Id.*

FN12. Gill asserts that Defendant Riddick supplied contradictory testimony that did not support his written report. Am. Compl. at ¶ 23.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

At the conclusion of Gill's hearing, on October 1, 2002, Defendant Adamik found Plaintiff guilty of all charges and sentenced Plaintiff to thirty (30) days keeplock confinement with corresponding loss of privileges, recreation, telephone, packages, and commissary. *Id.* at ¶ 24, Ex. G. Plaintiff's sentence was set to run from October 1st through October 31st. *Id.* In his hearing disposition statement, Defendant Adamik stated the evidence he relied upon was the misbehavior reports and testimony rendered by Gill, Brown, inmates Kelly and Cruz, C.O. Swanson, and Riddick. *Id.,* Ex. G. Adamik further stated that Rosado was dismissed in the middle of the hearing due to Gill's refusal to ask questions when instructed. *Id.*

**Due Process and First Amendment Claims Against Defendants Malloni and Perlman-Fifth and Sixth Causes of Action**

On October 2, 2002, Plaintiff had his Tier II Hearing Appeal notarized by the facility's law library officer. Am. Compl. at ¶ 25. The following morning, Plaintiff issued Defendant Malloni his appeal in a sealed envelope addressed to Superintendent Perlman, with the belief that Defendant Malloni would deposit Plaintiff's mail accordingly. *Id.* at ¶ 26, Ex. J (copy of typed and notarized appeal). As of October 24, 2002, more than fifteen days had elapsed since the filing of Gill's appeal and Defendant Perlman had still failed to render a decision on such appeal. *Id.* at ¶ 34. On or about April 15, 2003, while incarcerated at Five Points Correctional Facility, Gill received a memorandum decision from Captain Bellnier stating that Defendant Adamik's October 1st Tier II Hearing Decision had been reversed and all hearing records were expunged. *Id.* at ¶ 40, Ex. N.

**Eighth Amendment Claims Against Defendants Watson and Cacciotti-Seventh Cause of Action**

On or about October 17, 2002, Plaintiff was transferred from Walsh RMU back to Elmira Correctional Facility. Am. Compl. at ¶ 27. At approximately 9:30 a.m., on October 17th, Gill was escorted to the transporting vehicle by Defendants Watson and Cacciotti. *Id* . at ¶ 28. At approximately 11:00 a.m., while en route to Elmira, Gill informed Watson and Cacciotti that he needed to urinate. *Id.* at ¶ 29. Both Defendants laughed and dismissed Gill's request. *Id.* Plaintiff then urinated on himself. *Id.* When he informed Defendants of his condition, Defendant Cacciotti replied, "Howard Stern would love you on his show." *Id.* Defendants then pulled into a mini-mart gas station at which

time Plaintiff again requested use of the facility to relieve himself; such request was again denied. *Id.* at ¶ 31. Plaintiff was unable to control himself and urinated on himself for a second time. *Id.* When Gill reported his condition to Defendants, Defendant Cacciotti replied, "I don't care if you shit on yourself." *Id.* Plaintiff arrived at Elmira at approximately 12:10 p.m.

**Retaliation Claim Against Defendant Saxena-Eighth Cause of Action**

**\*7** On or about November 12, 2002, while confined at Elmira, Plaintiff's correction counselor informed Plaintiff that he had been transferred from Walsh for "medical reasons." *Id.* at ¶ 37. On or about December 11, 2002, Gill filed a grievance against Defendant Saxena for retaliatory transfer. *Id.* at ¶ 38, Ex. M (grievance). In his grievance, Gill stated that Saxena's transfer was retaliation for his exercise of his constitutional rights and Saxena conspired with other Walsh RMU officials to deny Gill his rights. *Id.,* Ex. M. Gill also requested Saxena explain the medical reasons that led to his transfer. *Id.*

### III. DISCUSSION

#### A. Retaliation Claims

In Plaintiff's First, Second, Third, Fourth, and Eighth Causes of Action, Gill asserts that Defendants Riddick, Brown, Adamik,[FN13] Rosado, and Saxena retaliated against him for engaging in constitutionally protected activity and in doing so, violated his First Amendment rights as well as his Fourteenth Amendment Substantive Due Process rights.

> [FN13.] In moving for dismissal, the Defendants have not construed a retaliation claim to have been asserted against Defendant Adamik. However, Plaintiff clearly states in his Amended Complaint that "the protected conduct was the substantial and motivating factor in the decision by defendant Adamik to punish and discipline plaintiff[ .]" Am. Compl. at ¶ 47.

The retaliatory actions vary with each Defendant. With regard to Defendants Riddick and Brown, the adverse action is the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

filing of false misbehavior reports; Defendant Adamik is alleged to have conspired with Defendants Riddick, Brown, and Rosado in rendering a guilty determination on both reports; Defendant Rosado acted in concert with Defendants Riddick, Brown, and Adamik; and Defendant Saxena transferred Gill to another facility.

First, with regard to Gill's assertion that Defendants Riddick and Brown filed false misbehavior reports against him, we note that prisoners have no constitutional right to be free from being falsely accused, and thus, the filing of a false report does not give rise to a constitutional violation *per se.* *Freeman v. Rideout,* 808 F.2d 949, 950 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to A *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman,* at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564-66. In the case at bar, however, Gill is asserting that Defendants Riddick and Brown filed false reports against him as *retaliation* for the exercise of a constitutional right and thus violated his substantive due process right, under the Fourteenth Amendment, as well as his First Amendment right. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 587-90 (citing cases) ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights."). Thus, we may properly proceed with an assessment of Gill's retaliation claims against these Defendants.

**\*8** To state a claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech

and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997) (alleging retaliatory transfers).

The Second Circuit has noted that retaliation claims are prone to abuse, therefore, courts should examine such claims "with skepticism and particular care." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467-68 (S.D.N.Y.1998).

In *Flaherty v. Coughlin,* the Second Circuit described three different methods of pleading retaliation, each requiring separate analysis by the court. 713 F.2d 10, 13 (2d Cir.1983). First, a retaliation claim supported by "specific and detailed allegations" must be pursued with full discovery. *Id.* (cited in *Carpio v. Walker,* 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15, 1997)). Whereas, a claim asserting retaliation in "wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* ("In such a case, the prisoner has no factual basis for the claim other than an adverse administrative decision and the costs of discovery should not be imposed on defendants."). The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.; see also Carpio v. Walker,* 1997 WL 642543, at \*6.

The first prong of a retaliation analysis requires this Court to assess whether Gill was engaged in constitutionally protected activity. In construing Gill's Complaint, it appears that the protected activity at issue is two-fold. On the one hand, Gill asserts he had a constitutional right to serve as the C-2 wing inmate representative to the Walsh Problem Solving Committee and to participate on that Committee without repercussion. On the other hand, Gill asserts that the filing of his "Grievance Agenda" and making oral complaints about the facility's procedures and enforcement therewith was the protected activity and the motivating factor for the retaliation he received. While the Defendants focus on the former theory,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

this Court finds that it is Gill's latter theory which saves his claim from dismissal at this juncture. Such theory is not raised for the first time in his opposition to the Defendants' Motion as Defendants suggest.[FN14] In fact, Gill makes multiple references in his Complaint to his filing a "Grievance Agenda" as well as making oral complaints which, in his estimation, served as the basis for the retaliatory backlash he received, namely, false reports, guilty determinations, and a facility transfer. Our assessment that the agenda and statements are the primary constitutional activities at issue is further bolstered by Gill's assertion that Defendants Riddick, Brown, Rosado, and Adamik violated New York's Correction Law § 138, which states in pertinent part: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4). We now assess whether Gill has properly met the first prong of the retaliation analysis.

FN14. In their Reply, Defendants assert that Plaintiff, in his Opposition, "shifts his focus towards arguing that the retaliation against him was instead because he filed grievances, which defendants admit would be constitutionally protected conduct under the law." Dkt. No. 28, Defs.' Reply at p. 2. Defendants then point out that Plaintiff only mentions the filing of grievances in a footnote in his Amended Complaint. Id. It is this Court's estimation that Defendants have misconstrued, to some extent, Plaintiff's use of the word "grievance," in categorically stating that he shifted his focus. It is clear from both the Amended Complaint and Plaintiff's Opposition to Defendants' Motion that the "grievance" Plaintiff refers as the basis for the retaliatory acts is primarily the "grievance agenda" he submitted for the upcoming Problem Solving Committee meeting. That is not to say that the Plaintiff has not alleged, that the Grievance he filed against Defendant Riddick for threatening him with disciplinary conduct, attached to the Amended Complaint as Exhibit F, may also have played a role in the retaliatory actions. We only point out that Gill has not attempted to salvage his claims by asserting new theories in his Opposition papers.

**\*9** First, we address Gill's participation on the Problem Solving Committee, which Defendants assert is not protected conduct. While the Second Circuit has not definitively weighed in on the matter, other district courts throughout this Circuit have held

that an inmate's participation as a member of a formal problem solving committee, such as the Inmate Grievance Resolution Committee (IGRC) or the Inmate Liason Committee (ILC), is protected activity. In Alnutt v. Cleary, 913 F.Supp. 160 (W.D.N.Y.1996), the court held that an inmate has a protected First Amendment right to "engage in his duties as IGRC representative without fear of reprisal or retaliation." 913 F.Supp. at 169. In reaching this determination, the court relied on a multitude of precedents establishing an inmate's protected right to seek redress for grievances. First, the court began with the premise recognized by the Second Circuit in Franco v. Kelly, 854 F.2d 584 (2d Cir.1988) that "prisoners must be permitted the 'free and uninhibited access' to both administrative and judicial forums for the purpose of seeking redress of grievances." Id. (quoting Franco, 854 F.2d at 589). The court then cited the following precedents amongst the district courts in this Circuit, as well as cases from sister Circuits, holding that petitioning for redress of grievances is protected activity:

Jones v. Coughlin, 45 F.3d 677 (2d Cir.1995) (inmate stated cause of action where he alleged retaliation as result of administrative complaint he filed against corrections officer); Morrison v. Lefevre, 592 F.Supp. 1052 (S.D.N.Y.1984) (inmate stated cause of action where he alleged retaliation, due, in part, to assistance he provided to other prisoners in filing lawsuits); McCorkle v. Walker, 871 F.Supp. 555 (N.D.N.Y.1995) (inmate stated a claim where he alleged that a prison nurse filed false charges against him in retaliation for his informing prison officials that she was nurse on duty when another inmate nearly drowned in infirmary); Payne v. Axelrod, 871 F.Supp. 1551 (N.D.N.Y.1995) (inmate stated cause of action where he alleged that a razor blade was planted in his cell in retaliation for reporting that a corrections officer set a fire in an inmate's cell); Cale v. Johnson, 861 F.2d 943 (6th Cir.1988) (inmate stated cause of action by alleging retaliation for complaining to associate warden concerning the poor quality of the food); McDonald v. Hall, 610 F.2d 16 (1st Cir.1979) (inmate stated cause of action where he alleged that he was transferred in retaliation for filing suits against prison officials, and for giving legal assistance to other inmates).

Alnutt v. Cleary, 913 F.Supp. at 169.

The court then noted that the principles established in the above cases "support the concept that [the inmate plaintiff] has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

a protected First Amendment right to engage in his duties as IGRC representative without fear of reprisal or retaliation." *Id.* (emphasis added). Then, after explaining the statutory evolution of the IGRC, the court noted that the inmates who filed grievances with the IGRC were exercising their First Amendment right to petition the government for redress of grievances and that "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Id.* at 169-70. As such, the court held that the inmate possessed a "constitutional right to be protected against retaliation by state officers who are not pleased with the activities engaged in and decisions made by [the inmate plaintiff] as IGRC representative." *Id.* Thus, it appears to this Court that an inmate's constitutionally protected right to serve as a grievance committee representative is derived from the inmates' protected rights to petition for redress. This derivative right has been upheld in other courts in this Circuit. *See Greene v. Coughlin,* 1995 WL 60020, at *15 (S.D.N.Y. Feb. 10, 1995) (analyzing, in the context of a procedural due process claim, whether an inmate had a liberty interest in maintaining position as IGRC representative and if certain procedures were mandated prior to removal from such position); *McCorkle v. Juchenwicz,* 1999 WL 163205, at *1 (S.D.N.Y. Mar. 23, 1999) (upholding an inmate's right to serve on the ILC and citing *Alnutt, inter alia,* in support of the ruling that "an inmate grievance committee representative has a constitutional right to seek redress of the grievances of other inmates without fear of retaliation"); *Maurer v. Patterson,* 197 F.R.D. 244, 247 n. 3 (S.D.N.Y.2000) (noting, in the context of deciding a Rule 50 motion for judgment as a matter of law, that an inmate has a protected right to engage in duties as IGRC representative); *Garrett v. Reynolds,* 2003 WL 22299359, at *4 (N .D.N.Y Oct. 7, 2003) (citing *Alnutt* for the proposition that an inmate has a "constitutional right to be protected from retaliation based upon his activities as an IGRC representative").

**\*10** Thus, in construing *Alnutt,* we find that prisoners have a constitutional right to serve as a grievance committee representative. While other courts have limited the *Alnutt* holding to participation on the IGRC and ILC, we do not believe the reasoning applied therein supports such limitation in the case at bar.[FN15] If an inmate's right to serve on a "formal" committee, like the IGRC, is derived from an inmate's right to seek redress of grievances, and not from the "formal creation" or state mandate of the committee, then it cannot be said that such right is solely limited to activities on a formal resolution

committee.[FN16] It would be more consistent to rule that an inmate serving on an "informal" grievance committee would also be entitled to constitutional protection since he would be performing the same tasks as a representative on a formal committee, such as the IGRC.[FN17] The difference between formal and informal grievance committees is a distinction without form or reason. This leads us to an analysis of the other protected activity Gill asserts was the basis for retaliatory conduct imposed on him, that is, his filing of the grievance agenda and making oral complaints. We find that such conduct is clearly protected. *See McCorkle v. Walker,* 871 F.Supp. 555, 559 (N.D.N.Y.1995) (protected conduct at issue in plaintiff's retaliation claim was that he informed prison officials that the defendant nurse had been on duty at the infirmary when another inmate nearly drowned); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999) (protected conduct at issue was plaintiff's complaints to mess hall staff that his work schedule was a violation of state law). Moreover, New York State has enacted legislation that specifically protects Gill's conduct: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of insitutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4); *see also Gaston v. Coughlin,* 81 F.Supp.2d at 386 (noting that the prisoner's "attempts to obtain redress of a perceived violation of State law" were protected under both the Constitution and New York law); *Salahuddin v. Harris,* 657 F.Supp. 369, 376 (S.D.N.Y.1987) (noting that § 138(4) "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population). Thus, since clearly Gill's attempts to seek redress of grievances is protected activity, it is worth repeating, "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Alnutt,* 913 F.Supp. at 169-70.

FN15. Defendants similarly construe that an inmate's right to serve on a grievance committee is limited to the formal committee, namely, the IGRC. Dkt. No. 20 (arguing that "activities conducted as part of an informal problem resolution committee do not have the same protection" as IGRC activities, if protected, since "there is no case law supporting such an argument").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

FN16. In researching the genesis of an inmate's right to serve on a grievance committee, the Court found an unpublished Tenth Circuit opinion where the court was asked to decide whether an inmate has a protected right to provide legal work on behalf of another inmate. *See Northington v. Zavaras,* 229 F.3d 1164 (Table), 2000 WL 1133128 (10th Cir. Aug. 10, 2000). The circuit court stated that precedence in that circuit mandated the holding that such a right was not acknowledged. *Id.* at *2. In so ruling, the court noted in a footnote that "other federal courts have held that, *if a state creates a position* such as inmate representative, it must allow the representative to engage in his duties without fear of retaliation." *Id.* (emphasis added) (citing, *inter alia, Alnutt* ). We mention this unpublished decision only to point out that we do not interpret *Alnutt* the same. While the court in *Alnutt* referenced the state creation of the IGRC, the constitutional right to serve on that committee was not derivative of the state created nature of the committee, but rather, on the nature of the inmates' rights to seek redress for grievances.

FN17. In any event, even if we were to find that an inmate is only protected for participation on a formal committee, it is not clear to this Court whether or not the Problem Solving Committee at Walsh RMU was a formal tribunal.

Defendants ask this Court to find that, in light of the Supreme Court decision in *Shaw v. Murphy,* 532 U.S. 223 (2001), the rulings of the various district courts in our Circuit that hold that an inmate's activities on a grievance committee are protected are "no longer with force." Dkt. No. 20 at p. 7. The Court declines this invitation and finds *Shaw* completely distinguishable. First, *Shaw* concerned the constitutionality of a prison policy restricting inmate-to-inmate correspondence. In *Shaw,* Kevin Murphy, an inmate incarcerated at the Montana State Prison, served as an " 'inmate law clerk,' providing legal assistance to fellow prisoners." 532 U.S. at 225. Murphy learned that another inmate had been charged with assaulting a correctional officer and decided to assist the inmate with his defense. *Id.* Prison rules prohibited Murphy from providing assistance, but Murphy nonetheless investigated the alleged assault. *Id.*FN18 Murphy then sent a letter to the accused inmate discussing his investigation. However, in accordance with prison policy, such correspondence was intercepted by prison officials. *Id.* at 225-26. Based upon the content of the letter,

specifically, the accusations against the assaulted correction officer, Murphy was cited for violations of various disciplinary rules, and, after a hearing, was found guilty of violating two of those rules. *Id.* at 226.

FN18. Prison policy forbade Murphy, a "high-security" inmate from meeting with maximum security inmates. *Murphy,* 532 U.S. at 225 n .1.

*11 Before examining the Supreme Court's holding, we pause to point out some other distinctions, that is, in *Shaw* the inmate acted as a *legal representative* for inmates and sought to represent another inmate in court on his criminal charge of assault; whereas a representative on a grievance committee does not act as a legal representative, but rather, as a facilitator or adjudicator of grievances. Furthermore, the Court in *Shaw* was asked to decide "whether prisoners have *any* First Amendment rights when they send legal correspondence to one another." *Id.* (emphasis in original). Thus, the Court analyzed whether the prison policy at issue restricting inmate-to-inmate communications passed the constitutional test established in *Turner v. Safely,* 482 U.S. 78 (1987), which directs courts to ask wether the "restrictions are reasonably related to legitimate and neutral governmental objectives ." *Id.* (citing *Turner,* 482 U.S. at 89). Here, we are not asked to construe the constitutionality of any prison policy restricting Gill's communications.

In applying the *Turner* Test to the prison policy at issue, the Supreme Court in *Shaw* declined to afford First Amendment protection to inmates providing legal assistance to other inmates "beyond the protection normally accorded prisoners' speech." *Id.* at 231. We find such holding to be inapplicable to inmates participating on grievance committees in light of the fact that such participation and activities do not constitute legal work, but rather, involve a duty to investigate and adjudicate matters being grieved. Thus, it can hardly be said that a grievance committee member's role is analogous to an inmate performing legal work on behalf of other inmates. Taking this one step further, we also believe that the filing of an institutional grievance by an inmate on behalf of himself as well as others who share the same grievance is not comparable to providing legal assistance to other inmates. We also note that, as explained above, the right to serve as a grievance committee representative derives from an inmate's right to seek redress of grievances, a right undoubtedly protected by the Constitution.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

The inmate in *Shaw* argued that his right to provide legal advice "follows from a right to receive legal advice." 532 U.S. at 231 n. 3. In response, the Supreme Court noted that "even if one right followed from the other, Murphy is incorrect in his assumption that there is a free-standing right to receive legal advice." *Id.* (citing previous Supreme Court precedence limiting an inmate's right to receive legal advice from other inmates "only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (internal quotation marks and citations omitted). Neither the Supreme Court nor any court in our Circuit has similarly limited an inmate's right to seek redress of grievances.

**\*12** Finding that Gill has satisfied the first prong, our analysis of his retaliation claims continues. Under the second prong, a prisoner must allege that the Defendants took adverse action against him. The third prong requires an assessment of whether there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. To satisfy the second prong, a prisoner must present evidence inferring that Defendants acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492

(cited in *Davis,* 320 F.3d at 353).

As stated above, the adverse conduct varies with each Defendant. First, with regard to Defendant Rosado, it is unclear to this Court the precise role Gill alleges Rosado played in retaliating against him. Stated another way, it is unclear what adverse action was taken by Rosado. Gill's bald assertion that Rosado conspired with other Defendants to deny Gill his constitutional rights is wholly conclusory. It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Defendant Rosado's involvement is rather limited. According to Gill's Amended Complaint, he discussed his selection as C-2 representative with Rosado on or about September 1, 2002. Rosado then directed Gill to submit a grievance agenda for the upcoming meeting. Then, after his altercation with Defendant Riddick in the yard, Gill wrote Rosado a letter to confirm their previous conversation regarding his selection as a representative on the committee. Gill never received a response from Rosado. Then, Rosado was set to testify at Gill's hearing but was dismissed by the hearing officer. Based on the above facts, it has not been shown what *action* was taken by Rosado. From these bare facts, we cannot draw the inference that Rosado actively impeded Gill's ability to participate on the committee. It is clear from the facts alleged that, at best, Rosado's failure to speak on Gill's behalf or answer his correspondence, if received, amounts to nothing more than indifference or inactiveness, which is clearly not a constitutional violation. Furthermore, the fact that Plaintiff may have written a letter does not automatically render Rosado responsible for any constitutional violation. *See Thomas v. Coombe,* 1998 WL 391143, at \*6 (S.D.N.Y. July 13, 1998) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N .Y. Sep. 22, 1989) (the wrong must have been capable of mitigation at the time the supervisory official was apprised thereof); *Woods v. Goord,* 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Since Gill has not established any adverse conduct, he has failed to state a retaliation claim against Defendant Rosado. We therefore recommend dismissal of Gill's retaliation claim against Defendant Rosado.

**\*13** Turning to the other Defendants, Gill asserts that Defendants Riddick and Brown filed false misbehavior reports, Defendant Adamik found Plaintiff guilty of the false reports, and Defendant Saxena transferred Gill to another facility. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

moving for dismissal, Defendants focus solely on Gill's transfer from a medical facility to a non-medical facility as the only retaliatory conduct at issue and that such conduct is not adverse where the Plaintiff has not alleged that "his medical needs can only be treated adequately at Walsh and not the facility to which he was transferred." Dkt. No. 20. In his Amended Complaint, Gill explains that upon his arrival at Walsh in June 2002, he was informed by Defendant Saxena that he had been transferred to Walsh due to his asthmatic condition and that he would remain at Walsh until his parole board appearance set for July 2003. The chronology of events unfolded as follows:

| | |
|---|---|
| September 1, 2002 | Gill and Rosado converse about his selection as representative; |
| September 4, 2002 | Gill circulates the grievance agenda; |
| September 7, 2002 | Confrontation between Defendant Brown and Gill; |
| September 10, 2002 | Confrontation between Defendant Riddick and Gill; |
| September 12, 2002 | Gill receives two misbehavior reports, one from Brown, the other from Riddick; |
| September 16, 2002 | Hearing on reports with Defendant Adamik presiding; |
| October 1, 2002 | Defendant Adamik finds Gill guilty and dispenses keeplock punishment for thirty days and corresponding loss of privileges; |
| October 17, 2002 | Gill transferred to another facility on Dr. Saxena's orders |
| April 15, 2003 | Disciplinary disposition overturned; records expunged. |

Based upon this chronology, and focusing on the temporal proximity of Gill's exercise of his constitutional rights and adverse action, coupled with the fact that his disciplinary disposition was overturned on appeal, we find that Gill's retaliation claims against Defendants Riddick, Brown, Adamik, and Saxena, raise at least a colorable suspicion of retaliation such that he is entitled to pursue some discovery. While it is true that Gill has not asserted that the medical care he received at another facility was inadequate, he has at least stated a claim that the transfer itself was improperly motivated. As such, he has stated a cause of action for retaliation.[FN19] Based on the above analysis, we recommend that Defendants' Motion for dismissal of Gill's retaliation First Amendment and substantive due process claims against Defendants Riddick, Brown, Adamik, and Saxena be denied and discovery proceed on these claims.

defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report"). Thus, Defendants may pursue and defend their motives for their actions in a motion for summary judgment.

B. Procedural Due Process Claims

FN19. We note that in situations where the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

Gill asserts that Defendant Adamik violated Gill's constitutional rights when Adamik failed to conduct a fair and impartial hearing, denied Gill the opportunity to present his own witnesses, failed to issue a written statement as to the reason for such denial, and conspired with Defendants Riddick, Brown, and Rosado to violate Gill's First and Fourteenth Amendment rights. Gill also asserts that, in committing the conduct above, Defendant Adamik violated New York Correction Law § 138. As to Defendants Malloni and Perlman, Gill maintains that these Defendants violated his constitutional rights when Defendant Malloni destroyed his notarized appeal of his disciplinary hearing and Defendent Perlman failed to render a timely decision on such appeal. It appears to this Court that the claims against these three Defendants center around the disciplinary hearing and are primarily rooted in Fourteenth Amendment Procedural Due Process.

**\*14** With regard to procedural due process allegations, we note that in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* If the prisoner successfully establishes the presence of a protected liberty interest, he must then demonstrate that he was deprived of that interest without due process. *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). If, however, no liberty interest is implicated, then *a fortiori,* our analysis ceases and the claim should be dismissed.

The deprivation at issue in this case is the thirty (30) day disciplinary sentence in keeplock with corresponding loss of privileges. Therefore, in order for the Court to assess the viability of the process Gill received at his hearing, Gill must initially show that he possessed a liberty interest in remaining free from keeplock and receiving recreation, packages, commissary, and phone privileges. As explained below, the Court finds that Gill cannot establish the existence of such a liberty interest and therefore cannot maintain procedural due process claims against Defendants Adamik, Malloni, and Perlman.

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic

liberty interests in prisoners." ' *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

State statutes and regulations may also confer liberty interests on prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U.S. at 460). Such interests, however, are generally limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484;*see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d at 392. Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin,* 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*15** Clearly, the thirty-day sentence to keeplock and corresponding loss of privileges would not fall under the auspice of "the most basic liberty interests" and, therefore, Gill would not have a valid liberty interest arising under the Due Process Clause. As for a state created liberty interest, Gill fails to allege any facts demonstrating that the conditions surrounding his thirty-day punishment were "atypical" or "significant" as to create a liberty interest. As such, where no liberty interests are at stake, no procedures are required. *Kentucky Dep't of Corr.,* 490 U.S. at 460. Since Gill cannot establish he had a liberty interest in remaining free from the punishment imposed at the disciplinary hearing, the Court need not assess the adequacy of the process he received. Accordingly, Plaintiff has failed to state a procedural due process claim. *See Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)* for the proposition that loss of privileges, *i.e.,* commisary, recreation, package, and telephone, did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

amount to an atypical and significant deprivation and clearly fell within the expected parameters of the sentence imposed by a court of law); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9 (1979) ("There is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires.") (quoted in *Rouccio v. Coughlin,* 923 F.Supp. 360, 371 (E.D.N.Y.1996)). We further note that, with regard to Defendant Rosado, Gill has failed to allege Rosado's personal involvement in any alleged due process violations. It is therefore, recommended that Defendant's Motion to Dismiss be granted and any procedural due process claims asserted against Defendants Adamik, Malloni, Perlman and Rosado be dismissed. Since we recommend dismissal of the claims asserted against Defendants Perlman and Rosado, these Defendants should be dismissed from this lawsuit.

C. Interference with Legal Mail

In his Fifth Cause of Action against Defendant Malloni, Gill asserts that Defendant Malloni also violated his First and Fourteenth Amendment rights when he tampered with Gill's "legal mail." In this regard, Gill analogizes his prison disciplinary appeal to legal mail and Malloni's interference therewith denied Gill access to the courts. Were we to draw the same analogy, we would nevertheless find such claim to be wholly conclusory and should be dismissed. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ("[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead a litany of general conclusions that shock but have no meaning."); *see also Cekic v. Coombe,* 2000 WL 1373136, at *1 (N.D.N.Y. Mar. 27, 2000) (quoting *Barr* ). Notably, Gill's legal mail claim fails to properly allege a cognizable cause of action for interference with legal mail since he only cites to this one instance, he has not pled malicious intent, and he cannot show that he was prejudiced by the interference in light of the fact that the appeal was ultimately decided in his favor.[FN20] *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing cases for the proposition that an isolated incident of tampering is insufficient to state a constitutional violation and in cases where the incidents are few and a violation is not patent, the plaintiff must specifically allege invidious intent or actual harm); *Cancel v. Goord,* 2001 WL 303713, at *4-6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) for the proposition that a prisoner who asserts a First Amendment violation resulting from interference with mail must show that the prison officials

"regularly and unjustifiably interfered with the incoming legal mail," and citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.")). Accordingly, such claims, to the extent stated, should also be dismissed against Defendant Malloni. Since we recommend dismissal of the only claims asserted against Defendant Malloni, we accordingly recommend dismissal of Defendant Malloni from this lawsuit.

> FN20. We also note that his claim against Defendant Malloni involves a significant leap in logic: *If* there was a delay in the decision, *then* Malloni interfered with his mail.

D. Eighth Amendment Claims

*16 Gill asserts that Defendants Cacciotti and Watson violated his Eighth Amendment right to be free from cruel and unusual treatment when they denied him the opportunity to use the bathroom while en route to Elmira Correctional Facility and further tantalized him when he informed them that he had urinated on himself. According to the Complaint, Plaintiff boarded the transferring vehicle at approximately 9:30 a.m., he asked to use a bathroom at 11:00 a.m., and arrived at Elmira at approximately 12:10 p.m. Plaintiff's Eighth Amendment claim centers around the hour and ten minutes he was denied access to a lavatory.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane, et al.,* 338 F.3d 155, 161 (2d Cir.2003)). The Eighth Amendment is violated only by those deprivations which deny "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Conditions of confinement rise to the level of an Eighth Amendment violation only when extreme deprivations are imposed. *Hudson v. McMillian,* 503 U.S. 1 (1992). A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

at issue is " 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities," ' and that the defendant possessed a " 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain." ' *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)); *see also Wilson v. Seiter,* 501 U.S. 194 (1991). The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed. *Graham v. Fries,* 1996 WL 1057212, at *8 (E.D.N.Y. Oct. 16, 1996). When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the "duration of the condition and the potential for serious physical harm." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); *see also Graham v. Fries,* 1996 WL 1057212, at *8 ("While many conditions may be restrictive and harsh, they do not violate the Eighth Amendment unless they deprive inmates of the minimal civilized measures of life's necessities."). To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was "deliberately indifferent" to the severe deprivation. *Wilson v. Seiter,* 501 U .S. at 304-05.

Applying these standards to the case at bar, we find that, in accordance with case law in this circuit, "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (no violation where prisoner urinated and defecated on himself after being deprived the opportunity to use a toilet for approximately ninety minutes); *see also Odom v. Keane,* 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (absence of a working toilet in prison cell for approximately ten hours, absent any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment); *Bourdon v. Roney,* 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (pre-trial detainee deprived of bathroom privileges for a maximum of three hours "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time").[FN21] Gill has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most. No matter how humiliating urinating on oneself can be, since Gill has failed to prove the objective component, we need not reach the subjective component because "without a constitutional violation, Defendants clearly could not have acted with "deliberate indifference." *Odom v.*

*Keane,* 1997 WL 576088 (S.D.N.Y. Sept. 15, 1997). As such, Gill has failed to allege a cognizable cause of action under the Eighth Amendment. We therefore recommend granting Defendants' Motion to Dismiss as to this ground and, since this Eighth Amendment violation was the only cause of action asserted against Defendants Cacciotti and Watson, we recommend dismissing these Defendants from this lawsuit.

> **FN21.** Plaintiff's reference to *Hope v. Pelzer,* 536 U.S. 730 (2002), in support of his Eighth Amendment claim is misplaced. The plaintiff in *Hope* had been handcuffed, naked, to a hitching post for seven hours and was exposed to an extraordinary summer sun. Here, the discomfort Gill experienced lasted, at most, seventy minutes.

### D. Qualified Immunity

**\*17** As an affirmative defense, Defendants Riddick, Brown, Rosado, Saxena, Cacciotti, and Watson assert they are entitled to qualified immunity. Because we have already recommended dismissal of the Eighth Amendment claims asserted against Cacciotti and Watson, and the retaliation/due process claims against Defendant Rosado, we need not address the applicability of any immunity doctrine. *Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, with regard to Defendants Riddick, Brown, and Saxena, since a constitutional violation has been established, at least at this limited stage of the litigation, we may proceed with an assessment of immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng,* 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

*Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id.* If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)). Finally, if a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N .D.N.Y.2003) (citing, *inter alia, Harhay,* 323 F.3d at 211);*see also Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleadings filed in the present case, thus far, are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather have done so in their Memorandum of Law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 2004 WL 2334909, at *2 (2d Cir. Oct. 18, 2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019);*see also McKenna v. Wright,* 2004 WL 2334909.

*18 The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768, 793 (2d Cir.2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

Essentially, Defendants contend that it was not clearly established that an inmate has a First Amendment right to participate on an informal grievance committee and that the Supreme Court ruling in *Shaw* suggests otherwise. As explained above, we do not agree with the Defendants assessments and find that the conduct engaged in was clearly protected. However, the Court declines to fully adjudicate this affirmative defense until some discovery has been undertaken in this case. Further development of the retaliation claims would put this Court in a better position to assess this defense and would provide Defendant Adamik the opportunity to assert this defense on his behalf. [FN22]

> FN22. As noted above, the Defendants did not construe the Amended Complaint to have stated a retaliation claim against Defendant Adamik.

WHEREFORE, based on the foregoing, it is hereby

RECOMMENDED, that Defendants' Motion to Dismiss (Dkt. No. 20) should be denied in part as to Plaintiff's retaliation claims set forth against Defendants Riddick, Brown, Adamik, and Saxena, and these Defendants should be directed to file a response to Plaintiff's Amendment Complaint; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to Plaintiff's retaliation claims against Defendant Rosado; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all due process claims asserted against Defendants Adamik, Perlman, Rosado, and Malloni; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all Eighth Amendment claims asserted against Defendants Cacciotti and Watson; and it is further

RECOMMENDED, that if all the above recommendations are accepted, then Defendants Rosado, Perlman, Malloni, Cacciotti, and Watson be dismissed from this action as all claims against them have been dismissed; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

*FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

**\*19** IT IS SO ORDERED

N.D.N.Y.,2005.
Gill v. Riddick
Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Marvin Smith SHAHEEN, Plaintiff,
v.
Gary FILION, Superintendent; Joan Smith, Deputy
Superintendent; Lt. Perez; J. Funk; Jochomas,
Correctional Officer; and John Doe, Defendants.
**No. 9:04-CV-625 (FJS/DRH).**

Sept. 5, 2006.
Sept. 17, 2006.

Marvin Smith Shaheen, Portchester, NY, Plaintiff, Pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Stephen M. Kerwin, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendants.

***DECISION AND ORDER***

FREDERICK J. SCULLIN, JR., S.J.

**\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge David R. Homer filed September 5, 2006, and the Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, it is hereby

**ORDERED,** that the Report-Recommendation of Magistrate Judge David R. Homer filed September 5, 2006 is **ACCEPTED** in its entirety, for the reasons stated therein; and it is further

**ORDERED,** that Defendants' motion for summary

judgment is **GRANTED,** as to defendants Filion, Smith, Horton, Perez and Funk and as to both of Shaheen's causes of action, and it is further

**ORDERED,** that the complaint is **DISMISSED** without prejudice as to defendants John Doe and Jochomas, and it is further

**ORDERED,** that this action is **TERMINATED** in its entirety as to all defendants and all claims.

**IT IS SO ORDERED.**
DAVID R. HOMER, Magistrate Judge.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Marvin Smith Shaheen ("Shaheen"), formerly an inmate in the custody of the New York State Department of Correctional Services (DOCS), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCS employees, violated his constitutional rights under the First, Fifth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are the motions of five defendants[FN2] for summary judgment pursuant to Fed.R.Civ.P. 56 or to dismiss for failure to prosecute pursuant to Fed.R.Civ.P. 41(b). Docket No. 34. Shaheen opposes both motions. Docket No. 40. For the reasons which follow, it is recommended that defendants' motion be granted. It is also recommended that the complaint be dismissed without prejudice as to the two unserved defendants.

> FN2. Filion, Smith, Horton, Perez, and Funk.

**I. Background**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

The facts are presented in the light most favorable to Shaheen as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Shaheen was incarcerated at Coxsackie Correctional Facility ("Coxsackie"). In November 2003, Shaheen was elected Chairman of the Inmate Liaison Committee ("ILC"). Filion Decl. (Docket No. 34) at ¶ 5. On November 25, 2003, Shaheen was punched in the face by another inmate in the ILC office. Funk Decl. (Docket No. 34) at Ex. A. Corrections officers responded and Shaheen was issued an inmate misbehavior report for fighting and violent conduct. *Id.* On December 1, 2003, a hearing on the charges was held. Smith Decl. (Docket No. 34) at Ex. A. During the hearing, Shaheen did not request any witnesses or documents and was the only witness to testify. *Id.* at ¶ 5, Ex. A; Pl. Reply Statement of Material Facts (Docket No. 40) at ¶¶ 8-10. Defendant Smith, the hearing officer found Shaheen guilty and sentenced him to sixty days of keeplock,[FN3] sixty days loss of recreation, and thirty days loss of telephone, commissary, and packages. Smith Decl. at ¶ 5. Shaheen was also removed from his position as ILC chairman. Filion Decl. at ¶ 12. On administrative appeal, the determination was overturned but only after Shaheen had completed service of the punishment. Pl. Reply Statement of Material Facts at ¶ 14. This action followed.

FN3. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

## II. Discussion

**\*2** Shaheen asserts two causes of action against all defendants. The first alleges that defendants retaliated against him after he wrote newspaper articles criticizing prison officials. The second alleges that defendants violated his due process rights in the disciplinary proceedings. Defendants seek judgment and dismissal for both claims.

### A. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.*[FN4] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

FN4. Notwithstanding his pro se status, Shaheen has significant experience in litigation having filed at least twenty-one other federal actions in the last eighteen years. *See U.S. Party/Case Index* (visited Aug. 30, 2006) <http://pacer.uspci.uscourts.gov/cgibin/dquery.pl>.

### B. Retaliation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

Shaheen contends that defendants placed him in keeplock and removed him from his position as chairman of the ILC in retaliation for writing newspaper articles and filing complaints criticizing prison officials. Defendants contend that this claim is without merit.

In order to prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Id.; see also Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because the conduct may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

*3 Here, Shaheen's writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the ILC were clearly assertions of his constitutional rights protected by the First Amendment. *See Simmat v. Manson,* 535 F.Supp. 1115, 1117-18 (D.Conn.1982) ( "[prisoner's] first amendment right to freedom of expression encompasses the right to express himself without punitive retaliation."). Shaheen claims that the adverse action which resulted from this conduct was defendants' filing of a false misbehavior report that resulted in Shaheen spending sixty days in keeplock. In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights. *Dawes,* 239 F.3d at 491. It is reasonably possible that other inmates would fail to exercise their constitutional right to criticize prison officials for fear that they would be subjected to false misbehavior reports and sentenced to keeplock. Thus, the disciplinary action and Shaheen's placement in keeplock at least present questions of fact whether they constitute adverse actions.

However, Shaheen fails to show a causal connection between his criticism of prison officials and the alleged filing of a false misbehavior report because he only offers conclusory evidence to support his claim that defendants were aware of his criticism of the prison. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see also Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Shaheen provides no evidence to demonstrate that any defendant had any knowledge of his complaints against prison officials prior to the filing of the misbehavior report. In response to Shaheen's allegations, each moving defendant had provided a declaration stating that he or she was unaware of any of Shaheen's writings that criticized prison officials and conditions. *See* Filion Decl. at ¶ 9; Funk Decl. at ¶ 5; Horton Decl. (Docket No. 34) at ¶ 7; Perez Decl. (Docket No. 34) at 4; Smith Decl. at ¶ 3. Thus, because Shaheen offers only conclusory evidence to support his claim, he has failed to demonstrate a causal connection between the constitutionally protected conduct and the alleged adverse action.

Therefore, it is recommended that defendants' motion on this ground be granted.

## C. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To determine whether an inmate possessed a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Here, Shaheen concedes that his time in keeplock was not atypical, stating "plaintiff has never presented or suggested that his confinement was atypical and significant hardship." Pl. Reply Mem. of Law (Docket No. 40) at 21. Thus, by his own admission, Shaheen has failed to establish the existence of a protected liberty interest.[FN5]

FN5. Shaheen also concedes that his position as Chairman of the ILC does not constitute a

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

protected liberty interest. Pl. Reply Mem. of Law at 20 ("Next addressing the defendants claim that plaintiff had no liberty interest in my position as ILC chairman which they are totally correct ...").

**\*4** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Shaheen's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, defendants' motion for summary judgment on this alternative ground should be granted.

### III. Failure to Prosecute

Defendants contend in the alternative that Shaheen's failure to inform the court of his new address after his release from Coxsackie requires dismissal of his claim for failure to prosecute.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may dismiss an action based upon the failure of a plaintiff to prosecute an action, comply with an order of the court, or notify the court of a change of address. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 629 (1962); *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998); *see also* N.D.N.Y.L.R. 41.2(b). Local Rule 10.1(b)(2) provides that all pro se litigants must notify the Court of any change of address. *See Moshier v. Trabout,* No. 96-CV-1666, 1998 WL 167298, at *1 (N.D.N.Y. Apr. 2, 1998). Here, subsequent to defendants' motion for summary judgment, Shaheen filed a response in opposition to defendants' motion and a notice of a change of address. *See* Docket Nos. 40, 41. Thus, Shaheen clearly has not abandoned his claim and dismissal would be an unduly harsh remedy. *See LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir.2001) (Rule 41(b) dismissal is a harsh remedy to be used only in extreme circumstances).

Therefore, defendants' motion on this ground should be denied.

### IV. Failure to Serve Defendants Doe and Jochomas

Shaheen's complaint asserts claims against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Shaheen or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

**\*5** As to defendant Jochomas, a summons for service of process upon Jochomas was issued on June 3, 2004. Docket Entry dated 6/3/04. The summons was returned unexecuted as to Jochomas on July 7, 2004. Docket No. 7. More than 120 days have passed since the summons for Jochomas was issued. Accordingly, it is also recommended that the complaint be dismissed as to Jochomas without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

### V. Conclusion

For the reasons stated above, it is hereby

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)
(Cite as: 2006 WL 2792739 (N.D.N.Y.))

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 34) be **GRANTED** as to defendants Filion, Smith, Horton, Perez, and Funk and as to both of Shaheen's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendants John Doe and Jochomas; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2006.
Shaheen v. Filion
Not Reported in F.Supp.2d, 2006 WL 2792739 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated
December 23, 1998, recommending that plaintiff's motion

be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

Pursuant to 28 USC § 636(b)(1)(C), this Court must make

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of

it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or allowing the policy or custom to continue; or (4) gross

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and harassment in that corrections officers laughed and

insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton infliction of pain ... constitutes cruel and unusual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access to the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has prejudiced his rights or amounted to an injury, he fails to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches

which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of their motion to dismiss, defendants rely on an affidavit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v.. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington, Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol, Albany, New York, for defendants, Lisa Renee Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Gustave J. Di Bianco, duly filed on the 18th day of September, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no party having submitted objections <sup>FN1</sup> thereto, it is

FN1. I note that the magistrate judge's report recommendation was returned to the court

undelivered because the plaintiff is no longer at the address listed in the court's file, which is the last address plaintiff instructed the court to use. By Order filed November 22, 1995, Magistrate Judge Gustave Di Bianco ordered that plaintiff "promptly notify the Clerk's Office of any change in his address." Dkt. No. 3 at 4. The same order provided that "failure to keep such office apprised of [plaintiff's] current address will result in the dismissal of the instant action." *Id.* I do not rely on plaintiff's failure to notify the court of his current address as a basis for dismissing the action; I merely note that plaintiff cannot in the future claim, in reliance on his failure to receive a copy of the report-recommendation, that he was deprived of the opportunity to file objections due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report.

3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, United States District Judge pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

In the instant civil rights complaint, the plaintiff alleges

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

## DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York

and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. Id. at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin*"); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty." *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), cert denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the potential penalty approach);

*Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir.1988). In cases where the defendants' actions are taken

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not ***false.*** Rather, the

plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check on [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id* . at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in retaliation for plaintiff's complaints against Kimak. *Id.* at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

### 7. Eighth Amendment

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same deliberate indifference standard. Deliberate indifference,

whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
MORTIMER EXCELL, Plaintiff,
v.
Brian FISCHER, Commissioner, DOCS, et al.,[FN1]
Defendants.

> **FN1.** It is noted that the plaintiff has named a total of forty-three (43) defendants in the eighty-eight (88) page complaint.

**Civ. No. 9:08-CV-945 (DNH/RFT).**

Sept. 24, 2009.

West KeySummary
**Prisons 310**  🔑  **126**

310 Prisons
   310II Prisoners and Inmates
      310II(B) Care, Custody, Confinement, and Control
         310k126 k. Protection from Violence, Assault, or Abuse. Most Cited Cases

**Sentencing and Punishment 350H**  🔑  **1537**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1537 k. Protection from Violence. Most Cited Cases
Inmate's claim of failure to protect was facially adequate to sustain an action for violation of Eighth Amendment rights. Inmate's complaint alleged that he put prison officials on notice of a threat to his safety by sending three complaint letters days before he was allegedly assaulted.

He also claimed that a prison nurse falsified his medical records so as to cover up the alleged assault, and another prison official participated in the conspiracy by instructing that no photographs be taken of inmate's injuries after the alleged assault. U.S.C.A. Const.Amend. 8.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Adam Silverman, Esq., David L. Cochran, Esq., Assts. Attorney General, of Counsel, Albany, NY, for State Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*16** Plaintiff, Mortimer Excell, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated August 25, 2009, the Honorable Randolph F. Treece, United States Magistrate Judge, specifically recommended that the defendants' motion to dismiss (Docket No. 59) be granted in part and denied in part; that the following defendants be dismissed: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson, Frenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), and Karen Bellamy; and that plaintiff's motion for a preliminary injunction (Docket No. 57) be denied. To clarify his recommendations, the Magistrate Judge specifically stated that his recommendations leave the following claims viable: (1) Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner; (3) violation of plaintiff's First Amendment right to practice religion against M. Orzech; and (4) supervisory liability against Dale Artus and Brian Fischer. The Magistrate Judge further stated

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

that his recommendations leave defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer as remaining defendants should the Report-Recommendation be adopted. In a Clarification Order dated September 9, 2009, Magaistrate Judge Treece clarified that it is his recommendation that all of plaintiff's claims against defendant Lester Wright, M.D., be dismissed. The plaintiff has timely filed objections to the Report-Recommendation.

**\*17** It is noted that the defendant "Labetz, Lt., Clinton Correctional Facility," has never been served. The Magistrate Judge ordered that said defendant not be dismissed from the action as the other unserved defendants will be. The Magistrate Judge directed the Clerk to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of the Report-Recommendation. It appears that the summons and complaint were never issued for service. Therefore, the plaintiff will be granted thirty days from the date of this order within which to serve defendant Labetz. The plaintiff is again warned, that if this defendant is not served within thirty days, the claims against defendant Labetz will be dismissed without further order of this court.

Based upon a careful review of the entire file, including the recommendations of Magistrate Judge Treece, the Clarification Order, and the objections by plaintiff, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part;

2. Defendants T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Paul Knapp, Lucia, Loomis, Ferguson, Poltlos,

Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), Karen Bellamy, and Lester Wright, M.D., are DISMISSED from this action;

3. Defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer will remain as defendants;

4. Plaintiff's motion for a Preliminary Injunction is DENIED;

5. The following claims remain in this action:

a. Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz;

b. Conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner;

c. Violation of plaintiff's First Amendment right to practice religion against M. Orzech; and

d. Supervisory liability against Dale Artus and Brian Fischer.

6. The defendant Labetz is not dismissed from this action at this time. The Clerk is directed to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of this Order adopting the Report-Recommendation.

7. If defendant Labetz is not served within thirty days of the date of the order, he will then be DISMISSED without further order of the court.

8. The Clerk is directed to enter judgment against the dismissed defendants, and to make the necessary changes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

on the docket to reflect the remaining defendants; and

9. The above action is referred to the Honorable Victor Bianchini, Recalled United States Magistrate Judge, for the purposes of mediation. Any further proceedings are stayed pending the completion of mediation.

**\*18** IT IS SO ORDERED.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Mortimer Excell brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that he suffered the following constitutional violations: (1) conspiracy to violate his First, Eighth, and Fourteenth Amendment rights; (2) excessive force; (3) deliberate indifference to his serious medical needs; (4) retaliation; (5) due process violations stemming from both Disciplinary and Parole Board Hearings; (6) violation of his First Amendment rights of religious affiliation and expression; and (7) interference with his personal and legal mail.

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order and Defendants' Motion to Dismiss. Dkt. Nos. 57, 59, & 62.[FN2] In support of his Opposition to Defendants' Motion, Plaintiff has submitted two Supplemental Briefs, both of which have Exhibits attached. Dkt. Nos. 79, 82, & 84. The Court has not considered these Exhibits in considering the instant Motion to Dismiss. For the reasons that follow, it is recommended that the Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part,** and the Plaintiff's Motion for a Preliminary Injunction be **DENIED.**

> FN2. Defendants Tamer, Urzech, T. Carter, and Moak filed an Answer to the Complaint and do not join in the Motion to Dismiss. Dkt. No. 61, Ans.; Dkt. No. 62, Defs.' Mem. of Law at p. 1 n.

2. The causes of action asserted against these Defendants for excessive force, conspiracy, retaliation, and interference with his religious practices survive this Motion. Also, Defendants C.O. Green, Labetz, Oltloff, and Karen Bellamy have not been served with process. Dkt. Nos. 17, 54, & 66 (no summons has been returned for Defendant Bellamy).

### I. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's Complaint is eighty-eight (88) pages in length and contains eighty-one (81) numbered paragraphs and five (5) "Causes of Action" which are in sum and substance summaries of the claims alleged in the preceding 81 paragraphs. *See generally* Dkt. No. 1, Compl. Given the length of the Complaint and the amount of claims stated therein, we shall provide in this section a summary of Plaintiff's claims and delve into the finer points of his allegations within our discussion of the Defendants' bases for dismissal. This summary is derived from the facts alleged in Plaintiff's Complaint, which must be accepted as true for the purposes of addressing Defendants' Motion to Dismiss brought pursuant to FED. R. CIV. P. 12(b)(6). *See infra* Part II.A.

From July through September 4, 2007, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"), where he was allegedly denied medication for various physical ailments by Defendant Nurse Fearchild, denied recreation for a period of three days by Defendant N. Bezio, threatened and harassed by Defendant Brian Bengmann, and had his due process rights violated during a Disciplinary Hearing. Dkt. No. 1, Compl. at ¶¶ 1-7.[FN3] In September 2007, Plaintiff was sent to Great Meadow Correctional Facility ("Great Meadow") in order to attend a medical appointment at Albany Medical Hospital. *Id.* at ¶ 7. During his stay at Great Meadow, Plaintiff was denied his "medical draft bag" and therefore forced to wear the same clothes from September 2-18, denied drinking water for one twenty-four (24) hour period, threatened, and issued a false misbehavior report by Defendant Correctional Officer ("C.O") Green. *Id.* at ¶¶ 7-10.

> FN3. All citations to the Plaintiff's Complaint refer to the paragraphs contained in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

*"Statement of Facts"* section, starting on page twelve (12) of the Complaint.

Plaintiff alleges that on October 18, 2007, after his transfer back to Upstate, Defendant T. Ramsdell sexually assaulted him by grabbing and squeezing his penis during a body search and that Ramsdell and Defendant Rokece pushed his face against an iron rail, causing injuries to his face and forehead. *Id.* at ¶¶ 11-12 & 14. In the days that followed Plaintiff was threatened, harassed, issued a false Misbehavior Report accusing him of possessing contraband, and for a two-day period denied a bed pan and personal hygiene products. *Id.* at ¶¶ 13-19. In November 2007, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), where in December of that year, several Defendants, including S. Tyrell, R. Lawrence, Poltlos, and Frenyea, conspired to take his identification card, put him in keeplock, and improperly opened his legal mail. *Id.* at ¶¶ 22-27. During a Disciplinary Hearing held on December 24, 2007, before Hearing Officer Defendant Lieutenant ("Lt.") Miller, Plaintiff was denied the opportunity to present evidence or testimony and was not given a written disposition of the proceeding. *Id.* at ¶ 32.

*2 On January 15, 2008, Plaintiff had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff,[FN4] during which Plaintiff articulated his complaints about the aforementioned alleged constitutional violations. These Defendants denied Plaintiff parole. *Id.* at ¶¶ 61-62.

> FN4. Defendant Ortloff's name is spelled "Oltloff" on the Docket Report. Because both parties refer to this Defendant as "Ortloff," we presume his name to be spelled as such.

On May 13, 1008, Defendant C.O. M. Orzech told Plaintiff to cut his beard by May 17th or he would issue Plaintiff a misbehavior report. *Id.* at ¶ 36. That same day, Plaintiff filed a request to Department of Correctional Services ("DOCS") officials for a beard permit based on his Rastafarian religious beliefs and, on May 14th, received a receipt for said request stating that Plaintiff did not have to cut his beard during the pendency of the decision on his request. *Id.* at ¶¶ 37-39. On May 15th, Plaintiff explained to Orzech that he had submitted a request for a beard exemption and could not be forced to

cut his beard until that request was decided, however, on May 17th, Orzech denied Plaintiff recreation time and placed him in keeplock because he had not cut his beard. *Id.* at ¶¶ 3 6-43. Also, Plaintiff alleges that on May 17th, Orzech allegedly threatened to beat him up if he filed any more complaints to Defendants Commissioner Fischer and Superintendent Artus. *Id.* at ¶ 43.

On May 18, 2008, Plaintiff filed a medical services request to address his heart pain and weakness. *Id.* at ¶ 45. On May 19, 2008, Defendant C.O.'s T. Carter and Orzech arrived at Plaintiff's cell to take him to the medical unit and proceeded to cuff Plaintiff's hands behind his back, then pushed him to the floor as he was being escorted out of his cell block and punched, kicked, and beat him, as did Defendant C.O.'s Tamer and Moak. *Id.* at ¶¶ 46-47. Plaintiff was escorted to the hospital where he was punched by Moak and Defendant Lieutenant ("Lt.") Labetz, and Defendant Nurse R. Rock allegedly refused to treat him for the injuries he sustained. *Id.* at ¶¶ 48 & 63(1).[FN5] Afterwards, Plaintiff was sent to the Special Housing Unit ("SHU"), where he was denied medical care, allegedly in order to prevent evidence of the incident in his medical records. *Id.* at ¶¶ 49-50.

> FN5. There are two consecutive paragraphs in the Complaint numbered 63. To avoid confusion, we will refer to them as paragraphs 63(1) and 63(2), respectively.

On May 20, 2008, Orzech and Carter issued Plaintiff Misbehavior Reports alleging that Plaintiff had attacked Orzech while being escorted to the medical unit; on May 27, 2008, a Disciplinary Hearing was convened on those charges before Hearing Officer Defendant Captain D. Uhler. At the Disciplinary Hearing, Plaintiff was denied the opportunity to call witnesses and present evidence, and was improperly removed from the proceedings; in addition the Hearing was allegedly improperly extended through June 19, 2008. *Id.* at ¶¶ 52-54, 58, & 63(2)-64.

From July 2005 through July 2008, Plaintiff did not receive any mail from family or friends, and his family members did not receive outgoing mail he sent. *Id.* at ¶¶ 63(1) & 65. In addition, letters of complaint Plaintiff sent to various New York State Officials and Officers were not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

received. Plaintiff alleges that his incoming and outgoing mail was stolen by Defendants J. Rice, Quinn, and D. Waldron, who are mail clerks at Auburn, Upstate, and Clinton Correctional Facilities, respectively. *Id.* at ¶¶ 65, & 75-80.

**\*3** Finally, on July 16, 2008, Plaintiff was transferred back to Upstate, where he was allegedly denied medical care from July 17 through August 14, 2008. *Id.* at ¶ 81.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950 (citing *Twombly* ).[FN6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

> FN6. By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 562-63 (2007) (quoting *Conley,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

### B. Eighth Amendment Claims

#### 1. *Medical Treatment*

**\*4** The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In this case, Plaintiff's medical indifference claims are as follows: (1) in mid-July 2007, he suffered from heart and chest pain for a period of five days, but received only non-aspirin medication and, on July 12, 2007, was denied a blood pressure test by Defendant Nurse Fearchild; (2) in November 2002, he was prescribed "Omeprazole 20 mg caps" for his "belly pains," but was denied refills of that medication by Defendant Nurses Travers and Fearchild at Upstate, and by Defendant Nurses Lashway, Rock, and

Benthley at Clinton; and (3) Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, and falsified his medical records to cover-up the injuries he allegedly sustained on that date.[FN7] Compl. at ¶¶ 1, 48, 74 & 81.

> **FN7.** Plaintiff also alleges that at a Disciplinary Hearing held on June 16, 2008, he told the presiding hearing officer, Defendant Uhler, about his medical problems, and that Uhler denied his requests for medical care. Compl. at ¶ 60. To the extent Plaintiff intended to raise an Eighth Amendment claim against Uhler, that claim must fail because Uhler was not responsible for Plaintiff's medical treatment.

In Plaintiff's first and second medical indifference claims, there is no allegation that he suffered from a serious medical condition. Plaintiff claims that he suffered from heart and chest pains for a period of five (5) days, and that he was denied refills for medication used to treat stomach pain. Compl. at ¶¶ 1 & 74. Such conclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"); *see also Hutchinson v. New York State Corr. Officers,* 2003 WL 22056997, at \*5 (S.D.N.Y. Sept.4, 2003) (holding that a general allegation of chest pain is not sufficiently serious under the Eight Amendment) (citations omitted); *Pender v. McClellan,* 1996 WL 343253, at \*4 (W.D.N.Y. Feb.5, 1996) (dismissing plaintiff's Eighth Amendment claims based on stomach pain when there was no allegation that his condition was urgent or otherwise serious). Therefore, it is recommended that those claims be **dismissed.**

**\*5** Likewise, in his third medical indifference claim alleging Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, Plaintiff fails to allege that he suffered from a constitutionally significant injury or medical condition. Plaintiff merely alleges in general terms that his head and neck were hurt, he experienced head and heart

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

pain, and that he requested x-rays for unspecified injuries to his head and body. Compl. at ¶¶ 48-49 & 81. These statements of general pain cannot sustain an Eighth Amendment claim because they do not allege that Plaintiff suffered from "a condition of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d at 702. Therefore, these claims should be **dismissed.**[FN8]

> **FN8.** Plaintiff's other claims surrounding the alleged excessive use of force on May 19th remain. *See infra* Parts II.F & IV.

### 2. Conditions of Confinement

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in Branham v. Meachum, 77 F.3d 626, 630-31 (2d Cir.1996)).

Plaintiff alleges the following conditions of confinement claims: (1) he was denied recreation on July 12, 13, and 15, 2007, Compl. at ¶ 2; (2) while on a multi-day visit to Albany Medical Hospital he was forced to wear the same clothes from September 2 through September 18, 2007, after being denied his "medical trip draft bag," Compl. at ¶¶ 7 & 10; (3) from September 12-13, 2007, he was forced to stay in a room without drinking water, Compl. at ¶ 8; and (4) he was denied all personal hygiene items from October 19-20, 2007, Compl. at ¶ 17.

With respect to Plaintiff's claim that he did not have drinking water in his cell for a 24-hour period from September 12-13, it unclear whether he is asserting that he did not have access to running water in his cell, or that he was completely denied water for a 24-hour period. Compl. at ¶ 8. To the extent Plaintiff intended to allege the former, a lack of access to running water, without more, does not constitute an Eighth Amendment violation, James v. Monroe County Jail, 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (citation omitted); to extent Plaintiff intended to allege the latter, that claim is weakened by his statement that he was provided food on that date, but refused to eat it for fear that it was drugged, Compl. at ¶ 8. Thus, Plaintiff admits that he was not deprived of sustenance, even if he refused to accept it. Also, although Plaintiff alleges he was forced to wear the same clothes from September 2 through September 18, 2007, he does not allege that he was denied the opportunity to bathe or otherwise clean himself during that period.

**\*6** In sum, none of these deprivations are so serious as to constitute a denial of the "minimal civilized measure of life's necessities." Wilson v. Seiter, 501 U.S. at 297-99 (citation omitted). Plaintiff's claims amount to assertions that he was inconvenienced and perhaps discomforted for short periods of time, and are therefore *de minimis* and not cognizable under the Eighth Amendment, which only protects inmates from conditions that violate "contemporary standards of decency." Hudson v. McMillan, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also, e.g.,* Hamilton v. Conway, 2008 WL 234216, at *9 (W.D.N.Y. Jan.28, 2008) (stating that "briefly denying hygienic materials does not violate contemporary standards of decency"), Ochoa v. Connell, 2007 WL 3049889, at * 12 (N.D.N.Y. Oct.18, 2007) (citing cases for the proposition that the denial of recreation for a few days does not implicate the Eighth Amendment). Therefore, it is recommended that these claims be **dismissed.**

### 3. Threats, Harassment, Excessive Force, and Sexual Abuse

Plaintiff makes numerous allegations that various Defendants threatened, harassed, and subjected him to verbal abuse. Specifically, Plaintiff alleges that (1) on July 12, 2007, Fearchild threatened to issue a misbehavior report against him, Compl. at ¶ 1; (2) Defendant Bengmann threatened him on August 8, 2007, Compl. at ¶ 3; (3) on September 12, 2007, Defendant Green threatened to assault him, Compl. at ¶ 8; (4) on October 19, 2007, Defendant Crossman threatened to beat him up if he did not stop talking and then verbally abused Plaintiff with profane language and gestures, Compl. at ¶ 18; (6) on December 21, 2007, Defendants Tyrell, Lawrence, Poltlos, Frenyea, and other unnamed officers conspired to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

harass and provoke Plaintiff when they took his identification card, put him on keeplock, and improperly opened his legal mail, Compl. at ¶¶ 24-27; and (7) Defendant Poltlos threatened his life, pushed his face up against a wall, and made racial epithets against Plaintiff while escorting him to the mental health unit, Compl. at ¶¶ 28-29.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept.2, 2005); *Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug.31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Therefore, the aforementioned claims of threats and harassment should be **dismissed.**

**\*7** To the extent Plaintiff intends to assert a claim of excessive force against Defendant Poltlos for allegedly pushing his face up against a wall, that action does not rise to the level of an Eighth Amendment violation, especially when, as here, Plaintiff has not alleged he was in any way injured by the Defendant's actions. *See Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (internal citations omitted); *see also Govan v. Campbell,* 289 F.Supp.2d 289, 300 (N.D.N.Y.2003) (prisoner's claim that he was pushed up against a wall, even if true, did not amount to a constitutional violation).

Plaintiff has also brought claims of sexual and physical abuse against Defendants Ramsdell and Rokece. Compl. at ¶¶ 11-14. Specifically, Plaintiff alleges that during a

search of his person for contraband, Defendant Ramsdell grabbed and squeezed his penis,[FN9] and that Rokece pushed his face up against an iron rail. *Id.* at ¶¶ 11-12 & 14. Like Plaintiff's claim against Poltlos, his claim that Rokece pushed him against a rail, even if true, is *de minimis* and therefore fails to state a claim. *See Govan v. Campbell,* 289 F.Supp.2d at 300. As per Plaintiff's claim against Ramsdell, in some cases, "[s]exual abuse may violate contemporary standards of decency" so as to implicate the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). However, the Second Circuit has made clear that allegations of minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. *Id.* In this case, Plaintiff has alleged a quick, isolated incident of inappropriate touching that occurred during a search of his person for contraband. Such an incident, even if true, does not constitute an Eighth Amendment violation. *Id.* (prisoner's allegation that a corrections officer inappropriately touched his penis on one occasion did not state a valid claim), *see also Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (prisoner's allegation that a corrections officer grabbed his penis during a pat frisk did not state a valid constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373 & 375 (S.D.N.Y.2001) (squeezing an inmate's genitalia on several occasions during pat frisks did not constitute an Eighth Amendment violation).

FN9. Plaintiff does not allege that he was in any way injured when Ramsdell allegedly squeezed his penis.

Therefore, it is recommended that Plaintiff's allegations of sexual abuse, threats, excessive force, and harassment be **dismissed** for failure to state a claim.

### C. Due Process Claims

Plaintiff alleges that he suffered due process violations during a Parole Hearing held on January 15, 2008, and Disciplinary Hearings held in 2007 and 2008.

*1. Parole Hearing*

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Plaintiff alleges that on January 15, 2008, he had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, all Commissioners of the New York State Division of Parole. Compl. at ¶ 61. Plaintiff states that he informed those Defendants about all of the constitutional violations he had suffered during his incarceration, but that Defendants Loomis and Ferguson prevented Plaintiff from pleading his side of the case and disregarded his suffering. *Id.* On January 16, 2008, Plaintiff was denied parole by Loomis, Ferguson, and Ortloff; Plaintiff alleges that but for such denial, he would not have been assaulted on May 19, 2008. *Id.* at ¶ 62.

**\*8** As Defendants point out, the Second Circuit has held that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (citations omitted). Therefore, because Defendants Loomis, Ferguson, and Ortloff were acting as quasi-judicial officers when they allegedly improperly denied Plaintiff's parole, they are entitled to absolute immunity and the claims for damages [FN10] against them should be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(I), which gives the Court authority to dismiss a claim brought by a plaintiff proceeding *in forma pauperis* "at any time" if it determines such claim to be frivolous.

> FN10. Plaintiff does not ask for any other non-pecuniary form of relief against Defendants Loomis, Ferguson, and Ortloff. *See* Compl. at pp. 77-80.

### 2. *Disciplinary Hearings*

Plaintiff makes several due process claims concerning Disciplinary Hearings held on (1) November 21, 2007; (2) December 24, 2007; and (3) May 27 through June 19, 2008. Compl. at ¶¶ 21, 32, 58-60, 63(2), & 64. Plaintiff alleges that at the Disciplinary Hearing presided over by Defendant D. Kemp on November 21, 2007, Kemp prevented Plaintiff from presenting a defense by threatening him and stating that if Plaintiff did "it her way[,] she [would] not give [him] any time and [would] dismiss the charges against [him]." *Id.* at ¶ 21. Plaintiff

alleges Kemp found him guilty of smuggling and issued him a sentence of "counsel and release." *Id.*

Plaintiff alleges that on December 24, 2007, Defendant Lieutenant Miller presided as Hearing Officer over a Disciplinary Hearing during which Plaintiff was denied the opportunity to present evidence and testimony and that he was not given a written disposition of the Hearing.[FN11] *Id.* at ¶ 32. Plaintiff alleges that he was found guilty at the Hearing and sentenced to thirty (30) days keeplock. Plaintiff states that he filed a complaint with Defendant Racette requesting a new hearing, which was denied. *Id.*

> FN11. Plaintiff also alleges that he did not receive a written disposition after a Disciplinary Hearing held in November 2007. Compl. at ¶ 20. However, that claim is alleged only against Superintendent Bukeco, who is not a named Defendant in this action, and therefore, should be **dismissed** as Plaintiff has alleged no personal involvement on the part of any Defendant.

Finally, Plaintiff alleges that on May 27, 2008, Defendant Uhler presided over a Disciplinary Hearing on charges brought by Defendants Orzech and T. Carter stemming from the May 19, 2008 incident, at which Plaintiff was denied the opportunity to present witnesses and other evidence. *Id.* at ¶ 54. Plaintiff also alleges that such Hearing was adjourned to June 3, 2008, and then again to June 9, 2008, but he did not receive a copy of an extension form in either instance and was made to wait in SHU during those adjournments. *Id.* Plaintiff alleges that the Hearing reconvened on June 16, 17, and 19, 2008 before Defendant Uhler, during which time Plaintiff was again precluded from presenting evidence and Uhler allegedly improperly led the witnesses. *Id.* at ¶¶ 58, 63(2), & 64. Plaintiff also avers that he was improperly removed from the proceedings on June 16, 2008. *Id.* at ¶ 63(2). Plaintiff does not state what the outcome of the May 27-June 19, 2008 Disciplinary Hearing was, nor if he received any form of punishment after its disposition. *Id.* at ¶¶ 54 & 58-60.

**\*9** In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In this case, Plaintiff has alleged that he was sentenced to thirty (30) days keeplock after his conviction in the Disciplinary Hearing conducted on December 24, 2007. Courts in this Circuit have held that a 30 day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec.22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant); *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan.22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept.30, 2008) (30 days in SHU, without more, did not create liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not create a liberty interest).

With respect to Plaintiff's allegations regarding the Disciplinary Hearings held on November 21, 2007 and from May 27, 2008, through June 19, 2008, Plaintiff does not allege that he suffered any atypical or significant hardship as a consequence of those alleged due process violations. To the extent Plaintiff intended to allege that his confinement in SHU during the pendency of his Hearing that went from May 27 through June 19, 2008, was a due process violation, such a short period of

confinement is not atypical and significant for the reasons mentioned above. Therefore, it is recommended that his due process claims be **dismissed** because he had failed to implicate a liberty interest with respect to any of the due process violations alleged.

### D. First Amendment Claims

1. *Interference with Personal Mail*

Plaintiff alleges that the Defendants interfered with his outgoing and incoming mail. Plaintiff states that his family members sent him numerous letters, but that he did not receive any mail from family or friends from September 2005 through July 2008. Compl. at ¶¶ 63(1) & 65. Plaintiff also states that on January 15, 2008, his mother informed Deacon Debiec [FN12] that she had not received any of Plaintiff's letters. *Id.* at ¶ 63(1). Plaintiff alleges that he sent his daughter and her mother a certified letter while in Auburn in 2005, but that he never received the return receipt; he called his daughter's mother who informed him that she never received the letter. *Id.* at ¶¶ 75-76. Plaintiff accuses the Senior Mail Clerk at Auburn, Defendant J. Rice, of stealing his mail. *Id.* Also in 2005, Plaintiff allegedly sent complaint letters to the New York Department of State Ethics Commission and, having heard no response, sent another letter to the Ethics Commission asking if they received his complaints, to which they responded they had not. *Id.* at ¶ 77. Plaintiff accuses Defendant Rice of stealing those complaints. *Id.*

> FN12. Deacon Debiec is not a named Defendant in this action.

**\*10** Plaintiff alleges that from 2005 through March 24, 2007, he sent over two hundred (200) letters to his daughter and her mother, all of which were allegedly stolen by Defendant Quinn, a mail clerk at Upstate. *Id.* at ¶ 76. In addition, Plaintiff accuses Quinn of stealing letters he sent to DOCS' Rastafarian Priest Abuna A. Foxe in 2006, as well as a complaint of criminal misconduct sent to various government officers. *Id.* at ¶ 78.

In March 2008, Plaintiff spoke with his father who advised

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

him that he had not received any correspondence from Plaintiff for over three years, though Plaintiff alleges he sent his parents over sixty (60) letters between 2005 and 2008. *Id.* at ¶ 79. Plaintiff accuses Defendants Rice, Quinn, and Defendant Waldron, who is a Senior Mail Supply Clerk at Clinton, of obstructing his written communications to his family. *Id.*

As Plaintiff correctly contends, the First Amendment protects an inmate's right to send and receive both legal and non-legal mail, though that right may be limited by restrictions that are " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, Plaintiff's sweeping accusations that his incoming and outgoing mail was obstructed for a period of over three years does not assert a plausible claim under § 1983. See *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868. Plaintiff's conclusory accusations that Defendants Rice, Quinn, and Waldron stole his incoming and outgoing mail appears to be based on nothing more than the fact that those Defendants were DOCS employees who worked in the mailrooms at Auburn, Upstate, and Clinton, respectively. Indeed, beyond his own suspicions, Plaintiff offers no factual allegations that link these Defendants to the alleged obstruction of his mail from 2005 through 2008. Therefore, we recommend that these claims be **dismissed** as conclusory.

### 2. *False Misbehavior Reports*

Plaintiff alleges that several Defendants filed false misbehavior reports against him. Some of those allegations include the additional claim that the false reports were filed in retaliation for the exercise of his First Amendment rights, some do not. We address first the claims that do not have the retaliation rider attached.

Plaintiff alleges that on October 19, 2007, Defendant Ramsdell, in an effort to cover-up staff misconduct, issued him a false Misbehavior Report accusing Plaintiff of carrying contraband in his crotch. Compl. at ¶ 15. Plaintiff also alleges that on December 22, 2007, Defendant Tyrell filed a false Misbehavior Report accusing Plaintiff of

threats in order to cover-up Tyrell's improper opening of Plaintiff's legal mail. *Id.* at ¶ 31. However, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d at 862 (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also* *Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar.31, 2005). While an inmate may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff has not established that he was engaged in constitutionally protected conduct with respect to these claims. Therefore, it is recommended that these claims be **dismissed** for failure to state a claim and pursuant to 42 U.S.C. § 1915(g). *See supra* Part II.C.1.

**\*11** We now consider Plaintiff's claims that false misbehavior reports were filed against him with retaliatory animus. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff alleges that (1) at some point prior to August 8, 2007, Defendant Bezio submitted a letter of complaint Plaintiff had written to Defendant Bengmann of the DOCS Inspector General's Office in retaliation for a civil rights action Plaintiff had previously initiated against several DOCS officials, Compl. at ¶ 3; (2) on August 11, 2007, Defendant Bengmann issued Plaintiff a false

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Misbehavior Report in retaliation for complaints Plaintiff had filed against several DOCS and New York State officials, Compl. at ¶ 3; (3) on October 21, 2007, Defendant Crossman filed a false Misbehavior Report against Plaintiff in retaliation for his filing a civil lawsuit against numerous DOCS officials, Compl. at ¶ 19; and (4) on December 22, 2007, Defendant Lawrence filed a false Misbehavior Report against Plaintiff in retaliation and in order to cover-up staff misconduct, Compl. at ¶ 30.

With respect to the first two claims listed above, Plaintiff alleges that on August 8, 2007, he spoke with Defendant Brian Bengmann, who told Plaintiff that Bezio had forwarded him a letter written by Plaintiff that allegedly included threats against the Upstate staff. *Id.* at ¶ 3. Plaintiff states that Bengmann produced a letter of complaint Plaintiff wrote to Defendant Woods about his medical issues, assaults he had endured, and his allegedly improper SHU confinement. *Id.* Plaintiff alleges that he received a Misbehavior Report on May 21, 2008, for sending that letter to Woods, and was eventually assessed ninety (90) days in SHU on that charge. Plaintiff states that notwithstanding the punishment he had already been assessed, Defendant Bezio sent his letter to Defendant Bengmann on August 8, 2007, in retaliation for a civil rights action he filed in federal court that Plaintiff has identified as 9:07-CV-0305. [FN13] Plaintiff alleges that he received a Misbehavior Report from Bengmann on August 21, 2007, in retaliation for a complaint Plaintiff filed against Defendant Richard Roy, former-Governor Eliot Spitzer, State Commission Chairman Daniel Stewart, DOCS Commissioner Defendant Brian Fischer, and Bezio. *Id.*

FN13. The Court takes judicial notice that Plaintiff has currently pending in the Northern District of New York another § 1983 action, *Excell v. Woods et al.,* civil action number 9:07-CV-305(GTS/GHL), in which he has brought claims against many of the same Defendants listed in this action, including Bezio.

*12 With respect to Bengmann, Plaintiff's claim that he wrote a false Misbehavior Report against Plaintiff because of complaints and lawsuits Plaintiff filed against other individuals is conclusory because Plaintiff fails to allege a plausible causal connection between his protected

conduct and Bengmann's allegedly false Misbehavior Report. Plaintiff himself alleges that Bengmann was acting on Plaintiff's letter of complaint that was forwarded to him by Bezio, a letter that was alleged to contain threats against DOCS officials. As per Bezio, the only retaliatory act Plaintiff has alleged is that he submitted Plaintiff's letter of complaint to Bengmann, who then authored a Misbehavior Report against Plaintiff. Thus, Plaintiff does not allege that Bezio took any adverse action directly against him. Therefore, it is recommended that these claims be **dismissed.**

Plaintiff's third and fourth retaliation claims listed above against Defendants Crossman and Lawrence, respectively, both suffer from the same deficiency: neither describes with any degree of specificity the constitutionally protected conduct that was the basis for the alleged retaliatory acts. *See id.* at ¶¶ 19 (alleging that Crossman filed a false Misbehavior Report against him "as retaliation against the Plaintiff for his inmate civil complaints against numerous fellow [DOCS] employees") & 30 (asserting no constitutionally protected conduct whatsoever). Therefore, it is recommended that these claims be **dismissed** as conclusory and pursuant to 42 U.S.C. § 1915(g).

### 3. *Access to the Courts*

In paragraph thirty-five (35) of his Complaint, Plaintiff appears to allege that he was denied access to the law library on May 8, 2008, but he does not state that any Defendant was personally involved in that alleged constitutional deprivation. *Id.* at ¶ 35. In paragraph sixty-six (66) of his Complaint, Plaintiff alleges in conclusory fashion that Brousseau destroyed several grievances he filed. Once again, this claim appears to be based on nothing more than Plaintiff's own supposition and speculation. Therefore, it is recommended that these claims be **dismissed.**

### E. Conspiracy Claims

Plaintiff brings several conspiracy claims that are difficult to decipher and to the extent they can be logically interpreted, are wholly conclusory. Plaintiff alleges that

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Defendant Bezio (and perhaps Uhler and Boyea as well) was involved in a conspiracy to send Plaintiff to Upstate and to have him placed in a cell next to an inmate with whom Plaintiff would likely have fights. Compl. at ¶ 22. In another conspiracy claim, Plaintiff states his belief that Bezio was the mastermind behind the alleged May 19, 2008, attack against him because Plaintiff knew Bezio from Upstate and Defendants Bezio and Uhler had a history of working together against Plaintiff. *Id.* at ¶ 5 8. Finally, Plaintiff alleges that Defendants Fischer, LeClaire, Bezio, Artus, and Uhler conspired to subject Plaintiff to "religious harassment and discrimination and physical assault and the prison disciplinary proceeding[s] and [to] transfer [him] back to upstate." *Id.* at ¶ 81.

**\*13** All of the aforementioned conspiracy claims appear to be based solely on Plaintiff's own beliefs and conjecture and, in the absence of factual allegations, should therefore be **dismissed** as frivolous pursuant to 42 U.S.C. § 1915(g).

### F. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948, 173 L.Ed.2d 868.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that

sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Aside from naming them as Defendants, Plaintiff has failed to make any factual allegations whatsoever against Defendants Roy, Knapp, Lucia, and Diaz. Also, Plaintiff's only mention of Defendant LeClaire is the conclusory claim that LeClaire was somehow involved in his alleged First and Eighth Amendment violations. Compl. at ¶ 81. Therefore, it is recommended that the Complaint be **dismissed** as against those Defendants.

Furthermore, because we have recommended dismissal of Plaintiff's underlying constitutional claims concerning mail theft, retaliation, medical indifference, conditions of confinement, and due process, his claims of supervisory liability against Defendants Woods, Bezio, Racette, Uhler, Wright, Johnson, Brousseau, Patnode, and Bellamy, for failure to remedy those alleged violations should also be **dismissed.** *See* Compl. at ¶¶ 10, 21-22, 32-34, 51, 58-59, 66-67, 72-73, & 79.

Defendants have not moved to dismiss Plaintiff's claims stemming from the alleged events of May 19, 2008, however, they argue that Defendants Artus and Fischer should be dismissed for lack of personal involvement. Defs.' Mot. at pp. 16-17. Plaintiff has alleged that prior to the alleged use of excessive force that occurred on May 19, 2008, he sent complaints to Artus and Fischer about his problems with Orzech and Orzech's alleged threat to assault him, and that such complaints were either ignored or not responded to, and therefore, Artus and Fischer failed to protect him. Compl. at ¶¶ 41, 44, 57, & 68.

**\*14** In order to state a valid failure to protect claim, a prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove deliberate indifference, the plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998).* "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836.

In this case, Plaintiff alleges that Artus and Fischer were put on notice of the threat to his safety by his letters of complaint dated May 15, 17, and 18, 2008. Based on these allegations, we find that Plaintiff has stated a facially adequate claim for failure to protect. Therefore, we recommend against dismissal of these claims against Artus and Fischer. Similarly, Plaintiff has alleged that Defendants Warner and Rock were involved in a conspiracy to cover-up the alleged May 19th assault. Although we recommended dismissal of Plaintiff's medical indifference claims against Rock in Part II.B.1, *supra,* Plaintiff also alleges that Rock falsified his medical records in furtherance of the alleged conspiracy to violate his Eighth Amendment rights. Compl. at ¶¶ 48 & 70. Warner is alleged to have participated in the conspiracy by directing Defendant Tamer not to take any close-up pictures of Plaintiff's injuries after the assault. *Id.* at ¶ 48. Considering that Plaintiff's underlying excessive force claim has not been challenged, dismissal of his conjoining conspiracy claims would be premature at this stage. Therefore, it is recommended that these claims against Warner and Rock not be dismissed.

**G. Unserved Defendants**

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [FN14] Failure to properly serve any defendant in accordance with the Federal Rules will result

in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

FN14. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

In this case, there is no indication that the Defendants C.O. Green, Labetz, Ortloff, or Karen Bellamy have been served. *See* Dkt. Nos. 17, 54, & 66. Although courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims against Defendants Green, Ortloff, and Bellamy lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against Green, Ortloff, and Karen Bellamy be **dismissed.** With respect to Labetz, Plaintiff has alleged that he used excessive force against Plaintiff during the May 19, 2008 incident. Compl. at ¶ 63(1). Because Defendants have not moved to dismiss Labetz for failure to state a claim, we will afford Plaintiff *one final opportunity to effectuate service of process on Defendant Labetz. Plaintiff is forewarned that a failure to do so will result in the Court's recommendation of dismissal of his claims against Labetz.* The Court will afford Plaintiff *thirty (30) days from the date this Report-Recommendation is issued* to effectuate service upon Labetz.

**III. Plaintiff's Motion for a Preliminary Injunction**

**\*15** On February 23, 2009, Plaintiff submitted a Motion for a Preliminary Injunction and Temporary Restraining Order seeking an order enjoining the Defendants from: interfering with his Rastafarian religious practices, physically assaulting him, confining him in SHU under the pretext of false misbehavior reports, denying him medical care, stealing his mail, and denying him access to the law library. Dkt. No. 57 at pp. 1-6.

In the Second Circuit, the standard for granting a temporary restraining order and a preliminary injunction is the same. *See* FED. R. CIV. P. 65; *see also Local 1814*

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

*Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n Inc.*, 965 F.2d 1224, 1228 (2d Cir.1992).

In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either: (a) a likelihood of success on the merits of [the case], or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in [favor of the moving party].

*D.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir.2006) (internal quotation marks and citation omitted).

Irreparable harm "means an injury for which a monetary award cannot bring adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). The Second Circuit has held that the alleged violation of a constitutional right triggers a finding of irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996). Therefore, in cases involving alleged constitutional violations, the issue of irreparable harm merges with the question of success on the merits. *See Metropolitan Council, Inc. v. Safir*, 99 F.Supp.2d 438, 443 (S.D.N.Y.2000) (citation omitted).

Finally, when the injunction sought "will alter, rather than maintain the *status quo,*" or will "provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success. *Beal v. Stern*, 184 F.3d 117, 122-23 (2d Cir.1999) (citation omitted).

In this case, Plaintiff has failed to demonstrate either irreparable harm or a likelihood of success on the merits of his claims. Indeed, we have already recommended for dismissal the majority of Plaintiff's claims. In addition, Plaintiff's Motion for Preliminary Injunction is presented in conclusory fashion and, for the most part, simply repeats the accusations brought in his Complaint. Therefore, it is recommended that Plaintiff's Motion be **denied.**

## IV. CONCLUSION

For the reasons stated above, it is recommended that the majority of the aforementioned claims be dismissed. To clarify, should the district court adopt this Report-Recommendation, the following claims will remain: (1) excessive force and retaliation against Defendants Tamer, Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against Defendants Tamer, Orzech, T. Carter, Moak, Labetz, R. Rock, and Warner; (3) violation of Plaintiff's First Amendment right to practice religion against Orzech; and (4) supervisory liability against Artus and Fischer.

Therefore, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 59) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that the following Defendants be **DISMISSED** from this action: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClair, Jr., Vonda Johnson, Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokeee, Green, Ortloff (spelled "Oltloff" on the Docket), Karen Bellamy; [FN15] and it is further

> FN15. To clarify further, should the District Court adopt this Report-Recommendation, the following Defendants shall remain as parties in this action: T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Artus, and Fischer.

**RECOMMENDED,** that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 57) be **DENIED;** and it is further

**ORDERED,** that should the District Court adopt this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Court's recommendation that Defendant Labetz not be dismissed from the action, the Clerk shall issue a Summons and forward it, along with a copy of the Complaint, to the United States Marshal for service upon Defendant Labetz. Plaintiff is warned that failure to effectuate service upon Labetz within ***thirty (30) days of the date this Report-Recommendation is issued*** will result in this Court recommending dismissal of his claims against Labetz; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
Mortimer Excell v. Fischer
Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Bela BORCSOK, Plaintiff,
v.
Peter D. EARLY, James Plescia, Donald Selsky, David
Miller and Glenn S. Goord, Defendants.
No. 9:03-CV-395 (GLS/RFT).

Aug. 23, 2007.

Bela Borcsok, Coxsackie, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General,
Douglas J. Goglia, Assistant Attorney General, of
Counsel, Albany, NY, for the Defendants.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

*1 After Bela Borcsok filed a § 1983 action alleging
violations of his Fourteenth Amendment rights,[FN1] see Dkt.
No. 1; see also 42 U.S.C. § 1983, his complaint was
referred to Magistrate Judge Randolph F. Treece for
report and recommendation. See 28 U.S.C. § 636(b)(1)(A),
(B); N.D.N.Y. R. 72.3(c); Gen. Order No. 12, § D(1)(G).
Subsequently, Judge Treece issued a report recommending
that defendants' motion for summary judgment be granted
in its entirety. See Report-Recommendation ("R & R"),
Dkt. No. 30.[FN2]

FN1. Borcsok asserts that his due process rights
were violated during a Tier III Disciplinary
Hearing because there was a lack of physical
evidence to support the contents of the
misbehavior report in question, the report itself

was fabricated, and the hearing officer was
biased. See Dkt No. 1.

FN2. The Clerk is directed to append Judge
Treece's Report-Recommendation to this
decision, and familiarity is presumed. See Dkt.
No. 30.

Broadly construing the complaint, Judge Treece
concluded the following: (1) Borcsok does not maintain a
constitutional right to be free from a false misbehavior
report; (2) his procedural due process claim fails because
he has not shown an "atypical and significant" hardship;
(3) his remaining due process claim fails because "some
evidence" existed to support a finding of guilt; (4) whether
sufficient evidence existed to support the hearing officer's
decision is barred by collateral estoppel because the issue
was already addressed in an Article 78 proceeding; and (4)
no evidence exists to show bias on behalf of hearing
officer Plescia.

Borcsok has now filed objections to Judge Treece's report.
See Dkt. No. 32. Although timely, the objections do not
specifically address Judge Treece's factual and legal
conclusions. Instead, Borcsok has simply repeated the
facts and arguments contained in his original petition and
motion papers. His objections contain no new analysis or
arguments, nor do they cite authority in support of what
are otherwise mere conclusory claims. Specifically,
Borcsok's objects that both defendant Early and Plescia
were required to produce physical evidence to support the
hearing decision. However, this assertion ignores Judge
Treece's conclusion that "some evidence" existed to
support defendants' finding. See Luna v. Pico, 356 F.3d
481 (2d Cir.2004). Similarly, Borscok's argument that the
state court did not consider the issue of physical evidence
in the Article 78 proceeding is belied by the record. See
Borcsok v. Selsky, 744 N.Y.S.2d 772 (N.Y.App.Div.2002)
(finding that sufficient evidence existed to find Borcsok
guilty of violating prison rules).

In sum, given the inadequacy of Borcsok's objections, he
has procedurally defaulted. See Almonte v. N.Y. State Div.
of Parole, 9:04-CV-484, 2006 WL 149049, at *4

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

(N.D.N.Y. Jan. 18, 2006). Accordingly, the court has reviewed Judge Treece's report and recommendation for clear error. *See Almonte,* 2006 WL 149049, at *6. Having discerned none, the court adopts the report and recommendation in its entirety, and Borcsok's complaint is dismissed in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Treece's February 21, 2007 Report-Recommendation (**Dkt. No. 30**) is accepted and adopted in its entirety; defendants motion for summary judgment (Dkt. No. 23) is GRANTED, the complaint is dismissed in its entirety; and it is further

**\*2ORDERED** that the Clerk enter judgment in favor of the defendants and close the case; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Bela Borcsok brings a civil action pursuant to 42 U.S.C. § 1983, alleging violations of his due process rights pursuant to the Fourteenth Amendment regarding a prison disciplinary hearing. Dkt. No. 1, Compl. at § IV. Defendants bring a Motion for Summary Judgment. Dkt. No. 23. Plaintiff opposes the Motion. Dkt. Nos. 24-26. For the reasons to follow, it is recommended that the Defendants' Motion for Summary Judgment be **granted.**

### I. PROCEDURAL HISTORY

A brief procedural history is necessary in this case. On March 31, 2003, Plaintiff filed his Complaint. Dkt. No. 1, Compl. Instead of submitting an answer, Defendants Goord and Selsky filed a Motion to Dismiss on July 3, 2003. Dkt. No. 10, Mot. to Dismiss. At the time the Motion to Dismiss was filed, Defendants Early, Plescia, and Miller had not been served nor appeared in the action. Dkt. No. 12. Defendants Early, Plescia, and Miller were subsequently served and appeared in the action. Dkt. Nos. 9 & 14-17.

Thereafter, on March 5, 2004, this Court ruled that the Motion to Dismiss would be converted into a Rule 56 Motion for Summary Judgment since Defendants Goord and Selsky submitted matters that were outside the pleadings. Dkt. No. 20, Order, dated Mar. 5, 2004. The Court noted that although Defendants Early, Plescia, and Miller appeared in the action, they did not join in the Motion to Dismiss. *Id.* at p. 2, n. 1. In order to make this conversion, the Court provided Plaintiff and Defendants an opportunity to submit additional materials. *Id.* at p. 4. The Court further stated that once the new Motion for Summary Judgment was filed, we would deem the papers filed in support and opposition to the Motion to Dismiss incorporated into the new Motion for Summary Judgment. *Id .* We also "preserve[d] Defendants' rights to bring such Motion on behalf of all the Defendants" who appeared in this action. *Id.* at p. 4, n. 5. Accordingly, all Defendants now bring the current Motion for Summary Judgment. Dkt. No. 23, Mot. for S.J. & Notice of Mot.

### II. FACTS[FN1]

FN1. Plaintiff failed to comply with Northern District of New York Local Rule 7.1(a)(3). Plaintiff submits a Statement of Facts, however, Plaintiff did not mirror the movant's Statement of Material Facts by either admitting or denying each of the movant's assertions in matching numbered paragraphs. Dkt. No. 25. Plaintiff, after paragraph four, seems to misnumber the paragraphs and then fails to properly admit or deny statements made by Defendants. *Id.* As such, any facts not specifically controverted by Plaintiff may be deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). Nevertheless, this Court will utilize Plaintiff's Verified Complaint with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

accompanying Exhibits and Statement of Facts as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the uncontested, material facts of the case.

During the time the events occurred relevant to this action, Plaintiff was incarcerated at the Eastern Correctional Facility. Dkt. No. 23, Defs.' 7.1 Statement at ¶ 1; Dkt. No. 25, Pl.'s 7.1 Statement at ¶ 1. Defendants Corrections Lieutenant Early, Deputy Superintendent of Administration Plescia, and Superintendent Miller, are employed at Eastern, while Selsky is the Director of the Department of Correctional Services ("DOCS") Inmate Disciplinary Program and Goord is the Commissioner of DOCS. Defs.' 7.1 Statement at ¶¶ 2-6; Pl.'s 7.1 Statement at ¶¶ 2-7.

**\*3** On March 26, 2001, Early issued a Misbehavior Report to Plaintiff, charging him with violations of Rules 109.10, 113.23, 116.10, 116.11, 113.15, and 114.10.[FN2] Defs.' 7.1 Statement at ¶¶ 7 & 8; Dkt. No. 11, Douglas J. Goglia Decl., dated June 19, 2003, Ex. 3(A), Misbehavior Report, dated Mar. 26, 2001; Pl.'s 7.1 Statement at ¶ 8. The Report stated the following as the description of the incident:

> FN2. The following constitutes the substance of each Rule: 1) 109.10-inmates shall not be out of place in any area of the facility;  2) 113.23-inmates shall not be in possession of any contraband items not authorized by the Superintendent, DOCS, or facility rules; 3) 116.10-inmates shall not lose, destroy, steal, misuse, damage or waste any type of state property; 4) 116.11-inmates shall not alter, tamper with or attempt to repair any type of state or personal property without authorization; 5) 113.15-inmates shall not purchase, sell, loan, give, or exchange personally owned articles without authorization; and 6) 114.10-inmates shall not attempt to smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another. Dkt. No. 23, Defs.' 7.1 Statement at ¶ 8, n. 2-7; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 270.2(B) (10(i), (14)(v), (14) (xiii), (15)(i), (17)(i), & (17)(ii).

[a]s a result of the ongoing investigation as well as an interview [Early] conducted with Inmate Borcsok, B. [,] 82-A-3861[,] on the above date and approximate time, [Early has] concluded the following: Inmate Borcsok has, over the last several months, used a CD-Burner that was located in the Braille Area to make copies of computer software and personally owned games.... He also admitted adding a CD-ROM drive to his computer in the Fire & Safety Area in Maintenance.... He further admitted giving the games and disks to Inmate Gardella, M. 75-B-0978.... Note: Braille is not Inmate Borcsok's assigned program....

Defs.' 7.1 Statement at ¶ 9; Goglia Decl., Ex. 3(A), Misbehavior Report; Pl.'s 7.1 Statement at ¶ 8.

Plaintiff alleges that Early fabricated the Report and that subsequently, his due process rights were violated at his Tier III Disciplinary Hearing ("Hearing"). Defs.' 7.1 Statement at ¶¶ 10 & 11; Goglia Decl., Exs. 3(D), Hr'g Tr., dated Apr. 6, 2001, & 3(E), Hr'g Record, dated Apr. 8, 2001. The Hearing was conducted by Plescia, the Hearing Officer ("H.O."), over several days. Defs.' 7.1 Statement at ¶ 11; Goglia Decl., Ex. 3(D), Hr'g Tr. The Hearing commenced on March 30, 2001 and Plaintiff pled not guilty to all the Rule violations. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 1-3.

Plescia asked Plaintiff about his defenses and Plaintiff stated he did not admit to having a CD/ROM in the machine yet he claimed he got rid of it two months prior to the Report because it was "getting hot[.]" *Id.* at p. 4. Plaintiff stated the CD/ROM was in the machine when he received it, therefore, Plaintiff did not add it himself. *Id.* Plaintiff did admit to removing it after he was told to do so by Officer Cooper. *Id.* at pp. 4-5. The Hearing was then adjourned until April 2, 2001, when a witness, John Cosh, became available. *Id.* at p. 5. Cosh stated that Plaintiff visited the Braille area once or twice to ask technical questions but was not allowed to use the equipment to burn CDs. *Id.* at pp. 7-8. The witness also confirmed that a CD burner was installed in the computer for a period of time. *Id.* at pp. 11-12. Cosh further noted that to his knowledge he did not believe Plaintiff burned any CDs. *Id.* at pp. 12-13.

After the witness concluded, the Hearing was adjourned again until April 5, 2001. *Id.* at p. 13. On April 5th,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Officer Cooper, the Fire and Safety Officer, testified that Plaintiff would on occasion assist him with the use of the computer. *Id.* at p. 14. He also stated that he did not believe that the computer Plaintiff worked on had a CD/ROM drive but Cooper noted that he and Plaintiff discussed the issue of CD/ROMs and software and that generally, if there was one on a computer, Cooper wanted to "get them out of there." *Id.* at p. 15. Cooper then proceeded to clarify his testimony and stated that he did not tell Plaintiff to remove a CD/ROM device, but only software such as games and programs that did not belong on the computers. *Id.* at p. 16. After Cooper finished testifying, Early was the next witness. *Id.* at p. 18.

*4 Early stated that the Report was eventually written because of an investigation, which was initiated based upon a confidential note that there was a computer with a CD/ROM drive in the "basement of FRP." *Id.* at p. 19. A search of the area produced two computers, one of which contained a CD/ROM with computer games and CDs that were burned. *Id.* After the search, Early interviewed Plaintiff regarding the use of a CD burner in the Braille area to make copies of software and games. *Id.* Early purported that Plaintiff admitted in the interview that he used a CD burner, gave some games to "Gardella[,]" and put a CD/ROM drive behind a false panel so that it would not attract attention *Id.* at pp. 19-21.

Plescia then addressed the Rule violations with Early to determine how they occurred. *Id.* at pp. 22-26. As to being out of area, Rule 109. 10, Early stated it was okay for Plaintiff to be in the Braille area for his job but not for purposes involving the CD burner. *Id.* at pp. 21-22; *see supra* note 2. As to 113.23, possession of contraband, Early stated that Plaintiff was not found in possession of the CD/ROM or other such items, but he was charged with this infraction because he admitted to possessing it in the past. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 22-24; *see supra* note 2. As to Rules 116.10 and 116.11 regarding state property, Early stated he again relied on the admissions made by Plaintiff and did not conduct any further investigations. Goglia Decl., Ex. 3(D), Hr'g Tr. at p. 23; *see supra* note 2. Early also testified that he could not specifically remember when the CD burner and/or CD/ROM were put into the Braille area and then taken out, only that it had happened within the past few months. Goglia Decl., Ex. 3(D), Hr'g Tr. at p. 24. In regards to Rule 113.15, exchange of personal articles, Plescia and

Early both stated that when Plaintiff admitted giving something to Gardella, the charge was applicable. *Id.* at p. 25; *see supra* note 2. Plaintiff then asserted that he could not have done any of the things he supposedly admitted he had done. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 25-26. Subsequently, Plaintiff told Plescia he would like to ask more questions but that his legal papers were not with him and therefore, Plescia adjourned the Hearing for one more day.[FN3] *Id.* at pp. 26-29.

> FN3. It does not seem as though the violation of Rule 114.10 was specifically discussed. *See generally* Goglia Decl., Ex. 3(D), Hr'g Tr.

On April 6, 2001, the Hearing was reconvened *Id.* at p. 29. Instead of asking more questions, Plaintiff summed up his thoughts by explaining that he did not believe there was sufficient evidence to justify any of the charges brought against him. *Id.* at pp. 30-31. Plaintiff reiterated that there was no physical evidence presented, the whole Report was based upon admissions, and there was no investigation conducted after he was interviewed. *Id.* at p. 31. Plaintiff reaffirmed that he did not make any admissions. *Id.* Shortly after concluding the Hearing, Plescia made his findings. *Id.* at p. 32. Plescia found Plaintiff guilty of all charges and sentenced him to confinement in the Special Housing Unit ("SHU") for ninety (90) days along with corresponding loss of packages, commissary, and phone privileges. *Id.* at pp. 32-35; Pl.'s 7.1 Statement at ¶ 13.

*5 Plaintiff claims that during the Hearing:

1. [i]t was never proven that plaintiff made any admissions[;] 2 .[i]t was never proven that Plaintiff ever committed any of the alleged charges/violations[;] 3.[t]here are no witnesses, recordings, nor any signed statements to substantiate the supposed admissions or the alleged charges[;] 4. [ ] Lt. [Early] admitted he never investigated the matter[;] 5.[t]here are no dates, times, or areas listed as to when and where the alleged Physical Evidence was discovered[;] 6.[t]here was *no* Physical Evidence produced at the hearing[;] 7.[t]he Hearing Officer and the Lt. admitted they had no evidence for the hearing[;] 8.[t]here was no proof of any Confidential Information[;] 9.[i]t was never proven that the computer in the Fire & Safety Area was in fact used

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

for non-business purposes[;] 10.[n]o times or dates are specified as to when any of the stated charges/violations supposedly occurred, yet the Hearing Officer himself stated that this occurred at "the appointed time in the past[;]" 11.[t]he Plaintiff was admittedly never found to be in Possession of any contraband[;] 12.[t]he testimony of both Mr. Cosh and Officer Cooper contradicted the Misbehavior Report as well as the Lt.'s testimony [; and] 13.[t]he finding of guilt was based on supposed admissions as well as non-existent Physical Evidence.

Defs.' 7.1 Statement at ¶ 12; [FN4] Compl. at § IV.

FN4. Defendants inadvertently have two paragraphs numbered 12. The Court refers to the first paragraph numbered 12 for this statement. *See* Defs.' 7.1 Statement.

Plaintiff's other assertions regarding his Hearing are that the Report was based upon double hearsay and Early and Plescia relied on physical evidence that did not exist and was not introduced at the Hearing. Defs.' 7.1 Statement at ¶¶ 12 & 13; [FN5] Compl. at § IV; Pl.'s 7.1 Statement at ¶¶ 8-10 & 12.

FN5. The Court references the second paragraph numbered 12.

After the Hearing, Plaintiff appealed the decision to Commissioner Goord on April 10, 2001, detailing the procedural and evidentiary flaws. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Appeal, dated Apr. 10, 2001; Pl.'s 7.1 Statement at ¶ 14. On April 23, 2001, Plaintiff sent an additional appeal form to Goord regarding the sentence imposed at the Hearing. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Appeal, dated Apr. 23, 2001; Pl.'s 7.1 Statement at ¶ 14. Selsky responded on behalf of Goord and affirmed the Hearing determination on May 24, 2001. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Selsky Mem.; Pl.'s 7.1 Statement at ¶ 15.

All in all, Plaintiff claims that Early offered conclusory testimony and therefore, displayed indifference in the matter, Plescia was biased and prejudiced in conducting

and evaluating the Hearing, Miller, as Superintendent, "is responsible for all that happens within his prison [,]" Selsky affirmed the disposition of the Hearing, and Goord "oversees all that goes on within his system ." Defs.' 7.1 Statement at ¶¶ 14-20; Compl. at § IV.

On September 10, 2001, Plaintiff commenced an Article 78 proceeding in the New York State Court, Albany County, challenging his Tier III Hearing. [FN6] Defs.' 7.1 Statement at ¶ 21; Goglia Decl., Ex. 1, Article 78 Pet., dated Sept. 10, 2001; Pl.'s 7.1 Statement at ¶ 16. Plaintiff contended there was a lack of substantial evidence, the testimony of Cosh and Cooper did not support Early's testimony, and Plescia exceeded his authority by disregarding the testimony of the two witnesses. Defs.' 7.1 Statement at ¶¶ 22-23; Goglia Decl., Ex. 1, Article 78 Pet. However, because there was a challenge of whether "substantial evidence" supported the determination, the proceeding was transferred to the New York State Appellate Division, Third Department. Defs.' 7.1 Statement at ¶ 26; Goglia Decl., Exs. 2(E), Mem. and J., dated July 11, 2002, at p. 1, & 5, *Borcsok v. Selsky,* 744 N.Y.S.2d 772 (N.Y.App. Div., 3d Dep't 2002); Pl.'s 7.1 Statement at ¶ 18.

FN6. Defendants state the Petition was filed on September 25, 2001, instead of September 10, 2001, the date of the signature. Defs.' 7.1 Statement at ¶ 21. However, the Court is unaware of how Defendants arrived at this date since the Petition shows no other date.

*6 The parties briefed the issues to the Appellate Division and the court rendered its decision on July 11, 2002. Defs.' 7.1 Statement at ¶¶ 22-27; Goglia Decl., Exs. 2(A), Pl.'s Br., 2(B), Resp.'s Br., 2(C), Pl.'s Reply Br.; Pl.'s 7.1 Statement at ¶¶ 19-20. The Appellate Division stated that the Report along with Early's testimony "constituted substantial evidence supporting the administrative determination of guilt[.]" Defs.' 7.1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 772; Pl.'s 7.1 Statement at ¶ 21. The Court further stated that

[t]he author of the report testified that petitioner admitted during an interview that he had used the CD burner to

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

make copies of software and games, that he had given certain games to another inmate and had added a CD-ROM drive to his computer which he attempted to hide with masking tape. Petitioner's claim that he did not make the admissions attributed to him created a credibility issue for the Hearing Officer to resolve .... Moreover, by not raising it at the hearing, petitioner has not preserved his objection to the sufficiency of the misbehavior report .... Were we to consider it, we would not find the omission of specific dates and times fatal, since the misconduct took place over several months and was the subject of a lengthy investigation[.]

Defs.' 7.1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 773; Pl.'s 7.1 Statement at ¶ 21.

Accordingly, the Appellate Division denied the Petition. Defs.' 7 .1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 773; Pl.'s 7.1 Statement at ¶ 21. Plaintiff appealed the decision to the New York State Court of Appeals where leave to appeal was denied. Defs.' 7.1 Statement; Goglia Decl., Ex. 6, *Borcsok v. Selsky,* 781 N.E.2d 914 (N.Y. Ct. of App.2002); Pl .'s 7.1 Statement at ¶ 22.

### III. DISCUSSION

#### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*7** To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

#### B. Due Process Claims

Plaintiff claims that his Fourteenth Amendment due process rights were violated as there was a lack of sufficient evidence presented at the Hearing to support the contents of the Misbehavior Report, the Report was fabricated, and that Plescia was biased. Dkt. No. 24, Pl.'s Mem. of Law at pp. 5-9; Compl. at § IV. Defendants claim there was "some evidence" to find Plaintiff guilty of the charges as required by law. Dkt. No. 12, Defs.' Mem. of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Law at pp. 8-13. Defendants also assert that collateral estoppel should apply to the finding of "some evidence" by the Appellate Division, that no evidence was provided to show Plescia was biased, and Plaintiff failed to exhaust his administrative remedies. *Id.*

As to Plaintiff's claim that the Report was fabricated, the Second Circuit has held that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997)* (citing *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986)*); *see Batista v. Goord, 2005 WL 2179420, at *11 n. 75 (N.D .N.Y. Aug. 28, 2005)*; *Pittman v. Forte, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002)*. Furthermore, if a prisoner is afforded the opportunity to have a hearing, "the filing of unfounded charges does not give rise to a *per se* constitutional violation actionable under *§ 1983*." *Franco v. Kelly, 854 F.2d 584, 587 (2d Cir.1988)* (quoting *Freeman v. Rideout, 808 F.2d at 953).* In addition, "[t]here must be more such as retaliation against the prisoner for exercising a constitutional right." *Pittman v. Forte, 2002 WL 31309183, at *5* (citing *Franco v. Kelly, 854 F.2d at 588-590)*;*see also Boddie v. Schnieder, 105 F.3d at 862*;*Batista v. Goord, 2005 WL 2179420, at *11 n. 75*.

**\*8** Here, Plaintiff alleges that no investigation was conducted and the Report was based solely on admissions supposedly made by him. Notwithstanding, Plaintiff has no constitutional right to be free from false accusations in a misbehavior report and moreover, Plaintiff was afforded an opportunity to have a hearing based upon the report and thus there is no *per se* constitutional violation actionable under *§ 1983* unless Plaintiff alleged that something else resulted from his exercise of a constitutional violation, such as retaliation. In this case, Plaintiff makes no such claim. *See generally* Compl. at § IV.

Plaintiff also asserts that there was insufficient evidence presented at the Hearing to support the Report. The Fourteenth Amendment to the Constitution states that "no State shall ... deprive any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV, § 1.* The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner, 515 U.S. 472, 484 (1995).* "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky, 37 F.Supp.2d 162, 167 (N.D.N.Y.), vacated and remanded on other grounds by238 F.3d 223 (2d Cir.2001)* (citing *Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir.1996)).* In *Sandin,* the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prisoner life." *515 U.S. at 484;see also Giano v. Selsky, 238 F.3d at 225* (citing *Sandin v. Conner, 515 U.S. at 484);Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir.1999).* Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *See Sandin v. Conner, 515 U.S. at 484.*

Factors relevant to an analysis of what constitutes an atypical and significant hardship include: "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon, 1998 WL 167297, at *5 (N.D.N.Y.Apr. 3, 1998)* (citing *Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998)); see also Palmer v. Richards, 364 F.3d 60, 64 (2d Cir.2004)* (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999)* (citations omitted). However, "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards, 364 F.3d at 64-65* (quoting *Colon v. Howard,*

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

215 F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97-98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125-288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).[FN7] If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

FN7. Department of Correctional Services policies provide the conditions of confinement prisoners are subject to when confined in SHU. *See* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1-.14 & 305.1-.6.

*9 Here, Plaintiff must make the threshold showing of an atypical and significant hardship since a claim of denial of due process was asserted. Borcsok received 90 days in SHU along with 90 days loss of packages, commissary, and phone privileges. Goglia Decl., Ex 3(D), Hr'g Tr. at pp. 32-35. The amount of time in SHU falls below the intermediate duration. Furthermore, Plaintiff does not provide any information that his loss of privileges were in some way atypical of conditions of confinement that normally occur when a penalty is assessed for such Rule violations. *See* Compl. at § IV; Pl.'s Mem. of Law. Therefore, the Court assumes that the conditions of confinement were no more restrictive than necessary pursuant to Department of Correctional Services policies. *See supra* note 7. Since there is no dispute as to the conditions and because the period of confinement fell below the intermediate range, Plaintiff has failed to show there was an atypical and significant hardship as to afford

the protection provided by procedural due process.

Nevertheless, had Plaintiff asserted that a liberty interest was implicated, we note that the Supreme Court and Second Circuit have addressed the issue of "some evidence." The Supreme Court has stated that in identifying safeguards of due process, it has acknowledged the genuine need of prisons to ensure the safety of inmates, thus "avoiding burdensome administrative requirements that might be susceptible to manipulation, and [to] preserv[e] the disciplinary process as a means of rehabilitation." *Superintendent, Mass. Corr. Inst. at Walpole v. Hill,* 472 U.S. 445, 454-55 (1985) (citations omitted). In terms of judicial review regarding the written findings of the disciplinary proceeding as required by due process, the Supreme Court has held that:

requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." *United States ex rel. Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 106 (1927). Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *See ibid.; United States ex rel. Tisi v. Tod,* 264 U.S. 131, 133-134 (1924); *Willis v. Ciccone,* 506 F.2d 1011, 1018 (CA8 1974). We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. *See Wolff,* 418 U.S., at 562-563, 567-569.

*10 *Id.* at 455-56.

The Second Circuit has interpreted "some evidence" to mean that there must be some "reliable evidence." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004). Examples of cases when "some evidence" was not found in a disciplinary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

proceeding include a corrections officer making a statement that "every inmate" in a mess hall participated in a riot and an inmate was found guilty based on that statement, and an inmate being found guilty based on information provided by a confidential informant though there was no independent examination of the informant's credibility. *Id.* (citing *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992) & *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001)).

Plaintiff purports that there was insufficient evidence at his Hearing to find him guilty of the Rule violations. Defendants state that collateral estoppel bars relitigation of this particular issue as it was decided by the New York State Appellate Division, Third Department pursuant to an Article 78 proceeding.

An inmate may be barred by the doctrine of collateral estoppel "from relitigating issues that were determined in [the Article 78] proceeding." *Robinson v. Scully,* 1993 WL 340998, at *4 (S.D.N.Y. Aug. 23, 1993). Pursuant to "the Full Faith and Credit Statute, 28 U.S.C. § 1738, federal courts must give a prior state court judgment the same preclusive effect that such a judgment would be given in the courts of the state from which the judgment emerged." *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982)). This rule applies to actions brought under section 1983. *Id.* (citing *Allen v. McCurry,* 449 U.S. 90, 103-04 (1980) (issue preclusion) & *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 84-85 (1984) (claim preclusion)). Therefore, this Court must analyze New York law in order to determine if there is preclusion based on a judgment rendered in the Article 78 proceeding. *Id.*

Under New York law, the doctrine of collateral estoppel, or issue preclusion, applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and (1) the issue "has necessarily been decided in the prior action and is decisive of the present case," and (2) there has been "a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); *see also Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

*Id.; see also LaFleur v. Whiteman,* 300 F.3d 256, 271-72 (2d Cir.2002).

Furthermore, " 'collateral estoppel may bar relitigation of an issue even against different defendants,' provided that the issue in contention was necessary to the result reached in the prior proceeding." *LaFleur v. Whiteman,* 300 F.3d at 274 (quoting *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 555 n. 1 (2d Cir.1967)). Thus, if the parties are in privity, collateral estoppel may still be applicable. *B.N.E., Swedbank, S.A. v. Banker,* 791 F.Supp. 1002, 1006 (S.D.N.Y.1992) (citing *Blonder-Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 329 (1971)); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 132.04(1)(b)(i) (3d ed.2005). "The term privity signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit." 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 132.04(1)(b)(ii); *see also Staten Island Rapid Transit Operating Auth. v. I.C.C.,* 718 F.2d 533, 543 (2d Cir.1983) (noting that privity, in general, means "concurrent relationship to the same right of property; successive relationship to the same right of property; or representation of the interests of the same person.") (citation omitted)).

*11 The burden of proving whether the issues are the same "rests squarely on the party moving for preclusion." *LaFleur v. Whiteman,* 300 F.3d at 272. However, the opposing party will have the burden "to show that it did not have a full and fair opportunity to litigate the issue in the prior proceeding." *Id.* at 274 n. 7 (citing *Ryan v. New York Tel. Co.,* 467 N.E.2d 487, 491 (N.Y. Ct. of App.1984)).

Even assuming that an Article 78 judgment satisfies "New York State law requirements for issue preclusion, as a matter of federal law a state cannot give preclusive effect in its own courts to a constitutionally infirm judgment." *Giakoumelos v. Coughlin,* 88 F.3d at 61 (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 482 (1982)). However, the "state proceedings need do no more than satisfy the minimum procedural requirements of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." *Id.* (quoting *Kremer v. Chemical Constr. Corp.,* 456 U.S. at 481).

Here, Plaintiff presented the issue of insufficient evidence in the Article 78 proceeding. *See Borcsok v. Selsky,* 744 N.Y.S.2d at 772-73. The state court found substantial evidence existed based upon Early's testimony and Plaintiff's admissions. *Id.* The court further noted that the fact that Plaintiff claimed he did not make the admissions created a credibility issue for Plescia to decide. *Id.* at 773. Thus, the issue of sufficiency of the evidence was decided in the Article 78 Proceeding and is decisive in the current action. FN8

> FN8. The Court further notes that the other issues regarding physical evidence raised in this proceeding were duly raised to the New York State Appellate Division, Third Department. *Compare* Compl. at § IV *with* Goglia Decl., Exs. 2(A), Pl.'s Br. & (B), Pl.'s Reply Br.

In order to forestall the application of collateral estoppel, Borcsok must establish the absence of a full and fair opportunity to litigate the claims in the prior Article 78 proceeding. Here, Plaintiff has not proclaimed that he was denied a full and fair opportunity to litigate his claims. Pl.'s Mem. of Law at pp. 6-7. His only claim is that new evidence was uncovered that would defeat collateral estoppel, and this new evidence is that there are no records to prove an investigation was conducted before the Report was written. Pl.'s Mem. of Law at pp. 7 & 13-14. Plaintiff had a full and fair opportunity to litigate his issues regarding the Hearing. *See supra* note 8. In addition, Donald Selsky, a Defendant in this action, was also the "Respondent" in the prior proceeding. *See Borcsok v. Selsky,* 744 N.Y.S.2d 722. The other Defendants in this action could be seen as having the type of relationship with Selsky that privity would exist amongst them, and therefore, a judgment involving one may justly be conclusive on the others.

Moreover, Plaintiff's citation to *Giakoumelos v. Coughlin,* 88 F.3d at 61-62, for the proposition that new evidence will defeat collateral estoppel is incorrect. The Second Circuit merely stated that the court should not give preclusive effect if there is a constitutionally infirm judgment. *Id.* There is no proof that such is the case here. The parties were fully able to brief all the issues to the Appellate Division and this Court finds that "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause" were satisfied. Thus, this Court gives preclusive effect to the Appellate Division's decision regarding "substantial evidence." FN9

> FN9. Additionally, as to Plaintiff's claim that the Hearing was based on hearsay, the Court notes that hearsay is permissible in disciplinary hearings. *See Espinal v. Goord,* 2002 WL 1585549, at *1 (S.D.N.Y. July 17, 2002).

**\*12** As for Plaintiff's claim that Plescia was biased and exhibited prejudice, Plaintiff's assertion is wholly conclusory. Plaintiff offers no support for his allegations except that the decision of the Hearing did not go in his favor. *See* Compl. at § IV; Pl.'s Mem. of Law. Furthermore, a review of the Hearing record shows that Plescia erred on the side of caution and adjourned the Hearing on several occasions so that witnesses could be present and Plaintiff could ask his questions. *See generally* Goglia Decl., Ex. 3(D), Hr'g Tr.

Therefore, it is recommended that the Motion for Summary Judgment be **granted.** FN10

> FN10. As for Defendants' assertion that Plaintiff failed to exhaust his remedies in regard to the sufficiency of the Misbehavior Report, the Court need not address the issue since Plaintiff has failed to state a due process claim.

**C. Personal Involvement**

Defendants Miller and Goord assert they were not personally involved in any alleged constitutional violation. Defs.' Mem. of Law at pp. 14-16. Plaintiff states these Defendants are liable in a supervisory capacity. Pl.'s Mem. of Law at p. 15.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (emphasis in original) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). However, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Here, Plaintiff merely claims that Miller is liable because he "is responsible for all that happens within his prison," Goord is liable because he "oversees all that goes on within his system," and Selsky could have corrected the matter when it was before him on appeal. However, as to Goord and Miller, such statements do not demonstrate personal involvement. More importantly, Plaintiff cannot establish any claims for supervisory liability as Plaintiff has failed to show that any "subordinate" Defendant committed a constitutional violation.

Thus, it is recommended that Summary Judgment be **granted** as to Defendants Miller, Goord, and Selsky on this ground.

## III. CONCLUSION

**\*13** For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 23) be **GRANTED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Borcsok v. Early
Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

*1 This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. [FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is
defendants' motion to dismiss pursuant to Fed.R.Civ.P.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not

whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement

claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference can be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain

from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

three named defendants. Docket Nos. 12 & 13. The "John
Doe" defendant has not been served with process or
otherwise identified and it is unlikely that service on him
will be completed in the near future. *See* Docket No. 6
(United States Marshal unable to complete service on
"John Doe"). Since over nine months have passed since
the complaint was filed (Docket No. 1) and summonses
were last issued (Docket entry Oct. 21, 1997), the
complaint as to the unserved defendant should be
dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m)
and N.D .N.Y.L.R. 4.1(b).

                    V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be
GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint
be dismissed without prejudice as to the unserved John
Doe defendant pursuant to Fed.R.Civ.P. 4(m) and
N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this
Report-Recommendation and Order, by regular mail, upon
parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge
written objections to the foregoing report. Such objections
shall be filed with the Clerk of the Court. FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN DAYS
WILL PRECLUDE APPELLATE REVIEW. *Roldan v.
Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary
of Health and Human Services,* 892 F.2d 15 (2d
Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a),
6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is
defendants' motion to dismiss pursuant to Fed.R.Civ.P.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement

claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference can be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

         V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office FN5. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

    FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony G. GILL, Plaintiff
v.
William RIDDICK, Senior Counselor, Mohawk Corr. Fac.;
T. Brown, Sergeant, Mohawk Corr. Fac.; J. Rosado, Deputy
Supt. of Health Care, Mohawk Corr. Fac.; K. Adamik,
Lieutenant, Mohawk Corr. Fac.; Kenneth Perlman, Supt.,
Mohawk Corr. Fac.; D. Malloni, C.O., Mohawk Corr. Fac.;
C.O. Cacocutti,[FN1] C.O., Mohawk Corr. Fac.; G. Watson,
C.O., Mohawk Corr. Fac.; K. Saxena, M.D., Mohawk Corr.
Fac., Defendants.

FN1. Defendants in form this Court that this Defendant's name is misspelled on the Amended Complaint and that the correct spelling is "Cacciotti." Dkt. No. 20 (Defs.' Mem. of Law at p. 1). The Court will refer to this Defendant by the correct spelling and will direct the Clerk of the Court to correct the docket report.

No. Civ. 9:03-CV-1456.

March 31, 2005.

Anthony G. Gill, Livingston Correctional Facility, Sonyea, New York, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, The Capitol, Litigation Bureau, Albany, New York, for Defendants, of counsel.

Lisa Ullman, Assistant Attorney General, of counsel.

REPORT-RECOMMENDATION and ORDER

TREECE, Magistrate J.

**\*1** Plaintiff Anthony Gill brings this *pro se* action, pursuant to 42 U.S.C. § 1983, alleging the Defendants violated his civil rights. Dkt. No. 5, Am. Compl. In his Amended Complaint, Gill alleges eight causes of action: (1) Defendant Riddick, Senior Correction Counselor at Mohawk Correctional Facility (Mohawk), filed a false misbehavior report against Plaintiff in retaliation for Gill exercising a First Amendment right; (2) Defendant T. Brown, Sergeant (Sgt.) at Mohawk, filed a false misbehavior report against Plaintiff in retaliation for Gill exercising a First Amendment right; (3) Defendant K. Adamik, Lieutenant (Lt.) at Mohawk, denied Gill his due process rights at a Tier II Disciplinary Hearing; (4) Defendant J. Rosado, Deputy Superintendent of Health at Mohawk, acted in concert with Defendants Riddick, Brown, and Adamik; (5) Defendant D. Malloni, Correction Officer (C.O.) at Mohawk, intentionally destroyed and/or tampered with Plaintiff's legal mail; (6) Defendant Kenneth Perlman, Supervising Superintendent of Mohawk, failed to render a decision on Gill's appeal of his Tier II Hearing disposition; (7) Defendants Cacciotti and G. Watson, C.O.s at Mohawk, subjected Gill to cruel and unusual punishment when, while en route to another facility, they denied Gill the opportunity to use the bathroom causing Plaintiff to urinate on himself, which was responded to with further taunting and humiliation; and (8) Defendant Kailash Saxena, Clinical Physician II, M.D., at Walsh Regional Medical Unit (Walsh or RMU), acted in concert with Defendants Adamik and Riddick and transferred Gill to another facility in retaliation for his exercise of a First Amendment right and to cover up the constitutional violations of the other Defendants.

Defendants filed a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6), on the ground that Plaintiff's Amended Complaint fails to state a cause of action. Dkt. Nos. 20 (Motion) & 28 (Reply). Plaintiff opposes the Motion. Dkt. No. 23.[FN2] For the reasons explained below, it is recommended that Defendants' Motion be granted in part and denied in part.

FN2. This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

## I. MOTION TO DISMISS STANDARD

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

**\*2** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint). In construing the complaint favorably to the pleader, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *see also Scheuer v. Rhodes,* 416 U.S. at 236;*Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). In spite of the deference the court is bound to give to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

The Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520-21) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing Second Circuit opinion in *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun. 11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan. 10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district). As the Second Circuit has noted, Anthony Gill, the Plaintiff herein is no stranger to the courts. *See Gill v. Pidlypchak* 389 F.3d 379, 384 (2d Cir.2004) (noting that the plaintiff therein, Anthony G. Gill, "is no stranger either to the grievance system or to the federal courts"). In light of Gill's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein. [FN3]

> FN3. Gill has filed twenty (20) lawsuits in this district alone:
>
> (1) *Gill v. LeFevre,* 85-cv-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute);
>
> (2) *Gill v. Padilla,* 88-cv-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute);
>
> (3) *Gill v. Burch,* 94-cv-369 (FJS/DNH) (closed on Apr. 1, 1999-Defts.' Mot. for Summ. J. granted);
>
> (4) *Gill v. Kramer,* 98-cv-45 (FJS/GJD) (closed on Sept. 27, 1999-Stip. of Discont.);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

(5) *Gill v. Anderson,* 98-cv-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defts.' Mot. for Summ. J. granted);

(6) *Gill v. Gummerson,* 99-cv-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defts.);

(7) *Gill v. Dann,* 00-cv-566 (NAM/RFT) (closed on Nov. 20, 2001-failure to prosecute);

(8) *Gill v. Tuttle,* 00-cv-585 (DNH/DRH) (currently stayed);

(9) *Gill v. Doe,* 00-cv-983 (GLS/DEP) (closed on June 8, 2004-Defts.' Mot. for Summ. J. granted);

(10) *Gill v. Calescibetta,* 00-cv-1553 (LEK/DEP) (closed on Aug. 5, 2004-frivolous action);

(11) *Gill v. McGinnis,* 00-cv-1787 (LEK/RWS) (*habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000);

(12) *Gill v. Smith,* 00-cv-1905 (FJS/GJD) (currently pending, trial date to be set);

(13) *Gill v. Butero,* 01-cv-82 (LEK/DRH) (closed on Apr. 30, 2003-Defts.' Mot. to Dismiss granted at trial);

(14) *Gill v. Hoadley,* 01-cv-323 (FJS/DEP) (currently pending);

(15) *Gill v. Steinberg,* 02-cv-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.);

(16) *Gill v. Pflueger,* 02-cv-130 (DNH/GJD) (closed on Jan. 30, 2003-Defts.' Mot. to Dismiss granted);

(17) *Gill v. Coyne,* 02-cv-1380 (TJM/GHL) (currently pending);

(18) *Gill v. Pidlypchak,* 02-cv-1460 (JMH/RFT) (currently pending);

(19) *Gill v. Erickson,* 02-cv-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003);

(20) *Gill v. Riddick,* 03-cv-1456 (NAM/RFT) (currently pending).

In light of Gill's litigious track record, as stated above, and the Second Circuit's explicit recognition that Gill has stepped into that rare status for inmate litigants as being deemed not entitled to "special solicitude," we place both parties on notice that FED. R. CIV. P. 11 sanctions may be applicable, when warranted, for any future litigation pursued by Gill. However, Rule 11 sanctions will not be considered for this case.

## II. BACKGROUND

**\*3** The following facts are derived from the Amended Complaint, which on a motion to dismiss this Court must construe as an accurate depiction of what took place. Due to the complexity of the facts involved and the numerous Defendants and claims asserted, the Court shall recite the relevant factual averments, set forth in the Amended Complaint, as it pertains to Gill's separate claims. As a general statement relevant to all claims, the Court notes that on or about June 10, 2002, Gill was transferred from Elmira Correctional Facility to the Walsh Regional Medical Unit (Walsh or RMU).[FN4] Dkt. No. 5, Am. Compl. at ¶ 1. Gill believed that this transfer was due to his chronic asthmatic medical condition. *Id.* Upon admission to Walsh, Gill was housed in the general population medical unit, C-wing, room C2B3-03, and was informed by Defendant Saxena that he was indeed transferred to Walsh due to his asthma condition and

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

would remain there until his scheduled parole board appearance in July 2003. *Id.* at ¶ 2.

FN4. Walsh Medical Center is a regional medical unit located on the grounds of Mohawk Correctional Facility. N.Y. COMP.CODES R. & REGS. tit. 7, § 100.100.

**Retaliation Claims Against Defendants Riddick, Brown, and Rosado-First, Second, and Fourth Causes of Action**

Walsh RMU has a "Problem Solving Committee" chaired by prison officials and inmate representatives from each living unit. Am. Compl. at ¶ 3, Ex. A, Vander Bosch Aff.FN5 at ¶ 3. The inmate representatives are selected by patient/residents of the respective living units, *i.e.,* A-wing, C-wing. *Id.* The C-wing at Walsh is divided into two separate living units, C-1 and C-2. Vander Bosch Aff. at ¶ 4. In the past, C-wing was permitted two inmate/patient representatives, one from the C-1 and one from C-2 living areas, to represent the C-wing before the Problem Solving Committee. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 5. At the time Gill was transferred to Walsh RMU, the C-wing only had one representative, inmate Samuel Kelly, who resided in the C-1 section. Am. Compl. at ¶ 3; Vander Bosch Aff at ¶ 6. Having no general or formal election procedures, the residents of the C-2 area approached Gill and collectively asked that he act as the C-2 Problem Solving Committee representative and work in conjunction with the C-1 representative. Am. Compl. at ¶ 3; Vander Bosh Aff. at ¶ 8. After a majority of the patient/residents in the C-2 living area of the C-wing selected Gill as the C-2 representative, Gill accepted such position. Am. Compl. at 3; Vander Bosh Aff. at ¶¶ 9-11.

FN5. Exhibit A, attached to Plaintiff's Amended Complaint, consists of affidavits of eight inmates all housed at Walsh, in the C-wing, during the relevant time. The Court has reviewed the contents of each affidavit and finds that they generally contain the same information such names, living assignment, and time spent at Walsh. In light of the fact that the affidavits generally contain the same material information, the Court will, in the interest of expedience, make reference to the first Affidavit submitted by Joseph Vander Bosch. It should be noted that in citing to Mr. Vander Bosch's Affidavit,

this Court makes no credibility nor reliability assessments with regard to this Affidavit as being more credible than the other seven Affidavits.

On or about September 1, 2002, Gill discussed his selection as the C-2 representative with Defendant Rosado. Am. Compl. at ¶ 8. On or about September 4, 2002, per the direction of Defendant Rosado, Gill submitted an agenda for the upcoming September 2002 Problem Solving Committee meeting. Am. Compl. at ¶ 4; Ex. B (typed agenda). The agenda, which contained multiple issues that were reviewed and approved by the residents of C-wing, was forwarded to Defendants Rosado and Riddick.FN6 Am. Compl. at ¶ 4. Plaintiff also attached to the agenda a memorandum he wrote to Defendant Riddick, dated August 29, 2002, notifying the recipients that he had been selected as the C-2 representative and would work in conjunction with the C-1 representative, Mr. Kelly. *Id.,* Ex. B. On or about September 5, 2002, Defendant Riddick provided Plaintiff with a copy of the August 21, 2002 Problem Solving Committee meeting minutes. FN7 Am. Compl. at ¶ 5, Ex. C (Memorandum of Minutes of Aug. 21, 2002 Meeting addressed to "All Concerned" from Defendant Riddick).

FN6. Gill also asserts he hand delivered the agenda to Mr. Pryor who is not a Defendant in this action. Am. Compl. at ¶ 4, n. 1.

FN7. It is unclear, and no inference can be drawn one way or another, whether the minutes were provided to Gill in his capacity as representative or as a general circulation given to all resident inmates.

**\*4** On or about the morning of September 7, 2002, Gill asked Defendant Brown about a recent memorandum posted by prison officials concerning the Walsh yard staying open until 11:00 p.m., as well as other issues concerning C-wing. Am. Compl. at ¶ 6. In response, Defendant Brown stated that Gill should mind his business and not be concerned about inmate activities. *Id.* at ¶ 7. Gill then informed Defendant Brown that he had been selected as the C-2 representative to the Problem Solving Committee and C-wing patients had asked him to inquire about their privileges since the posted memorandum was not being honored. *Id.* When Defendant Brown inquired how Plaintiff obtained such representational status, Gill disclosed his previous September 1st conversation with Defendant Rosado who accepted Plaintiff's appointment. *Id.* at

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

¶ 8. After Gill provided Brown with a copy of his August 29th Memorandum, Brown informed Gill that he would check into the yard matter. *Id.*

On or about September 10, 2002, Gill and inmate Kelly, C-1 representative, met with Defendant Riddick in the C-wing yard to discuss issues presented in the September 2002 proposed agenda. *Id.* at ¶ 9. During this meeting, Gill asked Defendant Riddick if the agenda he submitted had been circulated and also inquired as to the date of the upcoming meeting. *Id.* Defendant Riddick responded that there wasn't going to be a meeting until prison officials saw fit and that at no time in the past did the living units have two inmate representatives as one was sufficient. *Id.* at ¶ 10. Riddick also declared that the agenda was too demanding and that Plaintiff would be subjected to disciplinary action for filing the agenda on the basis that he was submitting legal work on behalf of the inmates in C-wing. *Id.* The following day, Gill wrote Defendant Rosado about the encounter with Defendant Riddick and requested Defendant Rosado to confirm, based on their previous September 1st conversation, whether she now disapproved of Plaintiff's selection as the C-2 representative. *Id.* at ¶ 11, Ex. D (typed letter). Defendant Rosado did not respond to Gill's inquiries.[FN8] *Id.*

> [FN8.] Gill states that upon information and belief, inmate Kelly also wrote a letter to Defendant Rosado regarding Defendant Riddick's disapproval of Gill's selection. Am. Compl. at ¶ 11, n. 3. Plaintiff did not submit Kelly's letter but did attach a memorandum from Defendant Rosado to Kelly in response to Kelly's correspondence dated September 6, 2002. *Id.,* Ex. E. In this correspondence, Rosado states, "[t]he correct procedure for an inmate to represent his unit on the problem solving committee is to be elected by his peers [and][t]his procedure is overseen by the Guidance Counselor." *Id.* Gill asserts that Rosado's response to Kelly established for the first time a new policy on how an inmate can become an inmate representative to the Problem Solving Committee. *Id.*

On or about September 12, 2002, Gill was issued two separate disciplinary reports authored by Defendants Brown and Riddick. *Id.* at ¶ 12, Ex. G (misbehavior reports). In his report, dated September 11, 2002, Defendant Brown relayed the substance of his September 7th encounter with Plaintiff, which was in accord with Plaintiff's account, as described above. *Id.*

Defendant Brown further stated that, after his encounter with Gill, he wrote to Defendant Riddick to confirm Gill's representations to which Riddick responded in a written statement that Gill was not the Problem Solving Committee representative.[FN9] *Id.* Brown accused Plaintiff of violating prison rule 107.20 (lying) and 110.10 (impersonation). Defendant Riddick's report, dated September 10 or 11, 2002,[FN10] recounts the encounter between himself and Gill on September 10th in the C-wing outside recreation area, however, such report is not in accord with Plaintiff's version. According to Riddick's report, while Riddick was sitting talking with other inmates in the yard, Gill approached him in an aggressive manner, stood over him, and demanded certain information about the Walsh Problem Solving Committee. Riddick replied that, as he told him throughout the week, Gill is not an inmate representative. *Id.* Riddick claimed that Gill then became loud, stating "you're a racist. You know I file lawsuits and that's why you oppose me as a representative. I am a rep until Administration says otherwise." *Id.* In his report, Riddick asserted that Gill's loud aggressive speech attracted the attention of the other inmates in the yard. *Id.* Defendant Riddick accused Plaintiff of violating rules 107.11 (harassment) and 104.13 (disturbance). *Id.*

> [FN9.] Brown asserts in his report that he attached to the report a copy of Riddick's written statement, however, such statement was not included as an exhibit to Plaintiff's Amended Complaint. Plaintiff asserts that at his disciplinary hearing he requested Riddick's written statement, which was not produced. Am. Compl. at ¶¶ 14 & 17.

> [FN10.] It is unclear whether the report is dated September 10th or 11th.

*5 Plaintiff believed that these reports were false and were filed as retaliation for Plaintiff exercising his right to make oral requests and for filing his grievance agenda for the Problem Solving Committee to address at an upcoming meeting. *Id.* at ¶ 13. Plaintiff filed institutional grievances against Defendants Brown and Riddick for the filing of false disciplinary reports in retaliation for Plaintiff exercising his right to redress grievances to the Problem Solving Committee. *Id.* at ¶ 13, n. 4, Ex. F (grievance).

Due Process/Retaliation Claims Against Defendants Adamik

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

and Rosado-Third and Fourth Causes of Action

The disciplinary reports authored by Defendants Riddick and Brown were consolidated and a Tier II Hearing on both reports commenced on September 16, 2002, with Defendant Adamik presiding as hearing officer. Am. Compl. at ¶ 14. Gill pleaded not guilty to all charges. *Id.* Plaintiff requested witness testimony from Defendants Brown, Riddick, and Rosado, C.O. Swanson, and inmates Kelly and Cruz. *Id.* Plaintiff also requested document production, specifically, the letter sent by Defendant Brown to Defendant Riddick, as referenced in Brown's misbehavior report, as well as any Walsh RMU written policies disclosing the procedures for inmate elections as Problem Solving Committee representative. *Id.* After Gill testified on his own behalf, [FN11] the hearing was adjourned "for witnesses and document production." *Id.* at ¶ 15. On or about September 18, 2002, testimony was procured from inmates Kelly and Cruz, C.O. Swanson, and Defendant Brown. Inmates Kelly and Cruz testified that they were present in the C-wing yard on September 10, 2002, and witnessed the encounter between Defendant Riddick and Gill. *Id.* at ¶ 16. Both inmates asserted that Gill did not at any time harass or create a disturbance. *Id.* Inmate Kelly further testified that throughout the duration of his confinement at Walsh, each housing unit had two inmate representatives and that there hadn't been any "elections" for approximately five years. *Id.* C.O. Swanson testified on Gill's behalf and stated that, on September 10, 2002, he was employed as the "A-man" on C-wing and at no time was he informed by Defendant Riddick, or anyone else, that Plaintiff harassed Riddick or created a disturbance in the yard. Defendant Brown testified about the letter he wrote to Defendant Riddick but could not produce a copy of such letter.

FN11. In his Amended Complaint, Gill asserts the sum and substance of his testimony was as follows:

[P]er [plaintiff's] September 1, 2002, conversation with defendant Rosado about plaintiff being selected as the C-2 inmate Problem Solving Committee representative by his peers, that there was no disapproval of this selection and that defendant Riddick had in fact provided plaintiff with the August 2002 Problem Solving Committee minutes ... and that on information and belief, there hasn't been an election held within the past five years to elect representatives. Further, that plaintiff never violated the alleged prison rules violation

authored by the named defendants.

Am. Compl. at ¶ 15.

On the same date, that is September 18th, Gill submitted a formal complaint to Defendant Perlman to have Defendant Adamik removed from his role as hearing officer due to his prejudice and failure to conduct a fair and unbiased hearing. *Id.* at ¶ 19, Ex. H (typed complaint). In sum Gill complained that during the hearing when he and Adamik disagreed on an issue, Gill stated he would appeal that issue to which Adamik responded "you can appeal this issue, but you're going to los[e]." *Id.* Gill asked Defendant Perlman to assign a different officer to conduct the hearing. *Id.* Defendant Perlman did not respond to Gill's September 18th complaint. *Id.* On September 27, 2002, Defendant Brown approached Gill at his living quarters and stated, "next week you'll be locked up, just because you requested for Dep. Rosado as a witness, you think she'll testify for you. You're guilty, accept it, you're in a no win situation. You keep filing fucking grievances around here you'll be locked up until July, smart ass jailhouse lawyer." *Id.* at ¶ 20. Later that day, Gill filed a grievance against Defendants Brown and Adamik for collusion regarding Gill's disciplinary hearing and asked that Adamik be removed as hearing officer. *Id.* at ¶ 21, Ex. I (typed grievance).

**\*6** On or about October 1, 2002, Plaintiff's hearing was set to continue but was briefly adjourned so Gill could retrieve his documents. *Id.* at ¶ 22. Upon his return to the hearing with his documents in hand, Gill witnessed Defendants Adamik, Rosado, and Riddick exiting a room adjacent to the hearing office. *Id.* at ¶ 23. It appeared to Gill as though the three had been in a conference behind closed doors prior to the re-commencement of his hearing. *Id.* When the hearing re-convened, Gill attempted to place on the record what he had witnessed with respect to these Defendants conversing in a separate room, however, Defendant Adamik prevented Plaintiff from placing such information on the record and arbitrarily dismissed Defendant Rosado as Plaintiff's witness and proceeded instead with the testimony of Defendant Riddick.[FN12] *Id.*

FN12. Gill asserts that Defendant Riddick supplied contradictory testimony that did not support his written report. Am. Compl. at ¶ 23.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

At the conclusion of Gill's hearing, on October 1, 2002, Defendant Adamik found Plaintiff guilty of all charges and sentenced Plaintiff to thirty (30) days keeplock confinement with corresponding loss of privileges, recreation, telephone, packages, and commissary. *Id.* at ¶ 24, Ex. G. Plaintiff's sentence was set to run from October 1st through October 31st. *Id.* In his hearing disposition statement, Defendant Adamik stated the evidence he relied upon was the misbehavior reports and testimony rendered by Gill, Brown, inmates Kelly and Cruz, C.O. Swanson, and Riddick. *Id.,* Ex. G. Adamik further stated that Rosado was dismissed in the middle of the hearing due to Gill's refusal to ask questions when instructed. *Id.*

**Due Process and First Amendment Claims Against Defendants Malloni and Perlman-Fifth and Sixth Causes of Action**

On October 2, 2002, Plaintiff had his Tier II Hearing Appeal notarized by the facility's law library officer. Am. Compl. at ¶ 25. The following morning, Plaintiff issued Defendant Malloni his appeal in a sealed envelope addressed to Superintendent Perlman, with the belief that Defendant Malloni would deposit Plaintiff's mail accordingly. *Id.* at ¶ 26, Ex. J (copy of typed and notarized appeal). As of October 24, 2002, more than fifteen days had elapsed since the filing of Gill's appeal and Defendant Perlman had still failed to render a decision on such appeal. *Id.* at ¶ 34. On or about April 15, 2003, while incarcerated at Five Points Correctional Facility, Gill received a memorandum decision from Captain Bellnier stating that Defendant Adamik's October 1st Tier II Hearing Decision had been reversed and all hearing records were expunged. *Id.* at ¶ 40, Ex. N.

**Eighth Amendment Claims Against Defendants Watson and Cacciotti-Seventh Cause of Action**

On or about October 17, 2002, Plaintiff was transferred from Walsh RMU back to Elmira Correctional Facility. Am. Compl. at ¶ 27. At approximately 9:30 a.m., on October 17th, Gill was escorted to the transporting vehicle by Defendants Watson and Cacciotti. *Id* . at ¶ 28. At approximately 11:00 a.m., while en route to Elmira, Gill informed Watson and Cacciotti that he needed to urinate. *Id.* at ¶ 29. Both Defendants laughed and dismissed Gill's request. *Id.* Plaintiff then urinated on himself. *Id.* When he informed Defendants of his condition, Defendant Cacciotti replied, "Howard Stern would love you on his show." *Id*. Defendants then pulled into a mini-mart gas station at which

time Plaintiff again requested use of the facility to relieve himself; such request was again denied. *Id.* at ¶ 31. Plaintiff was unable to control himself and urinated on himself for a second time. *Id.* When Gill reported his condition to Defendants, Defendant Cacciotti replied, "I don't care if you shit on yourself." *Id.* Plaintiff arrived at Elmira at approximately 12:10 p.m.

**Retaliation Claim Against Defendant Saxena-Eighth Cause of Action**

**\*7** On or about November 12, 2002, while confined at Elmira, Plaintiff's correction counselor informed Plaintiff that he had been transferred from Walsh for "medical reasons." *Id.* at ¶ 37. On or about December 11, 2002, Gill filed a grievance against Defendant Saxena for retaliatory transfer. *Id.* at ¶ 38, Ex. M (grievance). In his grievance, Gill stated that Saxena's transfer was retaliation for his exercise of his constitutional rights and Saxena conspired with other Walsh RMU officials to deny Gill his rights. *Id.,* Ex. M. Gill also requested Saxena explain the medical reasons that led to his transfer. *Id.*

### III. DISCUSSION

### A. Retaliation Claims

In Plaintiff's First, Second, Third, Fourth, and Eighth Causes of Action, Gill asserts that Defendants Riddick, Brown, Adamik,[FN13] Rosado, and Saxena retaliated against him for engaging in constitutionally protected activity and in doing so, violated his First Amendment rights as well as his Fourteenth Amendment Substantive Due Process rights.

> **FN13.** In moving for dismissal, the Defendants have not construed a retaliation claim to have been asserted against Defendant Adamik. However, Plaintiff clearly states in his Amended Complaint that "the protected conduct was the substantial and motivating factor in the decision by defendant Adamik to punish and discipline plaintiff[ .]" Am. Compl. at ¶ 47.

The retaliatory actions vary with each Defendant. With regard to Defendants Riddick and Brown, the adverse action is the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

filing of false misbehavior reports; Defendant Adamik is alleged to have conspired with Defendants Riddick, Brown, and Rosado in rendering a guilty determination on both reports; Defendant Rosado acted in concert with Defendants Riddick, Brown, and Adamik; and Defendant Saxena transferred Gill to another facility.

First, with regard to Gill's assertion that Defendants Riddick and Brown filed false misbehavior reports against him, we note that prisoners have no constitutional right to be free from being falsely accused, and thus, the filing of a false report does not give rise to a constitutional violation *per se. Freeman v. Rideout,* 808 F.2d 949, 950 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to A *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman,* at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564-66. In the case at bar, however, Gill is asserting that Defendants Riddick and Brown filed false reports against him as *retaliation* for the exercise of a constitutional right and thus violated his substantive due process right, under the Fourteenth Amendment, as well as his First Amendment right. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 587-90 (citing cases) ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights."). Thus, we may properly proceed with an assessment of Gill's retaliation claims against these Defendants.

**\*8** To state a claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech

and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997) (alleging retaliatory transfers).

The Second Circuit has noted that retaliation claims are prone to abuse, therefore, courts should examine such claims "with skepticism and particular care." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467-68 (S.D.N.Y.1998).

In *Flaherty v. Coughlin,* the Second Circuit described three different methods of pleading retaliation, each requiring separate analysis by the court. 713 F.2d 10, 13 (2d Cir.1983). First, a retaliation claim supported by "specific and detailed allegations" must be pursued with full discovery. *Id.* (cited in *Carpio v. Walker,* 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15, 1997)). Whereas, a claim asserting retaliation in "wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* ("In such a case, the prisoner has no factual basis for the claim other than an adverse administrative decision and the costs of discovery should not be imposed on defendants."). The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.; see also Carpio v. Walker,* 1997 WL 642543, at \*6.

The first prong of a retaliation analysis requires this Court to assess whether Gill was engaged in constitutionally protected activity. In construing Gill's Complaint, it appears that the protected activity at issue is two-fold. On the one hand, Gill asserts he had a constitutional right to serve as the C-2 wing inmate representative to the Walsh Problem Solving Committee and to participate on that Committee without repercussion. On the other hand, Gill asserts that the filing of his "Grievance Agenda" and making oral complaints about the facility's procedures and enforcement therewith was the protected activity and the motivating factor for the retaliation he received. While the Defendants focus on the former theory,

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

this Court finds that it is Gill's latter theory which saves his claim from dismissal at this juncture. Such theory is not raised for the first time in his opposition to the Defendants' Motion as Defendants suggest.[FN14] In fact, Gill makes multiple references in his Complaint to his filing a "Grievance Agenda" as well as making oral complaints which, in his estimation, served as the basis for the retaliatory backlash he received, namely, false reports, guilty determinations, and a facility transfer. Our assessment that the agenda and statements are the primary constitutional activities at issue is further bolstered by Gill's assertion that Defendants Riddick, Brown, Rosado, and Adamik violated New York's Correction Law § 138, which states in pertinent part: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4). We now assess whether Gill has properly met the first prong of the retaliation analysis.

FN14. In their Reply, Defendants assert that Plaintiff, in his Opposition, "shifts his focus towards arguing that the retaliation against him was instead because he filed grievances, which defendants admit would be constitutionally protected conduct under the law." Dkt. No. 28, Defs.' Reply at p. 2. Defendants then point out that Plaintiff only mentions the filing of grievances in a footnote in his Amended Complaint. *Id.* It is this Court's estimation that Defendants have misconstrued, to some extent, Plaintiff's use of the word "grievance," in categorically stating that he shifted his focus. It is clear from both the Amended Complaint and Plaintiff's Opposition to Defendants' Motion that the "grievance" Plaintiff refers as the basis for the retaliatory acts is primarily the "grievance agenda" he submitted for the upcoming Problem Solving Committee meeting. That is not to say that the Plaintiff has not alleged, that the Grievance he filed against Defendant Riddick for threatening him with disciplinary conduct, attached to the Amended Complaint as Exhibit F, may also have played a role in the retaliatory actions. We only point out that Gill has not attempted to salvage his claims by asserting new theories in his Opposition papers.

**\*9** First, we address Gill's participation on the Problem Solving Committee, which Defendants assert is not protected conduct. While the Second Circuit has not definitively weighed in on the matter, other district courts throughout this Circuit have held

that an inmate's participation as a member of a formal problem solving committee, such as the Inmate Grievance Resolution Committee (IGRC) or the Inmate Liason Committee (ILC), is protected activity. In *Alnutt v. Cleary,* 913 F.Supp. 160 (W.D.N.Y.1996), the court held that an inmate has a protected First Amendment right to "engage in his duties as IGRC representative without fear of reprisal or retaliation." 913 F.Supp. at 169. In reaching this determination, the court relied on a multitude of precedents establishing an inmate's protected right to seek redress for grievances. First, the court began with the premise recognized by the Second Circuit in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988) that "prisoners must be permitted the 'free and uninhibited access' to both administrative and judicial forums for the purpose of seeking redress of grievances." *Id.* (quoting *Franco,* 854 F.2d at 589). The court then cited the following precedents amongst the district courts in this Circuit, as well as cases from sister Circuits, holding that petitioning for redress of grievances is protected activity:

*Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995) (inmate stated cause of action where he alleged retaliation as result of administrative complaint he filed against corrections officer); *Morrison v. Lefevre,* 592 F.Supp. 1052 (S.D.N.Y.1984) (inmate stated cause of action where he alleged retaliation, due, in part, to assistance he provided to other prisoners in filing lawsuits); *McCorkle v. Walker,* 871 F.Supp. 555 (N.D.N.Y.1995) (inmate stated a claim where he alleged that a prison nurse filed false charges against him in retaliation for his informing prison officials that she was nurse on duty when another inmate nearly drowned in infirmary); *Payne v. Axelrod,* 871 F.Supp. 1551 (N.D.N.Y.1995) (inmate stated cause of action where he alleged that a razor blade was planted in his cell in retaliation for reporting that a corrections officer set a fire in an inmate's cell); *Cale v.. Johnson,* 861 F.2d 943 (6th Cir.1988) (inmate stated cause of action by alleging retaliation for complaining to associate warden concerning the poor quality of the food); *McDonald v. Hall,* 610 F.2d 16 (1st Cir.1979) (inmate stated cause of action where he alleged that he was transferred in retaliation for filing suits against prison officials, and for giving legal assistance to other inmates).

*Alnutt v. Cleary,* 913 F.Supp. at 169.

The court then noted that the *principles* established in the above cases "support the concept that [the inmate plaintiff] has

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

a protected First Amendment right to engage in his duties as IGRC representative without fear of reprisal or retaliation." *Id.* (emphasis added). Then, after explaining the statutory evolution of the IGRC, the court explained that the inmates who filed grievances with the IGRC were exercising their First Amendment right to petition the government for redress of grievances and that "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Id.* at 169-70. As such, the court held that the inmate possessed a "constitutional right to be protected against retaliation by state officers who are not pleased with the activities engaged in and decisions made by [the inmate plaintiff] as IGRC representative." *Id.* Thus, it appears to this Court that an inmate's constitutionally protected right to serve as a grievance committee representative is derived from the inmates' protected rights to petition for redress. This derivative right has been upheld in other courts in this Circuit. *See Greene v. Coughlin, 1995 WL 60020, at *15 (S.D.N.Y. Feb. 10, 1995)* (analyzing, in the context of a procedural due process claim, whether an inmate had a liberty interest in maintaining position as IGRC representative and if certain procedures were mandated prior to removal from such position); *McCorkle v. Juchenwicz, 1999 WL 163205, at *1 (S.D.N.Y. Mar. 23, 1999)* (upholding an inmate's right to serve on the ILC and citing *Alnutt, inter alia,* in support of the ruling that "an inmate grievance committee representative has a constitutional right to seek redress of the grievances of other inmates without fear of retaliation"); *Maurer v. Patterson, 197 F.R.D. 244, 247 n. 3 (S.D.N.Y.2000)* (noting, in the context of deciding a Rule 50 motion for judgment as a matter of law, that an inmate has a protected right to engage in duties as IGRC representative); *Garrett v. Reynolds, 2003 WL 22299359, at *4 (N .D.N.Y Oct. 7, 2003)* (citing *Alnutt* for the proposition that an inmate has a "constitutional right to be protected from retaliation based upon his activities as an IGRC representative").

**\*10** Thus, in construing *Alnutt,* we find that prisoners have a constitutional right to serve as a grievance committee representative. While other courts have limited the *Alnutt* holding to participation on the IGRC and ILC, we do not believe the reasoning applied therein supports such limitation in the case at bar.[FN15] If an inmate's right to serve on a "formal" committee, like the IGRC, is derived from an inmate's right to seek redress of grievances, and not from the "formal creation" or state mandate of the committee, then it cannot be said that such right is solely limited to activities on a formal resolution

committee.[FN16] It would be more consistent to rule that an inmate serving on an "informal" grievance committee would also be entitled to constitutional protection since he would be performing the same tasks as a representative on a formal committee, such as the IGRC.[FN17] The difference between formal and informal grievance committees is a distinction without form or reason. This leads us to an analysis of the other protected activity Gill asserts was the basis for retaliatory conduct imposed on him, that is, his filing of the grievance agenda and making oral complaints. We find that such conduct is clearly protected. *See McCorkle v. Walker, 871 F.Supp. 555, 559 (N.D.N.Y.1995)* (protected conduct at issue in plaintiff's retaliation claim was that he informed prison officials that the defendant nurse had been on duty at the infirmary when another inmate nearly drowned); *Gaston v. Coughlin, 81 F.Supp.2d 381, 386 (N.D.N.Y.1999)* (protected conduct at issue was plaintiff's complaints to mess hall staff that his work schedule was a violation of state law). Moreover, New York State has enacted legislation that specifically protects Gill's conduct: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of insitutional conditions, policies, rules, regulations, or laws affecting an institution." *N.Y. CORRECT. LAWW § 138(4);* *see also Gaston v. Coughlin, 81 F.Supp.2d at 386* (noting that the prisoner's "attempts to obtain redress of a perceived violation of State law" were protected under both the Constitution and New York law); *Salahuddin v. Harris, 657 F.Supp. 369, 376 (S.D.N.Y.1987)* (noting that *§ 138(4)* "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population). Thus, since clearly Gill's attempts to seek redress of grievances is protected activity, it is worth repeating, "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Alnutt, 913 F.Supp. at 169-70.*

FN15. Defendants similarly construe that an inmate's right to serve on a grievance committee is limited to the formal committee, namely, the IGRC. Dkt. No. 20 (arguing that "activities conducted as part of an informal problem resolution committee do not have the same protection" as IGRC activities, if protected, since "there is no case law supporting such an argument").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

FN16. In researching the genesis of an inmate's right to serve on a grievance committee, the Court found an unpublished Tenth Circuit opinion where the court was asked to decide whether an inmate has a protected right to provide legal work on behalf of another inmate. *See Northington v. Zavaras,* 229 F.3d 1164 (Table), 2000 WL 1133128 (10th Cir. Aug. 10, 2000). The circuit court stated that precedence in that circuit mandated the holding that such a right was not acknowledged. *Id.* at *2. In so ruling, the court noted in a footnote that "other federal courts have held that, *if a state creates a position* such as inmate representative, it must allow the representative to engage in his duties without fear of retaliation." *Id.* (emphasis added) (citing, *inter alia, Alnutt* ). We mention this unpublished decision only to point out that we do not interpret *Alnutt* the same. While the court in *Alnutt* referenced the state creation of the IGRC, the constitutional right to serve on that committee was not derivative of the state created nature of the committee, but rather, on the nature of the inmates' rights to seek redress for grievances.

FN17. In any event, even if we were to find that an inmate is only protected for participation on a formal committee, it is not clear to this Court whether or not the Problem Solving Committee at Walsh RMU was a formal tribunal.

Defendants ask this Court to find that, in light of the Supreme Court decision in *Shaw v. Murphy,* 532 U.S. 223 (2001), the rulings of the various district courts in our Circuit that hold that an inmate's activities on a grievance committee are protected are "no longer with force." Dkt. No. 20 at p. 7. The Court declines this invitation and finds *Shaw* completely distinguishable. First, *Shaw* concerned the constitutionality of a prison policy restricting inmate-to-inmate correspondence. In *Shaw,* Kevin Murphy, an inmate incarcerated at the Montana State Prison, served as an " 'inmate law clerk,' providing legal assistance to fellow prisoners." 532 U.S. at 225. Murphy learned that another inmate had been charged with assaulting a correctional officer and decided to assist the inmate with his defense. *Id.* Prison rules prohibited Murphy from providing assistance, but Murphy nonetheless investigated the alleged assault. *Id.*[FN18] Murphy then sent a letter to the accused inmate discussing his investigation. However, in accordance with prison policy, such correspondence was intercepted by prison officials. *Id.* at 225-26. Based upon the content of the letter, specifically, the accusations against the assaulted correction officer, Murphy was cited for violations of various disciplinary rules, and, after a hearing, was found guilty of violating two of those rules. *Id.* at 226.

FN18. Prison policy forbade Murphy, a "high-security" inmate from meeting with maximum security inmates. *Murphy,* 532 U.S. at 225 n .1.

*11 Before examining the Supreme Court's holding, we pause to point out some other distinctions, that is, in *Shaw* the inmate acted as a *legal representative* for inmates and sought to represent another inmate in court on his criminal charge of assault; whereas a representative on a grievance committee does not act as a legal representative, but rather, as a facilitator or adjudicator of grievances. Furthermore, the Court in *Shaw* was asked to decide "whether prisoners have *any* First Amendment rights when they send legal correspondence to one another." *Id.* (emphasis in original). Thus, the Court analyzed whether the prison policy at issue restricting inmate-to-inmate communications passed the constitutional test established in *Turner v. Safely,* 482 U.S. 78 (1987), which directs courts to ask wether the "restrictions are reasonably related to legitimate and neutral governmental objectives ." *Id.* (citing *Turner,* 482 U.S. at 89). Here, we are not asked to construe the constitutionality of any prison policy restricting Gill's communications.

In applying the *Turner* Test to the prison policy at issue, the Supreme Court in *Shaw* declined to afford First Amendment protection to inmates providing legal assistance to other inmates "beyond the protection normally accorded prisoners' speech." *Id.* at 231. We find such holding to be inapplicable to inmates participating on grievance committees in light of the fact that such participation and activities do not constitute legal work, but rather, involve a duty to investigate and adjudicate matters being grieved. Thus, it can hardly be said that a grievance committee member's role is analogous to an inmate performing legal work on behalf of other inmates. Taking this one step further, we also believe that the filing of an institutional grievance by an inmate on behalf of himself as well as others who share the same grievance is not comparable to providing legal assistance to other inmates. We also note that, as explained above, the right to serve as a grievance committee representative derives from an inmate's right to seek redress of grievances, a right undoubtedly protected by the Constitution.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

The inmate in *Shaw* argued that his right to provide legal advice "follows from a right to receive legal advice." 532 U.S. at 231 n. 3. In response, the Supreme Court noted that "even if one right followed from the other, Murphy is incorrect in his assumption that there is a free-standing right to receive legal advice." *Id.* (citing previous Supreme Court precedence limiting an inmate's right to receive legal advice from other inmates "only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (internal quotation marks and citations omitted). Neither the Supreme Court nor any court in our Circuit has similarly limited an inmate's right to seek redress of grievances.

**\*12** Finding that Gill has satisfied the first prong, our analysis of his retaliation claims continues. Under the second prong, a prisoner must allege that the Defendants took adverse action against him. The third prong requires an assessment of whether there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. To satisfy the second prong, a prisoner must present evidence inferring that Defendants acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492

(cited in *Davis,* 320 F.3d at 353).

As stated above, the adverse conduct varies with each Defendant. First, with regard to Defendant Rosado, it is unclear to this Court the precise role Gill alleges Rosado played in retaliating against him. Stated another way, it is unclear what adverse action was taken by Rosado. Gill's bald assertion that Rosado conspired with other Defendants to deny Gill his constitutional rights is wholly conclusory. It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Defendant Rosado's involvement is rather limited. According to Gill's Amended Complaint, he discussed his selection as C-2 representative with Rosado on or about September 1, 2002. Rosado then directed Gill to submit a grievance agenda for the upcoming meeting. Then, after his altercation with Defendant Riddick in the yard, Gill wrote Rosado a letter to confirm their previous conversation regarding his selection as a representative on the committee. Gill never received a response from Rosado. Then, Rosado was set to testify at Gill's hearing but was dismissed by the hearing officer. Based on the above facts, it has not been shown what *action* was taken by Rosado. From these bare facts, we cannot draw the inference that Rosado actively impeded Gill's ability to participate on the committee. It is clear from the facts alleged that, at best, Rosado's failure to speak on Gill's behalf or answer his correspondence, if received, amounts to nothing more than indifference or inactiveness, which is clearly not a constitutional violation. Furthermore, the fact that Plaintiff may have written a letter does not automatically render Rosado responsible for any constitutional violation. *See Thomas v. Coombe,* 1998 WL 391143, at \*6 (S.D.N.Y. July 13, 1998) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N .Y. Sep. 22, 1989) (the wrong must have been capable of mitigation at the time the supervisory official was apprised thereof); *Woods v. Goord,* 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Since Gill has not established any adverse conduct, he has failed to state a retaliation claim against Defendant Rosado. We therefore recommend dismissal of Gill's retaliation claim against Defendant Rosado.

**\*13** Turning to the other Defendants, Gill asserts that Defendants Riddick and Brown filed false misbehavior reports, Defendant Adamik found Plaintiff guilty of the false reports, and Defendant Saxena transferred Gill to another facility. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

moving for dismissal, Defendants focus solely on Gill's transfer from a medical facility to a non-medical facility as the only retaliatory conduct at issue and that such conduct is not adverse where the Plaintiff has not alleged that "his medical needs can only be treated adequately at Walsh and not the facility to which he was transferred." Dkt. No. 20. In his Amended Complaint, Gill explains that upon his arrival at Walsh in June 2002, he was informed by Defendant Saxena that he had been transferred to Walsh due to his asthmatic condition and that he would remain at Walsh until his parole board appearance set for July 2003. The chronology of events unfolded as follows:

| | |
|---|---|
| September 1, 2002 | Gill and Rosado converse about his selection as representative; |
| September 4, 2002 | Gill circulates the grievance agenda; |
| September 7, 2002 | Confrontation between Defendant Brown and Gill; |
| September 10, 2002 | Confrontation between Defendant Riddick and Gill; |
| September 12, 2002 | Gill receives two misbehavior reports, one from Brown, the other from Riddick; |
| September 16, 2002 | Hearing on reports with Defendant Adamik presiding; |
| October 1, 2002 | Defendant Adamik finds Gill guilty and dispenses keeplock punishment for thirty days and corresponding loss of privileges; |
| October 17, 2002 | Gill transferred to another facility on Dr. Saxena's orders |
| April 15, 2003 | Disciplinary disposition overturned; records expunged. |

Based upon this chronology, and focusing on the temporal proximity of Gill's exercise of his constitutional rights and adverse action, coupled with the fact that his disciplinary disposition was overturned on appeal, we find that Gill's retaliation claims against Defendants Riddick, Brown, Adamik, and Saxena, raise at least a colorable suspicion of retaliation such that he is entitled to pursue some discovery. While it is true that Gill has not asserted that the medical care he received at another facility was inadequate, he has at least stated a claim that the transfer itself was improperly motivated. As such, he has stated a cause of action for retaliation.[FN19] Based on the above analysis, we recommend that Defendants' Motion for dismissal of Gill's retaliation First Amendment and substantive due process claims against Defendants Riddick, Brown, Adamik, and Saxena be denied and discovery proceed on these claims.

FN19. We note that in situations where the

defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report"). Thus, Defendants may pursue and defend their motives for their actions in a motion for summary judgment.

B. Procedural Due Process Claims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

Gill asserts that Defendant Adamik violated Gill's constitutional rights when Adamik failed to conduct a fair and impartial hearing, denied Gill the opportunity to present his own witnesses, failed to issue a written statement as to the reason for such denial, and conspired with Defendants Riddick, Brown, and Rosado to violate Gill's First and Fourteenth Amendment rights. Gill also asserts that, in committing the conduct above, Defendant Adamik violated New York Correction Law § 138. As to Defendants Malloni and Perlman, Gill maintains that these Defendants violated his constitutional rights when Defendant Malloni destroyed his notarized appeal of his disciplinary hearing and Defendent Perlman failed to render a timely decision on such appeal. It appears to this Court that the claims against these three Defendants center around the disciplinary hearing and are primarily rooted in Fourteenth Amendment Procedural Due Process.

*14 With regard to procedural due process allegations, we note that in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. Arce v. Walker, 139 F.3d 329, 333 (2d Cir.1998) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. Id. If the prisoner successfully establishes the presence of a protected liberty interest, he must then demonstrate that he was deprived of that interest without due process. Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir.1998). If, however, no liberty interest is implicated, then a fortiori, our analysis ceases and the claim should be dismissed.

The deprivation at issue in this case is the thirty (30) day disciplinary sentence in keeplock with corresponding loss of privileges. Therefore, in order for the Court to assess the viability of the process Gill received at his hearing, Gill must initially show that he possessed a liberty interest in remaining free from keeplock and receiving recreation, packages, commissary, and phone privileges. As explained below, the Court finds that Gill cannot establish the existence of such a liberty interest and therefore cannot maintain procedural due process claims against Defendants Adamik, Malloni, and Perlman.

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic

liberty interests in prisoners." ' Arce v. Walker, 139 F.3d at 333 (quoting Hewitt v. Helms, 459 U.S. 460, 467 (1983)). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." Sandin v. Conner, 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." Id. at 484 (quoted in Arce v. Walker, 139 F.3d at 333).

State statutes and regulations may also confer liberty interests on prisoners. Arce v. Walker, 139 F.3d at 334 (citing Kentucky Dep't of Corr., 490 U.S. at 460). Such interests, however, are generally limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. at 484;see also Giano v. Selsky, 238 F.3d 223, 225 (2d Cir.2001) (citing Sandin ); Welch v. Bartlett, 196 F.3d at 392. Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin, 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).

*15 Clearly, the thirty-day sentence to keeplock and corresponding loss of privileges would not fall under the auspice of "the most basic liberty interests" and, therefore, Gill would not have a valid liberty interest arising under the Due Process Clause. As for a state created liberty interest, Gill fails to allege any facts demonstrating that the conditions surrounding his thirty-day punishment were "atypical" or "significant" as to create a liberty interest. As such, where no liberty interests are at stake, no procedures are required. Kentucky Dep't of Corr., 490 U.S. at 460. Since Gill cannot establish he had a liberty interest in remaining free from the punishment imposed at the disciplinary hearing, the Court need not assess the adequacy of the process he received. Accordingly, Plaintiff has failed to state a procedural due process claim. See Husbands v. McClellan, 990 F.Supp. 214, 217 (W.D.N.Y.1998) (citing Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996) for the proposition that loss of privileges, i.e., commisary, recreation, package, and telephone, did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

amount to an atypical and significant deprivation and clearly fell within the expected parameters of the sentence imposed by a court of law); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9 (1979) ("There is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires.") (quoted in *Rouccio v. Coughlin,* 923 F.Supp. 360, 371 (E.D.N.Y.1996)). We further note that, with regard to Defendant Rosado, Gill has failed to allege Rosado's personal involvement in any alleged due process violations. It is therefore, recommended that Defendant's Motion to Dismiss be granted and any procedural due process claims asserted against Defendants Adamik, Malloni, Perlman and Rosado be dismissed. Since we recommend dismissal of the claims asserted against Defendants Perlman and Rosado, these Defendants should be dismissed from this lawsuit.

C. Interference with Legal Mail

In his Fifth Cause of Action against Defendant Malloni, Gill asserts that Defendant Malloni also violated his First and Fourteenth Amendment rights when he tampered with Gill's "legal mail." In this regard, Gill analogizes his prison disciplinary appeal to legal mail and Malloni's interference therewith denied Gill access to the courts. Were we to draw the same analogy, we would nevertheless find such claim to be wholly conclusory and should be dismissed. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ("[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead a litany of general conclusions that shock but have no meaning."); *see also Cekic v. Coombe,* 2000 WL 1373136, at *1 (N.D.N.Y. Mar. 27, 2000) (quoting *Barr*). Notably, Gill's legal mail claim fails to properly allege a cognizable cause of action for interference with legal mail since he only cites to this one instance, he has not pled malicious intent, and he cannot show that he was prejudiced by the interference in light of the fact that the appeal was ultimately decided in his favor.[FN20] *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing cases for the proposition that an isolated incident of tampering is insufficient to state a constitutional violation and in cases where the incidents are few and a violation is not patent, the plaintiff must specifically allege invidious intent or actual harm); *Cancel v. Goord,* 2001 WL 303713, at *4-6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) for the proposition that a prisoner who asserts a First Amendment violation resulting from interference with mail must show that the prison officials

"regularly and unjustifiably interfered with the incoming legal mail," and citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.")). Accordingly, such claims, to the extent stated, should also be dismissed against Defendant Malloni. Since we recommend dismissal of the only claims asserted against Defendant Malloni, we accordingly recommend dismissal of Defendant Malloni from this lawsuit.

> FN20. We also note that his claim against Defendant Malloni involves a significant leap in logic: *If* there was a delay in the decision, *then* Malloni interfered with his mail.

D. Eighth Amendment Claims

**\*16** Gill asserts that Defendants Cacciotti and Watson violated his Eighth Amendment right to be free from cruel and unusual treatment when they denied him the opportunity to use the bathroom while en route to Elmira Correctional Facility and further tantalized him when he informed them that he had urinated on himself. According to the Complaint, Plaintiff boarded the transferring vehicle at approximately 9:30 a.m., he asked to use a bathroom at 11:00 a.m., and arrived at Elmira at approximately 12:10 p.m. Plaintiff's Eighth Amendment claim centers around the hour and ten minutes he was denied access to a lavatory.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane, et al.,* 338 F.3d 155, 161 (2d Cir.2003)). The Eighth Amendment is violated only by those deprivations which deny "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Conditions of confinement rise to the level of an Eighth Amendment violation only when extreme deprivations are imposed. *Hudson v. McMillian,* 503 U.S. 1 (1992). A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

at issue is " ' objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities," ' and that the defendant possessed a " 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain." ' *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)); *see also Wilson v. Seiter,* 501 U.S. 194 (1991). The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed. *Graham v. Fries,* 1996 WL 1057212, at *8 (E.D.N.Y. Oct. 16, 1996). When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the "duration of the condition and the potential for serious physical harm." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); *see also Graham v. Fries,* 1996 WL 1057212, at *8 ("While many conditions may be restrictive and harsh, they do not violate the Eighth Amendment unless they deprive inmates of the minimal civilized measures of life's necessities."). To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was "deliberately indifferent" to the severe deprivation. *Wilson v. Seiter,* 501 U .S. at 304-05.

Applying these standards to the case at bar, we find that, in accordance with case law in this circuit, "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (no violation where prisoner urinated and defecated on himself after being deprived the opportunity to use a toilet for approximately ninety minutes); *see also Odom v. Keane,* 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (absence of a working toilet in prison cell for approximately ten hours, absent any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment); *Bourdon v. Roney,* 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (pre-trial detainee deprived of bathroom privileges for a maximum of three hours "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time").[FN21] Gill has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most. No matter how humiliating urinating on oneself can be, since Gill has failed to prove the objective component, we need not reach the subjective component because "without a constitutional violation, Defendants clearly could not have acted with "deliberate indifference." *Odom v.*

*Keane,* 1997 WL 576088 (S.D.N.Y. Sept. 15, 1997). As such, Gill has failed to allege a cognizable cause of action under the Eighth Amendment. We therefore recommend granting Defendants' Motion to Dismiss as to this ground and, since this Eighth Amendment violation was the only cause of action asserted against Defendants Cacciotti and Watson, we recommend dismissing these Defendants from this lawsuit.

> FN21. Plaintiff's reference to *Hope v. Pelzer,* 536 U.S. 730 (2002), in support of his Eighth Amendment claim is misplaced. The plaintiff in *Hope* had been handcuffed, naked, to a hitching post for seven hours and was exposed to an extraordinary summer sun. Here, the discomfort Gill experienced lasted, at most, seventy minutes.

D. Qualified Immunity

*17 As an affirmative defense, Defendants Riddick, Brown, Rosado, Saxena, Cacciotti, and Watson assert they are entitled to qualified immunity. Because we have already recommended dismissal of the Eighth Amendment claims asserted against Cacciotti and Watson, and the retaliation/due process claims against Defendant Rosado, we need not address the applicability of any immunity doctrine. *Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, with regard to Defendants Riddick, Brown, and Saxena, since a constitutional violation has been established, at least at this limited stage of the litigation, we may proceed with an assessment of immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng,* 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

*Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id.* If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)). Finally, if a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N .D.N.Y.2003) (citing, *inter alia, Harhay,* 323 F.3d at 211);*see also Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleadings filed in the present case, thus far, are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather have done so in their Memorandum of Law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 2004 WL 2334909, at *2 (2d Cir. Oct. 18, 2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019);*see also McKenna v. Wright,* 2004 WL 2334909.

*18 The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768, 793 (2d Cir.2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

Essentially, Defendants contend that it was not clearly established that an inmate has a First Amendment right to participate on an informal grievance committee and that the Supreme Court ruling in *Shaw* suggests otherwise. As explained above, we do not agree with the Defendants assessments and find that the conduct engaged in was clearly protected. However, the Court declines to fully adjudicate this affirmative defense until some discovery has been undertaken in this case. Further development of the retaliation claims would put this Court in a better position to assess this defense and would provide Defendant Adamik the opportunity to assert this defense on his behalf. [FN22]

FN22. As noted above, the Defendants did not construe the Amended Complaint to have stated a retaliation claim against Defendant Adamik.

WHEREFORE, based on the foregoing, it is hereby

RECOMMENDED, that Defendants' Motion to Dismiss (Dkt. No. 20) should be denied in part as to Plaintiff's retaliation claims set forth against Defendants Riddick, Brown, Adamik, and Saxena, and these Defendants should be directed to file a response to Plaintiff's Amendment Complaint; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to Plaintiff's retaliation claims against Defendant Rosado; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all due process claims asserted against Defendants Adamik, Perlman, Rosado, and Malloni; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all Eighth Amendment claims asserted against Defendants Cacciotti and Watson; and it is further

RECOMMENDED, that if all the above recommendations are accepted, then Defendants Rosado, Perlman, Malloni, Cacciotti, and Watson be dismissed from this action as all claims against them have been dismissed; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)
(Cite as: 2005 WL 755745 (N.D.N.Y.))

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

*FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

**\*19** IT IS SO ORDERED

N.D.N.Y.,2005.
Gill v. Riddick
Not Reported in F.Supp.2d, 2005 WL 755745 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.